UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

EQUAL EMPLOYMENT                          )
OPPORTUNITY COMMISSION,                   )
                                          )
Plaintiff,                                )
                                          )
v.                                        )       Case No. 2:22-cv-00168
                                          )
98 STARR ROAD OPERATING CO.,              )
LLC, doing business as ELDERWOOD          )
AT BURLINGTON,                            )
                                          )
Defendant.                                )

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT
ON THE PLEADINGS**
(Doc. 20)

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this
action against Defendant 98 Starr Road Operating Co., LLC d/b/a Elderwood at
Burlington ("Elderwood") alleging that Elderwood violated § 703(a)(1) of Title VII of
the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e)-2(a)(1), and Title I of the
Civil Rights Act of 1991 ("Title I") by subjecting a class of Black employees to racial
harassment and creating and maintaining a hostile work environment due to their race.

EEOC filed its Complaint in this court on September 6, 2022. (Doc. 1.) Elderwood
answered on November 7, 2022, asserting nineteen affirmative defenses. (Doc. 7.) On
November 28, 2022, Elderwood moved to stay discovery (Doc. 25) pending the outcome
of its motion for judgment on the pleadings, which the court granted in part with respect
to all non-written discovery but denied with respect to the remainder of the motion. *See*
Doc. 33. On December 5, 2022, the EEOC filed a motion to strike Elderwood's sixth and
eighth affirmative defenses (Doc. 26), which the court granted on February 13, 2023. *See*
Doc. 38.

On November 23, 2022, Elderwood moved for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c) arguing Plaintiff has failed to state any viable claim as a matter of law. The EEOC responded on December 23, 2022 (Doc. 31) and Elderwood replied on January 6, 2023 (Doc. 35), at which point the court took Elderwood's motion under advisement.

The EEOC is represented by Alison Bitterly, Esq., Katie N. Linehan, Esq., and Kimberly A. Cruz, Esq. Elderwood is represented by Caroline J. Berdzik, Esq., Christopher P. Maugans, Esq., and Pietro J. Lynn, Esq.

I.      **Whether Elderwood's Exhibits are Incorporated by Reference in the Complaint, or Whether the Exhibits are Integral to the Complaint.**

"[E]vidence outside of the pleadings may not be considered by the [c]ourt when deciding a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(c)." *Jureli, LLC v. Schaefer*, 53 F. Supp. 3d 552, 554 (E.D.N.Y. 2014); *see also Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 396 (S.D.N.Y. 2012) ("When matters outside the pleadings are presented in support of, or in opposition to a [Rule 12(c)] motion, a district court must either exclude the additional material and decide the motion on the [pleading] alone or convert the motion to one for summary judgment[.]") (quoting *Stephens v. Bayview Nursing & Rehabilitation Ctr.*, 2008 WL 728896, at *2 (E.D.N.Y. Mar. 17, 2008)) (alterations in original). However, "courts may on a Rule 12(c) motion—just as on a Rule 12(b)(6) motion—consider extrinsic material that the complaint 'incorporates by reference,' that is 'integral' to the complaint, or of which courts can take judicial notice[.]" *Lively v. WAFRA Investment Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). "[W]here a court does draw from . . . extrinsic material, it must construe all reasonable inferences in the non-movant's favor." *Id.* at 305-06 (citing *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 760-63 (D.C. Cir. 2019)).

"To be incorporated by reference, the complaint must make 'a clear, definite[,] and substantial reference to the documents.'" *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327,

330-31 (S.D.N.Y. 2003)). "'[L]imited quotation' of documents not attached to the complaint 'does not constitute incorporation by reference.'" *Id.* (quoting *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985)).

"A document is integral to the complaint where the plaintiff (1) has 'actual notice' of the document and its information and (2) has 'relied upon the documents in framing the complaint.'" *McLennon v. City of New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) (internal citation omitted); *see also Chambers*, 282 F.3d at 153 (explaining that a document is integral to the complaint when the complaint "relies heavily upon its terms and effect") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

Elderwood's motion for judgment on the pleading relies on two documents not attached to the Complaint: a "progress note" relating to a resident with probable Alzheimer's as well as other conditions who allegedly targeted a specific Elderwood staff member with a physical assault and racial harassment (Doc. 20-2); and an October 2020 article from *Seven Days* about the facts giving rise to this lawsuit (Doc. 20-3). The EEOC asserts that neither of these documents was integral to or incorporated in the Complaint, however, the Complaint alleges that:

> Elderwood was on notice of the race-based comments and conduct to which the Aggrieved Individuals were subjected. Specifically:
>
> . . .
>
> Multiple Aggrieved Individuals noted race-based comments and conduct by Elderwood's residents contemporaneously in resident care notes (known as "Progress Notes"), which were routinely reviewed by Elderwood management;
>
> Through the publication of an October 2020 article in a Vermont-based publication called "Seven Days" that detailed the racial abuse of Black employees at Elderwood, https://www.sevendaysvt.com/vermont/black-staff-say-burlington-nursing-home-failed-to-protect-them-from-abuse/Content?oid=31476734.

(Doc. 1 at 4-6, ¶¶ 12(g)(v), (vi).)

Because the Complaint specifically asserts that the "progress notes" put Elderwood on notice of residents' abuse of staff, the progress note attached to its motion

for judgment on the pleadings may be considered without converting Elderwood's motion into one for summary judgment.

Similarly, the Complaint asserts the *Seven Days* article put Elderwood on notice and references the article by date and publication, and includes a hyperlink to it. When a plaintiff includes a hyperlink in their complaint, courts have found the linked item is incorporated by reference therein.[1] The *Seven Days* article is thus integral to the Complaint and may be considered in adjudicating the pending motion.

## II.   The Complaint's Allegations.

The EEOC is a federal agency charged with enforcing federal antidiscrimination laws, including Title VII. Elderwood is a Vermont corporation that operates a senior care facility in Burlington, Vermont. The Complaint alleges that at all relevant times Elderwood continuously had at least fifteen employees and was an employer engaged in an industry affecting commerce under §§ 701(b), 701(g), and 701(h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), (h).

Felicia Ivy, Dian Murphy, Nicole Ferguson, Londia Bradstreet, Faith Robinson, and Papa Ndour (collectively, the "Aggrieved Individuals") are Black, and are former employees of Elderwood. Each filed a charge of discrimination with the EEOC alleging Title VII violations by Elderwood. On March 23, 2022, the EEOC issued Letters of Determination for each of the six charges, finding reasonable cause to believe that Elderwood violated Title VII. The Letters of Determination further requested that Elderwood engage with the EEOC in "informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief." (Doc. 1 at

---

[1] *See, e.g., Goodman v. Bouzy*, 2023 WL 3296203, at *10 n.7 (S.D.N.Y. May 8, 2023) ("Because Goodman included a hyperlink to the phone call recording in his amended complaint, the recording is sufficiently incorporated by reference to be considered on a motion to dismiss."); *Doe #1 v. Syracuse Univ.*, 468 F. Supp. 3d 489, 503 n.11 (N.D.N.Y. 2020) ("The Court finds the videos for which Plaintiffs provided links in the Third Amended Complaint to be 'referenced' therein and will consider them in deciding this motion" to dismiss); *see also Estate of Roman v. City of Newark*, 914 F.3d 789, 796 (3d Cir. 2019) (considering, on a motion to dismiss, an article and press release which were referenced in the plaintiff's amended complaint and which were included by hyperlinks).

2, ¶ 7.) Following the parties' failure to reach a conciliation agreement acceptable to the EEOC on any of the six charges, on June 7, 2022, the EEOC issued a Notice of Failure of Conciliation to Elderwood.

The Complaint alleges that since at least March 2020, Elderwood subjected the Aggrieved Individuals to severe or pervasive race-based harassment as follows:

> White patients/residents of Elderwood including, but not limited to, a White male patient/resident housed in Elderwood's Chittenden Unit (hereafter "White Male Resident") and White female residents housed in Elderwood's Mansfield Unit (hereafter "White Female Residents") repeatedly subjected the Aggrieved Individuals to racist slurs including, but not limited to, calling them "n[******]," "coons," "monkeys," "Black bitches" and other racially offensive epithets. Further, the White Male Resident told many of the Aggrieved Individuals to "go back to Africa."
>
> The White Male Resident subjected the Aggrieved Individuals to race-based threats and race-based assaults including, but not limited to stating that he wished that he could hang Black employees and that he wanted to get a gun to shoot Black employees.
>
> The White Male Resident also subjected the Aggrieved Individuals to violent physical contact including, but not limited to punching LNA Ndour with fists while yelling racial epithets, intentionally hitting LPN Ferguson with a walker, smacking LPN Murphy, and putting his finger on the face of RN Robinson while threatening her.
>
> The race-based comments and conduct were constant and ongoing and were unwelcome and offensive to the Aggrieved Individuals.
>
> The race-based comments and conduct were not just limited to shifts when the Aggrieved Individuals were assigned to specifically care for the offending residents. For example, the White Male Resident would sit in a chair in the main hallway of Elderwood's Chittenden Unit or follow the Aggrieved Individuals throughout the Unit so as to engage in the above-described barrage of racist statements, regardless of who was assigned to care for him.

(Doc. 1 at 3-4, ¶ 12(b)-(f).)[2]

---

[2] Contrary to Elderwood's characterization of the Complaint, it does not only allege "conduct by a single 'White Male Resident.'" (Doc. 35 at 4.) It, instead, alleges that "White patients/residents" engaged in the racial harassment "including, but not limited to" the White Male Resident. (Doc. 1 at 3, ¶ 12b.)

The EEOC asserts Elderwood was on notice of the race-based comments and conduct experienced by the Aggrieved Individuals because its managers and supervisors personally observed it, received complaints about the same from the Aggrieved Individuals, and attended an August 2020 meeting at which the Aggrieved Individuals discussed the alleged harassing comments and conduct. In addition, the Aggrieved Individuals allegedly documented their concerns in progress notes, which were routinely reviewed by management, and at least one Aggrieved Individual reported multiple complaints about race-based conduct through Defendant's employee hotline.

In October 2020, *Seven Days*, a Vermont newspaper, published an article detailing racial abuse of Black employees at Elderwood. After publication of the *Seven Days* article, among other things, Elderwood met with the Vermont Commissioner of the Department of Disabilities and Aging to discuss the article, but allegedly took no "effective remedial action[,]" *id.* at 7, ¶ 12(i), other than attempt to transfer a male patient elsewhere.

The EEOC claims Elderwood "failed to prevent and then failed to take prompt and effective remedial action to stop or remedy the unwelcome and unlawful behavior." *Id.* at 6, ¶ 12(h). In addition to failing to take corrective action, Elderwood allegedly denied that ongoing racial harassment was taking place and disregarded the Aggrieved Individuals' complaints. It also allegedly advised the Aggrieved Individuals that it was a patient's right to say "what they want" including racial slurs. *Id.* at 6, ¶ 12i(ii). The EEOC asserts that the race-based conduct and comments continued from March 2020 through the remainder of each Aggrieved Individual's employment with Elderwood.

The progress notes detail the care of one male patient in June and September 2020 and state that the patient "physically assaulted/punched a staff member . . . prompting an ED visit" and that the patient "has been targeting this specific staff member and making racist comments." (Doc. 20-2 at 2.) When asked about an altercation with the nurse, the resident demonstrated no remorse and, among other things, uttered a racial slur. The notes state that the patient has probable Alzheimer's and suffers from memory loss.

The *Seven Days* article reports that employees "described racist encounters with

several patients but said that one 83-year-old white man in particular has tormented them since he moved into the facility in March." (Doc. 20-3 at 2.) Employees stated that managers not only tolerated this behavior, but "failed to tell him it's wrong." *Id.* The article conceded that the resident's "many diagnoses include 'unspecified dementia with behavioral disturbance'" but that "staff members expressed skepticism that the condition was responsible for his conduct." *Id.* at 3. One staff member stated to *Seven Days*, "I'm not upset because this man did this. What upset me is that Elderwood failed to protect me and the other people of color. They failed to protect us." *Id.*

In its prayer for relief, the EEOC requests a permanent injunction prohibiting Elderwood from maintaining a racially hostile work environment and requiring it to remediate its practices and seeks compensatory and punitive damages on behalf of the Aggrieved Individuals.

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Federal Rule of Civil Procedure 12(c) provides "[a]fter the pleadings are closed-- but early enough not to delay trial--a party may move for judgment on the pleadings." "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (alteration in original) (internal citations and quotation marks omitted) (quoting *Patel v. Contemp. Classics*, 259 F.3d 123, 126 (2d Cir. 2001)).

To survive a Rule 12(c) motion, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009)). The sufficiency of a plaintiff's complaint is evaluated using a "two-pronged approach[.]" *Hayden*, 594 F.3d at 161 (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The

7

court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (internal citation omitted).

Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"Like a motion under Rule 12(b)(6), a motion under Rule 12(c) may be filed before discovery is complete." *Lively*, 6 F.4th at 301. "Until both parties have an opportunity to test their evidence at summary judgment or trial, [the court] must accept the non-movant's pleadings as true and decline to weigh competing allegations asserted by the moving party." *Id.* Judgment on the pleadings "is not appropriate if there are issues of fact." *Id.* The mandate to "accept as true all of the factual allegations set out in plaintiff's complaint" seeks "to avoid hastily dismissing complaints of civil rights violations[.]" *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).

### B.     Whether the EEOC Plausibly States a Hostile Work Environment Claim Under Title VII.

Title VII prohibits employers from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex[,] or national origin." 42 U.S.C. § 2000e-2(a)(1). A hostile work environment claim under Title VII "requires a showing [] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). To maintain its hostile work environment claim, the EEOC must plausibly allege that Elderwood "knew, or in

the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000).

### 1.    Whether Elderwood May be Held Liable for the Actions of its Residents.

Elderwood seeks dismissal of the EEOC's hostile work environment claim, arguing it cannot be liable for the discriminatory acts of its resident-patients because its residents are not its employees, cannot be fired or disciplined, and because Elderwood is bound by federal regulations that forbid the use of "physical or chemical restraints imposed for purposes of discipline or convenience" which are "not required to treat the resident's medical symptoms." (Doc. 20-4 at 6) (internal quotation marks omitted) (quoting 42 C.F.R. § 483.10(e)(1)).

"[I]t is well-established that employers may be held liable for harassment by third parties when that conduct creates a hostile work environment[,]" and the "employer knew or reasonably should have known about the harassment and failed to take reasonable remedial action." *Davis v. Vermont, Dept. of Corrs.*, 868 F. Supp. 2d 313, 330 (D. Vt. 2012) (collecting cases); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 446 (2013) ("[A]n employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment."); *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) ("[W]hen the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence."); *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) (holding that "employers are liable for harassing conduct by non-employees where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct"). For this reason,

> it makes no difference whether the person whose acts are complained of is
> an employee, an independent contractor, or for that matter a customer.
> Ability to "control" the actor plays no role. Employees are not puppets on
> strings; employers have an arsenal of incentives and sanctions (including
> discharge) that can be applied to affect conduct. It is the use (or failure to
> use) these options that makes an employer responsible—and in this respect

9

> independent contractors are no different from employees. Indeed, it makes no difference whether the actor is human. Suppose a patient kept a macaw in his room, that the bird bit and scratched women but not men, and that the Hospital did nothing. The Hospital would be responsible for the decision to expose women to the working conditions affected by the macaw, even though the bird (a) was not an employee, and (b) could not be controlled by reasoning or sanctions. It would be the Hospital's responsibility to protect its female employees by excluding the offending bird from its premises.

*Dunn v. Washington County Hospital*, 429 F.3d 689, 691 (7th Cir. 2005).

Elderwood urges the court to follow *Wright v. Monroe Community Hosp.*, 493 F. App'x 233 (2d Cir. 2012), wherein the plaintiff-nurse brought a hostile work environment claim based on race against her employer for the harassing conduct of a patient who repeatedly called the plaintiff the N-word. The court concluded that the plaintiff failed to allege facts that would "provide 'a specific basis . . . for imputing the objectionable conduct to the employer,' . . . because the hospital cannot be held responsible for the outbursts of a patient suffering from dementia." *Id.* at 235. Because *Wright* is a Summary Order, it is neither precedential nor controlling. *See* 2d Cir. R. 32.1.1 ("Rulings by summary order do not have any precedential effect."). Moreover, unlike *Wright*, this is not a case in which a single patient suffering from dementia is alleged to have uttered racial slurs. Instead, in addition to allegations of physical assaults, the EEOC alleges racially hostile conduct and comments from a number of patients to the Aggrieved Individuals and further alleges that Elderwood knew of this conduct and repeatedly failed to redress it.

Other courts have held that long-term care facilities may be liable under Title VII for hostile work environment claims if the facility knew or should have known about the harassment of its employees but failed to take appropriate remedial measures. This may be true even when the harassment is caused by cognitively impaired patients, provided some form of remedial measure remains available. *See, e.g.*, *Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320, 326 (5th Cir. 2019) (recognizing "that there is not a categorical bar on hostile environment claims arising from harassment by patients" even when harassing resident had dementia); *see also Crist v. Focus Homes, Inc.*, 122 F.3d

10

1107, 1108 (8th Cir. 1997) (reversing grant of summary judgment when a mentally handicapped resident of a care facility sexually assaulted a caregiver). This is because "[t]he focus is not on the conduct itself but on the employer's behavior in response; a hospital cannot control every act of its patients, but it does control the environment at large." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001).

Elderwood asserts that long-term care facilities "are subject to extensive federal and state regulations designed . . . to protect residents, to ensure residents are not limited in their exercise of federally-specified 'resident rights,' and to protect residents from abuse, neglect, or exploitation, among other extensive requirements." (Doc. 20-4 at 12.) Elderwood cites 42 C.F.R. §§ 483.10 and 483.15, which "limit a facility's ability to discharge or transfer a resident involuntarily, unless certain stringent standards are satisfied" and which provide that facilities may only "attempt to transfer or discharge a resident in very narrow circumstances." (Doc. 20-4 at 12.) "Courts are permitted to take judicial notice of the contents of the Federal Register and the Code of Federal Regulations and guidance from administrative agencies." *Romero v. Bestcare Inc.*, 2017 WL 1180518, at *3 n.5 (E.D.N.Y. Mar. 29, 2017). At this stage, however, these regulations do not entitle Elderwood to judgment on the pleadings because the EEOC has plausibly alleged that remedial measures remained available. *See Duch v. Jakubek*, 588 F.3d 757, 766 (2d Cir. 2009) (ruling that judgment as a matter of law is inappropriate in a Title VII harassment case if there remains "issue[s] of fact as to whether an employer's act is effectively remedial and prompt."). As one court observed:

> [W]ithout resorting to discharging residents, a long-term care facility confronted with a hostile resident has a range of options. It can warn residents before admitting them of the facility's nondiscrimination policy, securing the resident's consent in writing; it can attempt to reform the resident's behavior after admission; and it can assign staff based on race-neutral criteria that minimize the risk of conflict.

*Chaney v. Plainfield Healthcare Center* 612 F.3d 908, 915 (7th Cir. 2010); *see also Ligenza v. Genesis Health Ventures of Massachusetts, Inc.*, 995 F. Supp. 226, 230 (D. Mass. 1998) (concluding that defendant company, which owned long-term care facilities

11

and argued that it was constrained by federal and state regulations, could not "shield itself from liability under Title VII . . . simply by relying on such regulations" because "[a]lthough patients have rights, employees of long term care facilities also have the right to a workplace free from . . . harassment").

Because there is no bright-line rule preventing employees from bringing Title VII hostile work environment claims against a long-term care facility for the harassing conduct of the facility's patients, even those that are cognitively impaired, and because the EEOC has plausibly alleged that "a specific basis exists for imputing the objectionable conduct to the employer," *Alfano*, 294 F.3d at 373, judgment in favor of Elderwood on the grounds that no legal claim exists must be DENIED.

### 2.    Whether the EEOC Plausibly Alleges that the Aggrieved Individuals Suffered from Harassment that was Sufficiently Severe or Pervasive.

"The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano*, 294 F.3d at 373. There is both an objective and a subjective component to this showing: "the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Generally, "[t]he incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry*, 115 F.3d at 149 (internal quotation marks omitted) (quoting *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir. 1989)). To determine whether this standard has been met, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano*, 294 F.3d at 374. To establish a race-based hostile work environment claim under Title VII, Plaintiffs must plausibly allege that the conduct occurred because of their race. *Id.*

Courts within this circuit have "cautioned [that] the existence of a hostile work

environment is a mixed question of law and fact. These kinds of questions are especially well-suited for jury determination[.]'" *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 458 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15, 16 (2d Cir. 2014)) (internal quotation marks omitted); *accord Ringel v. New York City Dep't of Educ.*, 616 F. Supp. 3d 205, 229 (E.D.N.Y. 2022). To determine whether an environment is sufficiently hostile or abusive, a court:

> looks at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interfered with plaintiff's work. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23.

"While the standard for establishing a hostile work environment is high," the Second Circuit has "repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks omitted) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). "The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Whidbee*, 223 F.3d at 70 (internal quotation marks omitted) (quoting *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997)). Moreover, when "the racially offensive language . . . is presented in a physically threatening manner," *Rivera*, 743 F.3d at 24, a hostile work environment is more likely to be found.

The Complaint alleges repeated incidents of racial insults, physical assaults, and threats of deadly force that a reasonable person would find offensive. It further plausibly alleges these race-based incidents were subjectively unwelcome and offensive to the

13

Aggrieved Individuals. These allegations more than suffice to allege a hostile work environment under Title VII.

> "Courts have repeatedly concluded that the use of the [N-word] in the workplace is particularly odious and offensive." *Anderson v. Phoenix Beverages, Inc.*, 2017 WL 9481014, at *14 (E.D.N.Y. July 17, 2017), *report and recommendation adopted*, 2017 WL 4767447 (E.D.N.Y. Sept. 30, 2017). As the Second Circuit has "emphasize[d]," "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the N-word]." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014); *see also White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004) ("'Far more than a "mere offensive utterance, the [N-word] is pure anathema to African-Americans.'"); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the [N-word] can have a highly disturbing impact on the listener. Thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile."). In fact, the word is so abhorrent that "there may well exist circumstances where a single use of the word [the N-word] would rise to the level of a hostile work environment." *Albert-Roberts v. GGG Const., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013); *see also Lovejoy v. Gure-Perez*, 2014 WL 2459656, at *5 (E.D.N.Y. May 21, 2014) ("Plaintiff testified that she was called [the N-word] by her supervisor in an aggressive and intimating tone, with saliva falling onto her body, and loudly enough for others to hear it. Whether considered alone or with additional evidence, this is sufficient to create a hostile work environment.").

*Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 262 (E.D.N.Y. 2019).[3]

"The use of racially offensive language is particularly likely to create a hostile

---

[3] *See also Lumhoo v. Home Depot United States*, 229 F. Supp. 2d 121, 155 (E.D.N.Y. 2002) (holding that "a reasonable person could find that [the plaintiff's] working conditions altered for the worse if over the course of five months or seven months, various management employees as well as a coworker used" the N-word in the plaintiff's presence, "referred to an African-American as a 'moolie,' 'black son of a bitch,' 'tar baby,' 'porch monkey,' made a joke that disparaged [Black people] and referred to them as 'jungle bunnies,' and addressed black individuals as 'you people.'"); *Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 470 (S.D.N.Y. 2017) (concluding that "[b]ecause the term 'monkey' is a particularly demeaning and offensive slur, and because the term was allegedly repeated multiple times," the plaintiff "plausibly alleged a hostile work environment claim" under New York law and § 1981).

work environment when . . . it is presented in a 'physically threatening manner." *Rivera*, 743 F.3d at 24; *see also Whidbee*, 223 F.3d at 70 (concluding that an employee's statement that he "had a rope with which to hang a co-worker" was "physically threatening."); *Price v. Gizzi*, 2012 WL 2120028, at *7 (N.D.N.Y. June 11, 2012) (deciding that Plaintiff plausibly alleged a hostile work environment due to "frequent use of racial slurs" and "that the racist language was—at least on occasion—accompanied by threats of physical violence").

Although courts may consider whether the offensive conduct and speech were beyond the patient's control, they do so on a case-by-case basis. [4] There is thus, again, no bright-line rule precluding liability if the harassing patient is mentally impaired. *See Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320, 326 (5th Cir. 2019) (holding that evidence of "persistent and often physical harassment" by resident of an assisted living facility who suffered from dementia was sufficient to allow a jury to determine whether it was "sufficiently severe or pervasive even considering the medical condition of the harasser"); *EEOC v. Nexion Health at Broadway, Inc.*, 199 F. App'x 351, 354 (5th Cir. 2006) (concluding on summary judgment that it was "objectively unreasonable for an employee in" a nursing home "to perceive a racially hostile work environment based solely on statements made by those who are mentally impaired," but acknowledging that there is no "bright-line rule that employees who care for disabled, elderly patients can never succeed on a [T]itle VII claim," rather, "[t]he specific circumstances of each harassment claim must be judged to determine whether a reasonable person would find the work environment hostile or abusive").

---

[4] *See, e.g., Matu-Dadie v. Wernersville State Hosp.*, 2018 WL 4501538, at *4 (E.D. Pa. Sept. 20, 2018) (concluding on summary judgment that a single incident in which a patient suffering from mental illness told a nurse "I don't like black people" and called her the N-word was insufficient to show that racial harassment was pervasive); *Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001) (ruling an "elderly and obviously impaired [patient's] commentary insufficient to establish sexual harassment" of a care provider under Title VII while he was suffering from Alzheimer's and Parkinson's diseases at summary judgment stage, where the plaintiff did not suffer physical threats or injuries).

Because the Complaint plausibly alleges racial harassment that was sufficiently objectively and subjectively severe or pervasive to alter the conditions of the Aggrieved Individuals' employment and to create an abusive working environment as well as a specific basis for imputing that conduct to Elderwood, it plausibly alleges a hostile work environment claim pursuant to Title VII.

## CONCLUSION

For the foregoing reasons, the court DENIES Elderwood's motion for judgment on the pleadings. (Doc. 20.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___17th___ day of July, 2023.

Christina Reiss, District Judge
United States District Court

16