## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Plaintiff, | Civil Action No. 2:22-cv-00168-cr |
| v. | |
| 98 STARR FARM ROAD OPERATING CO., LLC d/b/a ELDERWOOD AT BURLINGTON, AND ELDERWOOD ADMINISTRATIVE SERVICES, LLC, | |
| Defendant. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT FOR THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................... 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................... 3

III.   RELEVANT PROCEDURAL BACKGROUND .................................................... 4

IV.   ARGUMENT ........................................................................................................... 4

   A. Standard of Review ................................................................................................ 4

   B. The EEOC Must Establish a Basis to Recover Individual Relief for Each Claimant ........... 6

   C. Legal Standard for Hostile Work Environment Racial Harassment ..................... 7

      1. The Resident's Conduct Was Not Based On Race ..................................... 7

      2. The Resident's Conduct Was Not Severe or Pervasive ............................ 9

      3. Subjectively and Objectively Hostile ....................................................... 11

         i.    The Claimants Did Not Subjectively Perceive Behavior as Hostile .................. 11

         ii.   The Behavior Was Not Objectively Hostile ........................................ 12

      4. Analysis For Each Claimant .................................................................... 15

      5. There Is No Basis to Impose Liability on Elderwood ............................... 20

   D. The Court Should Grant Summary Judgment, however Assuming Arguendo That Summary Judgment is Not Granted, Apply Judicial Estoppel To Bar EEOC From Seeking Monetary Or Other Relief On Behalf Of Felicia Ivy. ............................................................... 23

      1. Judicial Estoppel Should Be Applied Here to Protect the Integrity of the Judicial Process ........................................................................................ 23

      2. Judicial Estoppel Is Applicable Here To Bar EEOC From Recovering Any Monetary Damages Or Other Relief On Behalf Of Felicia Ivy .................................... 24

      3. Courts Have Applied Judicial Estoppel To Bar EEOC From Recovering Monetary Damages Or Other Relief On Behalf Of Claimants Who Failed To Disclose Their Potential Claims To The Bankruptcy Court .................................................. 24

V.   CONCLUSION ...................................................................................................... 25

Table of Authorities

**Cases**

*Adelphia Recovery Tr.*,
   634 F.3d 678 (2d Cir. 2011) ............................................................................24

*Alamo v. Bliss*,
   864 F.3d 541 (7th Cir. 2017) .........................................................................12

*Alfano v. Costello*,
   294 F.3d 365, 374 (2d Cir. 2002) ................................................................9, 12

*Alice Peck Day Mem'l Hosp. v. Samuelson*,
   678 F. Supp. 3d 542 (D. Vt. 2023) ..................................................................6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)................................4, 5, 6

*Belgrave v. Splendora Indep. Sch. Dist.*, No. H-07-1704,
   2008 U.S. Dist. LEXIS 67728 (S.D. Tex. Aug. 29, 2008) .........................................14

*Belton v. City of New York*, No. 12 Civ. 6346
   (JPO), 2014 U.S. Dist. LEXIS 136471, 2014 WL 4798919 (S.D.N.Y. Sept. 26, 2014) ..........10

*Blethen v. MaineGeneral Rehab. & Nursing Care*, No. 1:11-cv-00277-DBH,
   2012 U.S. Dist. LEXIS 132916, 2012 WL 4325824 (D. Me. Aug. 1, 2012) ...........................4

*Brennan v. Metro. Opera Ass'n*,
   192 F.3d 310, 318 (2d Cir. 1999)......................................................................8

*Cain v. Blackwell*,
   246 F.3d 758 (5th Cir. 2001) .....................................................................10, 11

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ......................................5, 6

*Chambers v. TRM Copy Centers Corp.*,
   43 F.3d 29, 37 (2d Cir. 1994)..........................................................................8

*Chavis v. Progressive Step Corp.*,
   2008 US Dist. LEXIS 30153 (N.D. Ohio 2008) ....................................................11

*Coffaro v. Crespo*,
   721 F. Supp. 2d 141, 148 (E.D.N.Y. 2010) .........................................................24

*Commander Oil Corp. v. Advance Food Serv. Equip.*,
   991 F.2d 49 (2d Cir. 1993) ............................................................................6

*Cruz Coach Stores, Inc.*,
    202 F.3d 560, 570 (2d Cir. 2000)................................................................9

*Davis v. Vermont, Dept. of Corrs.*,
    868 F. Supp. 2d 313 (D. Vt. 2012) ..........................................................20

*DeRosa v. Nat'l Envelope Corp.*,
    595 F.3d 99, 103 (2d Cir. 2010)................................................................24

*Distasio v. Perkin Elmer Corp.*,
    157 F .3d 55 (2d Cir. 1998) ......................................................................20

*Dodd v. My Sisters' Place, Inc., No. 21 CV 10987*
    (VB), 2024 U.S. Dist. LEXIS 107447, 2024 WL 3028474 (S.D.N.Y. June 17, 2024) ..............8

*EEOC v. CRST Van Expedited, Inc.*,
    611 F.Supp.2d 918, 929 (N.D. Iowa 2009)..................................................7

*EEOC v. Dave's Detailing, Inc.*,
    2008 U.S. Dist. LEXIS 36202 (W.D. Ky. May 2, 2008)........................................24

*EEOC v. Int'l Profit Assoc., Inc.*,
    102 Fair Empl. Prac. Cas (BNA) 139, 90 Empl. Prac. Dec. P 42986, 2007 WL 3120069 at *14
    (N.D. Ill. October 23, 2007)......................................................................7

*EEOC v. IPS Indus., Inc.*,
    899 F. Supp. 2d 507, 517 (N.D. Miss. 2012) ................................................6

*EEOC v. O'Reilly Automotive Inc.*,
    2010 WL 5391183, *5 (S.D.Tex. 2010) ......................................................6

*Ellis v. CCA of Tennessee LLC*,
    650 F.3d 640 (7th Cir. 2011) ....................................................................1

*Freitag v. Ayers*,
    468 F.3d 528 (9th Cir. 2006) ..................................................................20

*Gore v. RBA Grp., Inc.*,
    No. 03-CV-9442 (KMK) JCF, 2008 U.S. Dist. LEXIS 25912, 2008 WL 857530, at *6
    (S.D.N.Y. Mar. 31, 2008) ........................................................................8

*Harris v. Forklift Sys.*,
    510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)................................7, 11

*Hicks v. Alabama*,
    45 F. Supp. 2d 921 (S.D. Ala. 1998) ......................................................21

*Ibok v. SIAC-Sector Inc.*,
    470 F. App'x 27 (2d Cir. 2012) ..............................................................24

*Kaytor v. Elec. Boat Corp.*,
   609 F.3d 537 (2d Cir. 2010) .................................................................5

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015) ................................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ...................5

*Matu-Dadie v. Wernersville State Hosp.*,
   2018 US Dist. LEXIS 122277 (E.D. Pa Sept. 20, 2018) .........................13

*McElwee v. Cnty. of Orange*,
   700 F.3d 635 (2d Cir. 2012) ................................................................4

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) ...........................7

*Perry v. Ethan Allen, Inc.*,
   115 F.3d 143, 149 (2d Cir. 1997).........................................................9

*Pickett v. Sheridan Health Care Ctr., No. 07 C 1722*,
   2008 U.S. Dist. LEXIS 20662 (N.D. Ill. Mar. 14, 2008) ...................11, 21

*Raspardo v. Carlone*,
   770 F.3d 97, 114 (2d Cir. 2014).........................................................7

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
   743 F.3d 11, 20 (2d Cir. 2014) ..........................................................10

*Rodriguez v. Vill. Green Realty, Inc.*,
   788 F.3d 31 (2d Cir. 2015) .................................................................4

*Shealey v. Pittsburgh Mercy Health Sys., No. 2:23-CV-01511-CCW*,
   2025 U.S. Dist. LEXIS 15529 (W.D. Pa. Jan. 29, 2025) ........................13

*Tolbert v. Smith*,
   790 F.3d 427 (2d Cir. 2015) .............................................................7, 9

*Torres v. Pisano*,
   116 F.3d 625, 631 (2d Cir. 1997)........................................................10

*Vance v. Ball State Univ.*,
   570 U.S. 421 (2013) .........................................................................20

*Webster v. Chesterfield Cty. Sch. Bd.*,
   534 F. Supp. 3d 537 (E.D. Va. 2021) .................................................21

*Westbrook v. Illinois Dept. of Human Servs.*,
   2018 US Dist. LEXIS 48814 (N.D. Ill. 2018) .......................................14

*Whidbee v. Garzarelli Food Specialties, Inc.*,
    223 F.3d 62 (2d Cir. 2000) ........................................................................10

*Wilson v. Glenro, Inc.*,
    2012 U.S. Dist. LEXIS 40068, 2012 WL 1005007 (D. Vt. Mar. 23, 2012); 524 F. App'x 739
    (2d Cir. 2013) ...........................................................................................6

*Witt v. Moffe, No. 03 Civ. 397A*,
    2008 U.S. Dist. LEXIS 8878, 2008 WL 324255 (W.D.N.Y. 2008) ...........................................11

*Wright v. Monroe Community Hosp.*,
    493 F App'x 233 (2d Cir. 2012) ...................................................................15

*Woodman v. WWOR-TV, Inc.*,
    411 F.3d 69 (2d Cir. 2005) ........................................................................5

**Statutes**

42 U.S.C. § 1981a ....................................................................................6

42 U.S.C. § 2000e-5 ..................................................................................6

Section 706 ..........................................................................................6

**Other**

Fed. R. Civ. P. 56 ...................................................................................4

I.    **PRELIMINARY STATEMENT**

Elderwood is a skilled nursing community and subacute rehabilitation facility located in Burlington, Vermont. The Amended Complaint alleges that six former **98 Starr Farm Road Operating Co., LLC d/b/a Elderwood at Burlington**[1] (collectively "Elderwood") employees (the "Claimants"), along with other unidentified purportedly similarly situated employees, were subjected to a racially hostile work environment during the brief time they provided services to Elderwood's residents. Five of the six Claimants only worked for Elderwood for mere weeks or months through temporary staffing agency assignments. The Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") has stipulated that the sole claim made on behalf of the Claimants is one of a hostile work environment and purported emotional distress relating to the same. (Doc. 16)

The EEOC went on a years long fishing expedition attempting to find evidence to prop up this baseless lawsuit. Despite demanding voluminous discovery from Elderwood and hundreds of thousands of documents being produced, the EEOC came up empty. At no point in time did the EEOC ever identify any additional "purportedly similarly situated employees" beyond the Claimants. Throughout the litigation, the EEOC had insisted that the alleged harassing conduct was attributed to "multiple" third-party residents at Elderwood. But now the EEOC has now seemingly conceded that the alleged conduct was isolated to a single frail elderly resident of Elderwood with dementia and other diagnoses impacting cognition (who was deemed by medical professionals to be incompetent to make decisions), who has long since passed away from his co-morbidities.

---

[1] Defendant Elderwood Administrative Services ("EAS") did not employ any of the Claimants. However, for purposes of this litigation only, EAS stipulated that it is an integrated with 98 Starr Farm Road Operating Co., LLC d/b/a Elderwood at Burlington. (Doc. 66-1).

In denying Elderwood's motion for judgment on the pleadings (Doc. 42), the Court advised that it would not dismiss the EEOC's action at that stage of litigation because in these unique circumstances courts need to evaluate on a case-by-case basis if the offensive speech was beyond the resident's control, and because there is no bright line rule as a matter of law insulating long-term care facilities from liability for the harassing conduct based on residents despite the regulatory constraints imposed on such facilities. Despite the Court teeing up both of those critical issues, the EEOC chose with eyes wide open not to engage any experts.[2] On the other hand, Elderwood provides the expert opinion of Dr. Eric L. Fremed, who opines that the at-issue resident suffered from a neurological condition, specifically his dementia, resulting in disinhibition and an inability to control inappropriate behavior. Elderwood also provides the expert testimony of Alan C. Horowitz, who offers perspective on the restrictive regulatory environment that Elderwood operates in, and opines that Elderwood took the actions in response to the resident behavior that it was permitted to do under the regulations governing long-term care facilities. Specifically, Elderwood attempted several times to discharge/transfer the resident out of the facility, contacted his estranged family members for assistance, sought guidance from the then Vermont Commissioner of the Department of Disabilities and Aging, called the police multiple times, sent the resident to the hospital on several occasions, trained its employees on how to deescalate residents with challenging cognitive conditions, and offered employees the ability to transfer to different units of the facility. Moreover, Elderwood's challenges were exacerbated in the moment by the COVID-19 pandemic given that at issue resident was admitted to Elderwood in March 2020 as the pandemic was unfolding.

---

[2] The EEOC eventually disclosed a single "rebuttal" expert, Megan Carnarius. Elderwood has concurrently filed with this motion for summary judgement, a motion to preclude Ms. Carnarius' testimony in this matter.

Incredibly, none of the Claimants (or the EEOC) were able to identify any other potential remedial actions that Elderwood could have taken. Instead, they recite the self-serving generic and conclusory response that Elderwood somehow "could have done more". It could not have, but even if it could, the law does not demand perfection. Instead, Elderwood can only be held liable if it was negligent in failing to act, and it certainly was not.

Finally, it warrants mentioning that the Claimants' true motivation behind their EEOC charges (and this litigation) was to extort money from Elderwood, a facility that is dependent on Medicare and Medicaid funds from the government to operate. This is evident from the Claimants' group text messages where they refer to themselves as "The Mysterious Six" and state that they should be entitled to receive millions of dollars while simultaneously wishing death by COVID on the resident they were paid to care for. It also explains the Claimants' otherwise bizarre behavior of refusing Elderwood's offers to limit their interactions with the at issue resident, and the Claimants' choice not to ask the staffing agencies that assigned them to Elderwood to take another assignment (assignments which were in abundant supply due to the COVID-19 staffing crisis).

Ultimately, the EEOC's conclusory allegations fall well short of creating a genuine issue of material fact, and Elderwood is respectively entitled to summary judgment on its claims.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The undisputed facts[3] material to Elderwood's motion for summary judgment are set forth in the Statement of Undisputed Material Facts (cited as "SUMF ¶ __"), which are incorporated by reference as needed.

---

[3] Elderwood does not dispute these facts for purposes of summary judgment motion, but reserves the right to dispute any and all facts contained in its Statement of Undisputed Material Facts, or this memorandum, at any trial in this matter as evidence and testimony may warrant.

### III.    RELEVANT PROCEDURAL BACKGROUND

The Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") filed the above captioned action (the "Complaint") on September 6, 2022. ECF No. 1. Elderwood timely filed its Answer to the Complaint on November 7, 2022. (Doc. 7) Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), Elderwood moved for judgment on the pleadings on the ground that the EEOC failed to state any viable claim as a matter of law. (Doc 20.) Elderwood's motion was denied. (Doc. 42) The EEOC subsequently filed an Amended Complaint on April 5, 2024, and Elderwood timely answered on May 2, 2024 (Docs. 67, 70, 71). Elderwood now timely moves for summary judgment, in compliance with the Court's deadline of April 18, 2025. (Doc. 110).

### IV.    ARGUMENT

#### A.  Standard of Review

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' ... if it 'might affect the outcome of the suit under the governing law.'" Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 39 (2d Cir. 2015) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. at 39-40 (quoting Anderson, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his [or her] favor." McElwee v. Cnty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Moreover, not all disputes of fact are material—"[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). Accepting the nonmoving party's version of the disputed facts as true, summary judgment may be granted if the moving party remains entitled to judgment as a matter of law in its favor.

"Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and

which facts are irrelevant that governs." <u>Alice Peck Day Mem'l Hosp. v. Samuelson</u>, 678 F. Supp. 3d 542, 553 (D. Vt. 2023) (quoting <u>Anderson</u>, 477 U.S. at 248).

Summary judgment may also be granted if no rational fact finder could find in favor of the moving party even if the moving party's version of the facts is adopted, <u>Wilson v. Glenro, Inc.</u>, 2012 U.S. Dist. LEXIS 40068, 2012 WL 1005007, at *5 (D. Vt. Mar. 23, 2012), aff'd, 524 F. App'x 739 (2d Cir. 2013); <u>Commander Oil Corp. v. Advance Food Serv. Equip.</u>, 991 F.2d 49, 51 (2d Cir. 1993) ("There is no material fact issue ... when reasonable minds cannot differ as to the import of the evidence before the court."), or if the plaintiff fails to establish the essential elements of a claim with regard to which it will have the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322-23.

**B.  The EEOC Must Establish a Basis to Recover Individual Relief for Each Claimant**

The EEOC brings this suit under Section 706 of Title VII, which allows the EEOC to recover individual relief including compensatory and punitive damages on behalf of allegedly aggrieved individuals. (Doc. 67, ¶¶ 1, 3; 42 U.S.C. § 2000e-5(f)(1), (3) and 42 U.S.C. § 1981a. The EEOC must prove that Elderwood violated Title VII with respect to each individual claimant[4] in order to recover on that claimant's behalf. Stated another way, for each claimant, there must be individualized proof of every element of each claim. <u>EEOC v. IPS Indus., Inc.</u>, 899 F. Supp. 2d 507, 517 (N.D. Miss. 2012) (sex harassment) ("'Each claimant will be required to satisfy each element of the [hostile work environment] claim, including severity or pervasiveness, based on their individual experience.'") (quoting <u>EEOC v. O'Reilly Automotive Inc.</u>, 2010 WL 5391183,

---

[4] The Amended Complaint seeks relief on behalf of Felicia Ivy, Dian Murphy, Nicole Ferguson, Londia Bradstreet, Faith Robinson and Papa Ndour and "other similarly aggrieved Black employees who were adversely affected by such practices". The EEOC failed to identify any other purportedly similarly aggrieved individuals before the close of discovery. Accordingly, the EEOC is foreclosed from seeking relief on behalf of any other individuals beside the 6 named claimants.

*5 (S.D.Tex. 2010) (race-based hostile work environment)); <u>EEOC v. CRST Van Expedited, Inc.</u>, 611 F.Supp.2d 918, 929 (N.D. Iowa 2009) ("[T]he EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all of the elements of their sexual harassment claims to obtain individual relief for them."); cf. <u>EEOC v. Int'l Profit Assoc., Inc.</u>, 102 Fair Empl. Prac. Cas (BNA) 139, 90 Empl. Prac. Dec. P 42986, 2007 WL 3120069 at *14 (N.D. Ill. October 23, 2007) (requiring individualized proof that each claimant was subject to actionable harassment where compensatory and punitive damages were sought under pattern and practice framework).

### C.  Legal Standard for Hostile Work Environment Racial Harassment

In order to establish a hostile work environment claim under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). "'This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim    must subjectively perceive    the work    environment to    be    abusive.'" <u>Id.</u> at 321 (quoting <u>Raspardo v. Carlone</u>, 770 F.3d 97, 114 (2d Cir. 2014)).

### 1.  The Resident's Conduct Was Not Based On Race

"Title VII does not prohibit all verbal or physical harassment in the workplace[, however]; it is directed only at discrimination because of [a protected characteristic]." <u>Oncale v. Sundowner Offshore Servs., Inc</u>., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (alterations omitted). Therefore,    "[i]t    is    axiomatic    that    the plaintiff must    show that the hostile conduct occurred because of a protected characteristic." <u>Tolbert v. Smith</u>, 790 F.3d

427, 439 (2d Cir. 2015) (citation omitted). An inference of such a discriminatory intent "may be derived from a variety of circumstances, including 'invidious comments about others in the employee's protected group,' or 'the more favorable treatment of employees not in the protected group.'" Dodd v. My Sisters' Place, Inc., No. 21 CV 10987 (VB), 2024 U.S. Dist. LEXIS 107447, 2024 WL 3028474, at *11 (S.D.N.Y. June 17, 2024) (quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)). At summary judgment, "a plaintiff must introduce evidence of hostile conduct that a reasonable juror could find was a result of the plaintiff's membership in a protected class." Gore v. RBA Grp., Inc., No. 03-CV-9442 (KMK) JCF, 2008 U.S. Dist. LEXIS 25912, 2008 WL 857530, at *6 (S.D.N.Y. Mar. 31, 2008) (citing Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999)).

A.C. was an 83 year old white male who suffered from numerous psychologically and physically debilitating ailments including, but not limited to: late onset Alzheimer's disease, late stage dementia with behavioral disturbances, cataracts, blindness in one eye, hearing loss, asthma, numerous diagnoses related to his balance and gait, numerous diagnoses related to his heart and circulation, a unilateral inguinal hernia, and calculus of kidney. SUMF ¶ 88. Prior to A.C.'s admission at Elderwood at Burlington, A.C. lived alone in a trailer in St. Albans where his estranged wife discovered him sitting in the dark in his own urine and feces. SUMF ¶ 89. A.C. was hospitalized, and then later admitted to Elderwood on March 31, 2020. SUMF ¶ 90.

Dr. Eric Fremed ("Dr Fremed") rendered his expert opinion in this matter with regarding A.C. cognitive state during his stay at Elderwood and whether a safe discharge of A.C. was possible. SUMF ¶ 91. Dr. Fremed concluded, among those things, that A.C., suffered from dementia, resulting in either Alzheimer's disease and vascular dementia on the basis of his hypertension. SUMF ¶ 92. A.C.'s neurological condition, specifically his dementia, resulted in

disinhibition and an inability to control inappropriate behavior. SUMF ¶ 93. Furthermore, A.C.'s suffering from a neurodegenerative disorder affected his cognitive abilities rendering him incapable of controlling his speech or behavior given his disinhibited state. SUMF ¶ 94.

During A.C.'s time as a resident at Elderwood at Burlington his behavior varied based on his medical condition, and he had various negative interactions with Elderwood at Burlington employees and other residents, which included individuals of various races including those that are white. SUMF ¶ 95. Cortney Starace, Director of Social Services, observed A.C. call staff irrespective of skin color, "fat," "lazy," "stupid," "dumb" "monkeys", among other terms. SUMF ¶ 96. A.C. called administrator in training Valerie Cote (white, female), a "fat bleeping whale". SUMF ¶ 97. A.C. was not able to ambulate far on his own and utilized a wheelchair, and Nurse Kay Stones advised that she never saw A.C. walk farther than five steps during his time as a resident at Elderwood. SUMF ¶ 98.

Given that A.C. was incapable of controlling his speech or behavior given his disinhibited state, he made uncharitable comments to individuals of all races, and therefore his speech and behavior cannot form the basis of actional racial harassment.

## 2. The Resident's Conduct Was Not Severe or Pervasive

"As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Tolbert, 790 F.3d at 439 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). "[A] plaintiff alleging a hostile work environment 'must [thus] demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of her working environment.'" Alfano, 294 F.3d at 374 (quoting Cruz Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) and Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.

1997)). "'The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean[, however,] that employers are free from liability in all but the most egregious of cases,'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) (quoting Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997)), and the Second Circuit has "cautioned against setting the bar too high." Terry, 336 F.3d at 148.

"In assessing whether a plaintiff has met [his] burden, 'courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" Belton v. City of New York, No. 12 Civ. 6346 (JPO), 2014 U.S. Dist. LEXIS 136471, 2014 WL 4798919, at *8 (S.D.N.Y. Sept. 26, 2014) (alterations in original) (quoting Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014)).

In Cain v. Blackwell, 246 F.3d 758 (5th Cir. 2001), a nurse provided home health services to an elderly man suffering from Alzheimer's and Parkinson's diseases. Cain, 246 F.3d at 759. Cain complained that over the seven months she worked for the man, Marcus, he repeatedly propositioned her for sex, called her disparaging names, including racial epithets after being told she had dated a black man. The Fifth Circuit affirmed summary judgment for the employer on Cain's claim of hostile work environment, finding that although crude, humiliating, and insensitive, the "unique circumstances in this case makes the elderly and obviously impaired Marcus's commentary insufficient to establish sexual harassment." Id. at 760. (emphasis added). The court noted that caring for individuals with diseases like Marcus's was part of Cain's daily routine and that she did not accept an offer of reassignment. In these circumstances, Marcus's "unacceptable but pitiable conduct" was not so severe or pervasive as to interfere unreasonably

with Cain's work performance or create an abusive work environment. Id.; Pickett v. Sheridan Health Care Ctr., No. 07 C 1722, 2008 WL 719224, at *4 (N.D. Ill. Mar. 14, 2008) (three instances of inappropriate resident conduct including verbal threats, humiliation, and unwanted touching over eight months were insufficient in the context of a nursing home providing care for residents with mental illnesses to establish severe or pervasive harassment); Chavis v. Progressive Step Corp., 2008 US Dist. LEXIS 30153, at *22-23 (N.D. Ohio 2008) (granting summary judgment to employer on hostile work environment claim, where Plaintiff, an occupational therapist at the healthcare facility was called "f**** black bitch" and a "f**** black n**** because the comments were disparaging and highly inappropriate, it not give rise to a severe and pervasive environment of racial discrimination that affected her ability to perform her job functions).

### 3. Subjectively and Objectively Hostile

#### i. The Claimants Did Not Subjectively Perceive Behavior as Hostile

To qualify as a hostile work environment, the conduct at issue must be severe or pervasive enough to cause psychological injury, although Title VII "comes into play before the harassing conduct leads to a nervous breakdown." Ellis v. CCA of Tennessee LLC, 650 F.3d 640, 647 (7th Cir. 2011) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).) "The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." Harris, 510 U.S. at 23.

Indeed, it is fatal to a hostile work environment claim where the plaintiff did not actually perceive the conduct to be made for discriminatory reasons. See Witt v. Moffe, No. 03 Civ. 397A, 2008 U.S. Dist. LEXIS 8878, 2008 WL 324255, at *1 (W.D.N.Y. 2008) (granting defendant's motion for summary judgment on hostile work environment claim where Plaintiff was deemed to not subjectively believe behavior was motivated by unlawful intent to discriminate).

### ii. The Behavior Was Not Objectively Hostile

The nature of the workplace is one of the circumstances a court appropriately considers in evaluating whether a claimant has established severe or pervasive harassment, including the requirement of an objectively hostile work environment. Additionally, unrelated isolated events, that cannot reasonably and objectively be seen as continuous and concerted incidents of hostile conduct directed at an employee because of his race, do not establish a race-based hostile work environment claim under Title VII. See Alfano, 294 F.3d at 374. The long-term care workplace is different than many others from the outset. Behaviors routinely encountered when working with the elderly, disabled, ill, and/or cognitively impaired, are already outside the norms for, say, an accounting firm.[5]

Courts have long held that Plaintiffs alleging hostile work environment may be required to make a showing of conduct well beyond these norms to establish a hostile workplace based on resident conduct. "[B]ehavior exhibited by nursing home patients suffering from dementia or other mental diseases can be expected to be outside ordinary social boundaries; it is the reason they reside in such facilities." Cain v. Blackwell, 246 F.3d 758 (5th Cir. 2001) (finding no hostile work environment; affirming summary judgment against employee); EEOC v. Nexion Health at Broadway, Inc., 199 Fed. Appx. 351 (5th Cir. 2006) (same); See, e.g., Alamo v. Bliss, 864 F.3d 541, 550 (7th Cir. 2017) (quoting Robinson v. Sappington, 351 F.3d 317, 330 (7th Cir. 2003)) ("The specific circumstances of the working environment and the relationship between the harassing party and the harassed ... bear on whether that [objectively hostile] line is crossed.")

---

[5] There are other salient examples of unique workplaces whereby it is not objective to conclude that certain behavior is legally objectionable (e.g. a special education teacher that is subject to verbal and physical abuse from a child in his or her class).

The <u>Nexion</u> court stated, "[t]he EEOC's claim fails, because the harassment Johnson suffered did not objectively interfere with his work performance or undermine his workplace competence. Johnson's job required him to deal with the tragic failings of elderly people whose minds have essentially failed. Absorbing occasional verbal abuse from such patients was not merely an inconvenience associated with his job; it was an important part of the job itself." <u>Id.</u> at 354. Plaintiff had alleged that a 70 year-old schizophrenic, Hispanic resident called him racially offensive words, including the word "nig***" three to four times a week over a number of months. <u>Id.</u> at 352. The patient also made disparaging remarks about whites and Hispanics during the same time period. "Although these were more than isolated instances of harassment, they were not so frequent as to pervade the work experience of a reasonable nursing home employee, especially considering their source." <u>Id.</u> at 353. "This unique aspect of Johnson's line of employment is a vital consideration. He worked in a place where most of the people around him were often unable to control what they said or did. It is objectively unreasonable for an employee in such a workplace to perceive a racially hostile work environment based solely on statements made by those who are mentally impaired." <u>Id.</u> ; <u>See also</u> <u>Shealey v. Pittsburgh Mercy Health Sys.</u>, No. 2:23-CV-01511-CCW, 2025 U.S. Dist. LEXIS 15529, *37 (W.D. Pa. Jan. 29, 2025)(granting summary judgment on hostile working environment claim holding that no reasonable person would perceive a hostile working environment on the repeated use of the N-word by a patient that suffered from dementia); <u>Matu-Dadie v. Wernersville State Hosp.</u>, 2018 US Dist. LEXIS 122277 (E.D. Pa Sept. 20, 2018), (concluding on summary judgment that it is objectively unreasonable for a nurse in a care facility with persons with mental conditions to perceive a racially hostile environment when statements such as "I don't like black people" and calling her the N-word were made by patient suffering from mental illness); <u>Westbrook v. Illinois Dept. of Human Servs.</u>, 2018 US Dist. LEXIS 48814, at *25

(N.D. Ill. 2018) (granting summary judgment to employer on hostile work environment claim where Plaintiff, a Security Therapy Aide working at the Illinois Department of Human Services, was called "nig*** bitch," "black bitch," "black Nig***," "ugly black bitch," "black cow," and "nig***" by a mentally ill patient, because no reasonable factfinder could find the that it would create a hostile work environment); Blethen v. MaineGeneral Rehab. & Nursing Care, No. 1:11-cv-00277-DBH, 2012 U.S. Dist. LEXIS 132916, 2012 WL 4325824, at *19 (D. Me. Aug. 1, 2012) ("From an objective standpoint, the offensive remarks attributed to [two patients in a care facility] may well have been more than mere offensive utterances if spoken by co-workers and supervisors, but they did not reasonably give rise to an objectively hostile or abusive work environment under the circumstances because the record demonstrates that [the patients] were elderly, dependent residents at Gray Birch, whose unfortunate attitudes did not present a threat or other significant obstacle to Blethen and whose statements are therefore objectively on the level of mere offensive utterances."); Belgrave v. Splendora Indep. Sch. Dist., No. H-07-1704, 2008 U.S. Dist. LEXIS 67728, *43 (S.D. Tex. Aug. 29, 2008) (denying hostile work environment claim by African American teacher, where he was called racial slurs and given a racially charged note by students, because his job expectations involved supervising disruptive students with behavior problems).

The EEOC recently tried (and failed) to substantiate a similar type of claim as presented in this case. In EEOC v. Vill. At Hamilton Pointe LLC, Case No. 17-cv-00147, 2020 U.S. Dist. LEXIS 267271, 2020 WL 13568924 (S.D. Ind. Sept. 29, 2020) the district court determined that offensive racial comments made by cognitively impaired nursing home residents could not form the basis for a hostile work environment claim. Id. at *4. The Seventh Circuit affirmed in EEOC v. Vill. at Hamilton Pointe LLC, 102 F.4th 387 (7th Cir. 2024), ruling that Black CNAs were not

subjected to a hostile work environment due to racial slurs and insults levied at them by residents of the nursing home they worked in. Id. at 417. The Seventh Circuit based its ruling on the fact that most of the comments came from residents suffering from severe mental impairments. Id.

Finally, in Elderwood's motion for judgment on the pleadings, we cited to a summary order from the Second Circuit, Wright v. Monroe Community Hosp., 493 F App'x 233, 235 (2d Cir. 2012), which involved a patient with dementia allegedly called an employee the N-word. In denying the claim, the Second Circuit noted that "while the patient's alleged behavior is certainly objectionable, we cannot conclude that the facts as alleged provide a specific basis….for imputing the objectionable conduct to the employer because the hospital cannot be held responsible for the outbursts of a patient suffering from dementia." (internal citations omitted). In denying Elderwood's motion for judgment on the pleadings, this Court distinguished this matter from Wright, because Wright involved a single patient and the EEOC alleged there were a number of patients involved here. (Doc. 10, p. 10) Now, having completed discovery, the EEOC has conceded what Elderwood has maintained throughout this entire litigation, which is that there was only one resident, A.C., who suffered from dementia, that was involved in the at issue behavior. Accordingly, Elderwood respectfully requests that the Court reconsider the principles in Wright (along with the many other similar decisions from other circuits relied upon by Elderwood above), and dismiss the Amended Complaint in its entirety.

### 4. Analysis For Each Claimant

#### 1. Londia Bradstreet

Bradstreet is a CNA who, by way of her employment with Favorites, completed three contracts at Elderwood: the first from July 26, 2020 to September 19, 2020, the second from September 20, 2020 to mid-December 2020, and the third from mid-December 2020 to March 6,

2021. SUMF ¶ 23. Bradstreet at all relevant times was a resident of New Orleans, Louisiana. SUMF ¶ 24. Bradstreet admitted under oath that she never provided care to A.C. during her assignment at Elderwood. SUMF ¶ 25. Bradstreet had no hesitation renewing her contracts with Elderwood at Burlington despite her purported experiences with A.C. SUMF ¶ 26. Bradstreet did not call Elderwood's compliance hotline to complain about A.C. SUMF ¶ 27. Bradstreet complained to Favorites on December 22, 2020 due to a payroll issue, and threatened not to go to work due to it, but she never threatened not to go to work due to A.C. SUMF ¶ 28. On February 8, 2021, Bradstreet advised Favorites that she was hesitant to extend at Elderwood at Burlington solely because "they had shut down the rehab unit and the facility has not been giving overtime." SUMF ¶ 29. Bradstreet declined her fourth contract with Elderwood in February of 2021, and went home to Louisiana to care for her mother for approximately 1 year. SUMF ¶ 30. In Bradstreet's experience, she has been called the N-Word by disabled residents at most of the long-term care facilities she has worked at throughout her career. SUMF ¶ 31.

### 2. Nicole Ferguson

Ferguson is an LPN who, by way of her employment with Prime Time, completed four contracts at Elderwood: the first from November 7, 2019 to January 25, 2020, the second from January 25, 2020 to April 11, 2020, the third from May 18, 2020 to August 15, 2020, and the fourth from August 15, 2020 through October 16, 2020. SUMF ¶ 32. At all relevant times, Ferguson was a resident of North Carolina. SUMF ¶ 33. Ferguson was not assigned to care for A.C. for months of her time on assignment at Elderwood at Burlington. SUMF ¶ 34. Ferguson never called Elderwood's compliance hotline to complain of A.C. (or any other resident). SUMF ¶ 35. Ferguson did not ask Elderwood to transfer away from caring for A.C. SUMF ¶ 36. Ferguson only cared for C.D. one time for ten minutes or less and testified under oath that C.D. did not make any statements

about her race. SUMF ¶ 37. Ferguson is unaware of and did not care for M.R. SUMF ¶ 38. On October 16, 2020, Ferguson filed a charge of discrimination with the EEOC alleging racial harassment, indicating that she told her concerns to her employer Prime Time Healthcare, and that she believed they told Elderwood on or about August 25, 2020. SUMF ¶ 39. In her October 16, 2020 EEOC Charge, Ferguson does not allege specific words or actions of racial harassment that she purportedly heard in the workplace. SUMF ¶ 40.

### 3. Felicia Ivy

Ivy is an LPN who, by way of her employment with Prime Time completed one contract at Elderwood from August 3, 2020 to October 10, 2020. SUMF ¶ 41. Ivy was a resident of Tennessee at all relevant times. SUMF ¶ 42. On any given shift at Elderwood, Ivy would be assigned to approximately 20-25 residents. SUMF ¶ 43. Ivy was never assigned to care for A.C. and was only in the Chittenden unit that A.C. resided in, 3-4 times a week. SUMF ¶ 44. During her assignment at Elderwood, Ivy never requested a transfer to a different unit at Elderwood that A.C. lived on. SUMF ¶ 45. Ivy witnessed A.C. get in an altercation with a white resident. SUMF ¶ 46. A.C. called Ivy fat and ugly. SUMF ¶ 47. Ivy initially filed a Charge of Discrimination with the EEOC dated August 25, 2020, which does not allege specific words of racial harassment that she purportedly heard in the workplace. SUMF ¶ 48. Ivy provided care to M.R. once or twice during her employment at Elderwood at Burlington, and had no issues. SUMF ¶ 49. Ivy provided care to C.D. a handful of times during her employment at Elderwood, and only had an issue once or twice, where C.D. called her a "black bitch", but Ivy could not recall when that occurred. SUMF ¶ 50.

### 4. Dian Murphy

Murphy is an LPN who, by way of her employment with Prime Time, completed two contracts at Elderwood: the first from April to July of 2020; the second from July to October of 2020. SUMF ¶ 52. In Murphy's experience, she has been called the N-Word by disabled residents and heard threats uttered by disabled residents towards staff at many facilities throughout her career.  SUMF ¶ 53. Murphy had limited interactions with C.D. SUMF ¶ 54. Murphy does not recall providing any care to M.R. SUMF ¶ 55. During her employment at Elderwood, Murphy did not call Elderwood's compliance hotline to complain about A.C. SUMF ¶ 56. In Murphy's Charge of Discrimination to the EEOC dated 11/29/20, she does not state any dates that the purported conduct allegedly occurred, nor does he specify what alleged words used or actions taken by A.C. towards him or others, and she merely states that she believes Elderwood was made aware of the issue on August 25, 2020. SUMF ¶ 57.

### 5. Faith Robinson

Robinson is a registered nurse ("RN") who, by way of her employment with Prime Time, completed one contract at Elderwood at Burlington from August 31 2020 to November 28, 2020. SUMF ¶ 58. Robinson admitted that she observed A.C. "terrorizing white individuals".  SUMF ¶ 59. Robinson did not call Elderwood's compliance hotline to complain about A.C. SUMF ¶ 60. On November 24, 2025, Lisa Peacock spoke with Robinson to address her concerns about A.C., and Robinson thanked her. SUMF ¶ 61. Robinson resisted moving her staffing assignment to a different unit away from A.C. SUMF ¶ 62. Robinson only worked on the same unit as C.D. for a single shift, where she was responsible for caring for approximately twenty residents. SUMF ¶ 63. Robinson could not remember M.R. at depositions. SUMF ¶ 64. In Robinson's EEOC Charge she fails to identify the alleged words or actions taken by A.C. SUMF ¶ 65.

### 6. Papa Ndour

Ndour is an LPN who was an employee of Elderwood at Burlington from February 2017 until his resignation in July of 2019, returning to Elderwood in September 2019, until he resigned again in February of 2021. SUMF ¶ 66. Elderwood approved a month long leave of absence for Ndour to go home to Africa due a death in his family between September 4, 2020 and October 5, 2020. SUMF ¶ 67. Ndour observed A.C. call employees "bitches" and "fat." SUMF ¶ 68. During his employment at Elderwood, Ndour did not call Elderwood's compliance hotline to complain about A.C. SUMF ¶ 69. Ndour was offered to transfer units at Elderwood and he refused the offer. SUMF ¶ 70. Ndour did submit a handwritten complaint to Elderwood on January 17, 2021. SUMF ¶ 71. Ndour acknowledges that a Unit Manager apologized to him after an incident with A.C. occurred. SUMF ¶ 72. Ndour never filed a workers' compensation claim during his time employed at Elderwood, nor did he ever seek medical treatment in relation to any interaction with A.C (or any other resident). SUMF ¶ 73. Thereafter, Lisa Peacock had a conversation with Ndour, and advised him that Elderwood was attempting to find a location to safely discharge A.C. SUMF ¶ 74. Ndour did not provide care to C.D. and does not remember M.R. SUMF ¶ 75. In Ndour's Charge of Discrimination to the EEOC dated 1/14/21, he does not state any dates that the purported conduct allegedly occurred, nor does he specify what alleged words used or actions taken by A.C. towards him or others. SUMF ¶ 76. When Ndour resigned his employment from Elderwood 1/22/21 providing two weeks' notice, and stated "thank you for your trust", with no mention of A.C. in his letter. SUMF ¶ 77. Ndour advised the EEOC in an interview on June 24, 2021 that one of the reasons he resigned from Elderwood on January 22, 2021 was because Elderwood "cut bonus and shift differential" without telling employees. SUMF ¶ 78. Each of the four Claimants who renewed their contracts with Elderwood at various times affirmed they did so willingly.

19

SUMF ¶ 79. Every Claimant affirmed that the various licenses they hold (CNA, LPN, and/or RN) do not qualify them to diagnose a resident for their medical condition. SUMF ¶ 80. On October 6, 2020, Kay Stones, Ivy, and Bradstreet started a group text message. The group text message expanded on October 26, 2020 to include Ferguson, Murphy, Robinson. The group refers to themselves as the "Mysterious 6". In this group text message, Murphy refers to A.C. as a "rat bastard" and jokes about him getting COVID-19 and dying. They also discuss seeking $42,000,000 from Elderwood at Burlington. SUMF ¶ 81.

Each Claimant's cause of action fails because they did not subjectively believe the conduct was harassment, they were assigned to Elderwood for short periods of time, their interaction with A.C. was limited (if any), and while the behavior is unfortunate and not condoned by Elderwood, it is not unusual in this industry given the vulnerable population that is served.

### 5. There Is No Basis To Impose Liability On Elderwood

"[I]t is well-established that employers may be held liable for harassment by third parties when that conduct creates a hostile work environment[,]" and the "employer knew or reasonably should have known about the harassment and failed to take reasonable remedial action." Davis v. Vermont, Dept. of Corrs., 868 F. Supp. 2d 313,330 (D. Vt. 2012) (collecting cases); see also Vance v. Ball State Univ., 570 U.S. 421,446 (2013) ("[ A ]n employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment."); Distasio v. Perkin Elmer Corp., 157 F .3d 55, 63 (2d Cir. 1998) ("[W]hen the harassment is attributable to a coworker, rather than a supervisor, ... the employer will be held liable only for its own negligence."); Freitag v. Ayers, 468 F.3d 528, 538 (9th Cir. 2006) (holding that "employers are liable for harassing conduct by non-employees where the employer either ratifies or acquiesces in

the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct").

The employer's remedy need only be an effort directed to reasonably stop the harassment. See Webster v. Chesterfield Cty. Sch. Bd., 534 F. Supp. 3d 537, 551 (E.D. Va. 2021) (granting summary judgment to school board where they expended effort to curb the harassment). Moreover, employers cannot be held liable when there simply are no remedial avenues to address the third party harassment). See Hicks v. Alabama, 45 F. Supp. 2d 921, 933 (S.D. Ala. 1998) (holding that a prison was not liable under Title VII for hostile work environment when inmates engaged in sexually-explicit behavior, no prison employees engaged in harassment, and no other remedial avenues were available).

Finally, in the context of a hostile work environment claim, even where the plaintiff believed her employer could have done more, the employer is entitled to summary judgment if its actions were timely and reasonable. See Pickett v. Sheridan Health Care Ctr., No. 07 C 1722, 2008 U.S. Dist. LEXIS 20662, *14 (N.D. Ill. Mar. 14, 2008).

Under the regulations described further in Horowitz's report, including 42 U.S.C. § 1395i-3-(c)(2)(A), Elderwood may not involuntarily discharge a resident absent one of six (6) discrete criteria: (1) for the resident's welfare and the resident's needs cannot be met in the facility; (2) the resident's health has improved and no longer needs the facility's services; (3) the safety of individuals in the facility is endangered due to the clinical or behavioral status of the resident; (4) the health of the individuals in the facility would otherwise be endangered; (5) the resident has failed, after reasonable and appropriate notice to pay for (or to have paid under Medicare or Medicaid) a stay at the facility; or (6) the facility ceases to operate. SUMF ¶ 85. Elderwood may not chemically or physically restrain a resident pursuant to 42 U.S.C. § 1395i(c)(1)(A)(ii), 42

C.F.R. § 483.45, the State Operations Manual ("SOM"), CMS S & C and QSO Memos, CMS Initiatives, OIG & Chemical Restraints, and various case law. SUMF ¶ 86. Elderwood's residents have federal (embedded in the Nursing Home Reform Act) and state (embedded in the Vermont's Resident's Rights Law) mandated resident rights which include, but are not limited to, the right against involuntary discharge/eviction; the right to be free from abuse, neglect, and exploitation; the right to be free from chemical and physical restraints; the right to refuse treatment; the right to participate in their treatment and care planning; the right to privacy; the right to express grievances without fear of retaliation; the right to not be transferred or discharged from a facility unless one of six aforementioned enumerated criteria exist. SUMF ¶ 86.

At the outset, Elderwood takes significant proactive preventative measures and provides robust employee training including, but not limited to, a program entitled "Harassment Free Workplace, Prevention Workplace Violence, Lockdown Procedures, Active Shooter Response, Cultural Diversity, HIPAA. SUMF ¶ 17. Elderwood's employee training defines harassment, covers racial harassment prevention, advises that the law protects against third party non-employees, advises where to report harassment internally, provides a complaint form, provides the number for Elderwood's corporate compliance hotline, and generally advises that retaliation is prohibited. SUMF ¶ 18. Elderwood maintains an employee handbook that is provided to employees upon hire. SUMF ¶ 19. Elderwood's employee handbook includes sections on Equal Employment Opportunity and Zero-Tolerance for Discriminatory Conduct, a complaint procedure, among other policies. SUMF ¶ 20. Elderwood employees are also provided with training on approaches for dementia and de-escalation. SUMF ¶ 21.

Elderwood made significant and repeated attempts to address A.C.'s behavior during an extremely challenging COVID-19 pandemic. SUMF ¶¶ 99-128. Horowitz offers the following expert opinion:

> A review of the relevant records reveals that Elderwood undertook multiple appropriate and timely measures to ameliorate the offensive remarks. For example, some of Elderwood's efforts at mitigating the situation included, but was not limited to: transferring residents to hospitals (they were returned to Elderwood), including three times for the White Male. Additionally, Elderwood attempted to transfer the male resident to another facility as a voluntary transfer; it provided de-escalation seminars for the staff; it care planned accordingly and regularly; it had ongoing psychiatric and other clinical consultations for the residents at issue; it engaged the efforts of the facility's social worker; it repeatedly discussed how to effectively deal with the situation involving the male resident at the Interdisciplinary Team ("IDT") meetings; its physicians titrate medications as appropriate; it engaged the facility's QAPI program and actively involved the facility's Quality Assessment and Assurance (QAA) committee. Moreover, in an effort to seek state government agency guidance, Elderwood contacted Monica Caserta Hutt, Commissioner of Vermont's Department of Disabilities, Aging and Independent Living for her guidance and Assistance. Additionally, it also sought guidance from Vermont's long-term care ombudsman.

SUMF ¶ 129. Finally, the State of Vermont Department of Labor-VOSHA, already completed a thorough investigation into workplace issues relating to A.C., and did <u>not</u> find a violation or issue any fines. SUMF ¶ 130.

### D. The Court Should Grant Summary Judgment, however Assuming Arguendo That Summary Judgment is Not Granted, Apply Judicial Estoppel To Bar EEOC From Seeking Monetary Or Other Relief On Behalf Of Felicia Ivy.

#### 1. Judicial Estoppel Should Be Applied Here to Protect the Integrity of the Judicial Process

Judicial estoppel typically applies if: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." <u>In re Adelphia Recovery Tr.</u>, 634 F.3d 678, 695-96 (2d Cir. 2011) (quoting <u>DeRosa v. Nat'l Envelope Corp.</u>, 595 F.3d 99, 103 (2d Cir. 2010)). Judicial

estoppel is limited "to situations where the risk of inconsistent results with its impact on judicial integrity is certain." Id. (internal quotation marks omitted). However, the doctrine "is commonly applied in order 'to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy.'" Ibok v. SIAC-Sector Inc., 470 F. App'x 27, 28 (2d Cir. 2012) (quoting Coffaro v. Crespo, 721 F. Supp. 2d 141, 148 (E.D.N.Y. 2010)). This is because the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets, a debtor is not permitted to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently assert those claims for his own benefit in a separate proceeding.  See Ibok v. SIAC-Sector Inc., No. 05 CV 06584 (GBD) (GWG), 2011 U.S. Dist. LEXIS 27301, *8 (S.D.N.Y. Mar. 14, 2011).

### 2. Judicial Estoppel is Applicable Here to Bar EEOC From Recovering Any Monetary Damages or Other Relief on Behalf of Felicia Ivy.

In the case at bar, Felicia Ivy testified at her deposition that she was currently in a Chapter 13 bankruptcy proceeding in Memphis, Tennessee; however, Felicia Ivy did not disclose this lawsuit to the trustee in the bankruptcy proceeding. SUMF ¶ 51.

### 3. Courts Have Applied Judicial Estoppel To Bar EEOC From Recovering Monetary Damages Or Other Relief On Behalf Of Claimants Who Failed To Disclose Their Potential Claims To The Bankruptcy Court

Federal courts have concluded that judicial estoppel—an equitable doctrine—may be applied to bar EEOC from seeking monetary and other relief on behalf of claimants who did not disclose their claims in the context of a bankruptcy proceeding. For example, in EEOC v. Dave's Detailing, Inc., 2008 U.S. Dist. LEXIS 36202 (W.D. Ky. May 2, 2008), the court applied judicial estoppel to bar EEOC from asserting damage claims on behalf of two claimants who failed to disclose their sexual harassment claims against their employer when they filed for Chapter 7 bankruptcy. Id. at *7. The court rejected EEOC's contention that judicial estoppel was inapplicable

because the claimants were not parties to the action, explaining that judicial estoppel is "an equitable doctrine" and finding that if the claimants had filed the action, judicial estoppel would apply and bar them from proceeding with their claims for monetary damages. Id. at *8. As a result, the Court failed "to see how it would be equitable to allow the [claimants] to receive monetary damages recovered by EEOC on their behalf after the Bankruptcy Court discharged their debts in reliance on their false disclosures when they would not be entitled to receive such monetary damages had they filed the action on their own behalf." Id. As the court aptly noted, "[s]uch a result would allow the [claimants] to have their cake and eat it too . . . and would represent the type of abuse which judicial estoppel is designed to preclude." Id. (internal citations omitted).

Based on the forgoing, the Ivy should be barred from seeking monetary damages in this matter based on judicial estoppel.

V.    **CONCLUSION**

For all the reasons discussed herein, Elderwood respectfully requests that the Court grant the Elderwood's motion for summary judgment on claims in Plaintiff's Amended Complaint.

Dated:  April 18, 2025                              Respectfully submitted,

                                                   /s/ Caroline J. Berdzik
                                                   CAROLINE J. BERDZIK
                                                   *Counsel for Defendants*
                                                   GOLDBERG SEGALLA LLP
                                                   301 Carnegie Center Dr., Suite 200
                                                   Princeton, NJ 08540
                                                   (609) 986-1301
                                                   cberdzik@goldbergsegalla.com

                                                   CHRISTOPHER P. MAUGANS
                                                   *Counsel for Defendants*
                                                   GOLDBERG SEGALLA LLP
                                                   665 Main Street
                                                   Buffalo, NY 14203
                                                   (716) 710-5825
                                                   cmaugans@goldbergsegalla.com

PIETRO J. LYNN
*Counsel for Defendants*
LYNN, LYNN, BLACKMAN &
MANITSKY, P.C.
76 St. Paul St., Suite 400
Burlington, VT 05401
(802) 860-1500
plynn@lynnlawvt.com