UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

Plaintiff,

v.

98 STARR ROAD OPERATING CO., LLC
d/b/a Elderwood at Burlington and
ELDERWOOD ADMINISTRATIVE
SERVICES, LLC,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:22-cv-00168-cr

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART THE EEOC'S MOTION TO
EXCLUDE EXPERT ROBERT L. FREMED,
GRANTING THE EEOC'S MOTION TO EXCLUDE EXPERT ALAN C.
HOROWITZ,
GRANTING IN PART AND DENYING IN PART ELDERWOOD'S MOTION TO
EXCLUDE EXPERT MEGAN CARNARIUS, AND
DENYING ELDERWOOD'S MOTION FOR SUMMARY JUDGMENT**
(Docs. 112, 113, 114, 115)

U.S. Equal Employment Opportunity Commission (the "EEOC") brings this action against Defendants 98 Starr Road Operating Co., LLC d/b/a Elderwood at Burlington and Elderwood Administrative Services, LLC (collectively, "Elderwood") under Title VII of the Civil Rights Act of 1964 ("Title VII"). The EEOC asserts a hostile work environment claim, alleging that three Elderwood residents, AC, MR, and CD (collectively, the "Residents"), subjected Black Elderwood employees (collectively, the "Staff")[1] to racial harassment and Elderwood failed to take remedial action.

Pending before the court are four motions: the EEOC's motion to exclude expert

---

[1] The EEOC brings this action on behalf of the Staff: Londia Bradstreet, Nicole Ferguson, Felicia Ivy, Dian Murphy, Faith Robinson, and Papa Ndour.

witness, Robert L. Fremed, M.D.; the EEOC's motion to exclude expert witness, Alan C. Horowitz; Elderwood's motion to exclude expert witness, Megan Carnarius; and Elderwood's motion for summary judgment.[2] The court heard oral arguments on all pending motions on January 20, 2026, and thereafter took them under advisement.

The EEOC is represented by Alison Bitterly, Esq., Emily R. Kempa, Esq., Katie N. Linehan, Esq., and Kimberly A. Cruz, Esq. Elderwood is represented by Caroline J. Berdzik, Esq., Christopher P. Maugans, Esq., and Pietro J. Lynn, Esq.

## I.    The Parties' *Daubert* Motions.

### A.    Elderwood's Expert Witness Opinions.

#### 1.    Dr. Fremed's Opinions.

Dr. Fremed is a medical doctor who obtained his medical degree in 1983 from the State University of New York at Syracuse Upstate Medical Center. From 1992 to 2020, Dr. Fremed was a clinical instructor at the Mount Sinai School of Medicine. Since 1999, he has practiced as a neurologist and currently serves as the Associate Chief of Neurology and the Senior Active Attending Neurologist at the Englewood Hospital and Medical Center in Englewood, New Jersey. He has spoken at a number of conferences and conducted numerous lectures related to neurology. There is no evidence that he has been previously qualified as an expert witness in state or federal court.

In his expert witness report, Dr. Fremed states that Elderwood retained him to review the Residents' medical records "to determine their diagnoses, state of mind, and the nature of their behavior in connection with the" EEOC's allegations. (Doc. 112-4 at 2.) With regard to AC's medical conditions and Elderwood's response to AC's behavior, Dr. Fremed opines:

---

[2] On April 18, 2025, the EEOC filed motions to exclude Elderwood's expert witnesses, Robert L. Fremed, M.D., (Doc. 112), and Alan C. Horowitz. (Doc. 114.) Elderwood opposed these motions on May 2, 2025, (Docs. 119, 121), and the EEOC replied on May 16, 2025. (Docs. 123, 124.) On April 18, 2025, Elderwood filed a motion to exclude the EEOC's expert witness, Megan Carnarius. (Doc. 113.) The EEOC opposed the motion on May 2, 2025, (Doc. 120), and Elderwood replied on May 16, 2025. (Doc. 126.) On April 18, 2025, Elderwood moved for summary judgment. (Doc. 115.) The EEOC opposed the motion on May 19, 2025, (Doc. 128), and Elderwood replied on June 11, 2025. (Doc. 134.)

Pertaining to AC, it is clear from the records reviewed that he has dementia, which is the result of either Alzheimer's disease or a combination of Alzheimer's disease and vascular dementia on the basis of his hypertension. He has MRI evidence of ischemic change, and possible normal pressure hydrocephalus, an entity that also causes dementia, and is often associated with gait imbalance and incontinence.

AC's neurologic condition, specifically his dementia, resulted in disinhibition and an inability to control inappropriate behavior.

The records confirm that attempts were made to pharmacologically modify AC's behavior, although there are many documented incidents of him refusing or skipping medications which he is permitted to do under his resident's rights pursuant to federal and Vermont law. He was sent out to an acute care hospital several times for escalations in his behaviors, but was returned to the skilled nursing facility. Physicians and psychiatrists continually reviewed, updated, and changed his medications and provided new orders. His care plans were regularly updated by staff. The social worker worked closely with AC as well to try and diffuse his behaviors.

As socially unacceptable as AC's outbursts appear to have been based on my review of the chart, his behavior is not different from that expected from somebody with his neurologic condition, and [it] is typically very difficult, if not impossible, to control and/or correct these behaviors. These types of behaviors are very typical of residents in skilled nursing facilities with cognitive impairments and significant co-morbidities. It would be unacceptable, and unlawful, for the nursing home to have been more aggressive in controlling his behavior in terms of physical restraints such as muzzling their patient, or increasing his pharmacologic sedation to the point where he was no longer mobile or aware in an effort to curb the undesirable behaviors. From the medical perspective, I therefore do not see what else could have been done to remedy his behavior and make the work environment better for the affected employees and residents. I am not privy to other efforts made by Elderwood at Burlington to address the interactions between AC and staff and residents that are not contained in the medical record.

*Id.* at 24-25.

With respect to MR, Dr. Fremed opines that "MR had vascular/Alzheimer's disease and resolving encephalopathy to account for her obvious dementia and likely disinhibition." *Id.* at 25. He concludes:

CD's records document diagnoses of residuals from prior strokes, worsening short-term memory loss, anxiety with paranoid accusations, and

diagnoses of Alzheimer's and vascular dementia. Notes documenting inappropriate behavior on CD's part . . . described behavior consistent with disinhibition and mood and behavioral changes often seen with the above-listed diagnoses.

*Id.* In light of these diagnoses, Dr. Fremed opines that his findings regarding AC's behavior "would therefore apply to any comments or actions towards staff members on the part of MR and CD for the same reasons." *Id.*

Dr. Fremed's report addresses Elderwood's response to the Residents' behavior as follows:

This is not a case of inappropriate behavior in an employed staff member, but rather inappropriate behavior in a demented patient, or patients, whose care was the responsibility of the skilled nursing facility. [Elderwood] did not have the option of "terminating" the patient. . . . Barring the ability to safely discharge AC, Elderwood . . . had no other option but to continue treating AC in their facility insofar as he was deemed incapable of taking care of himself at home due to his many co-morbidities.

*Id.* at 25-26. He also explains that the COVID-19 pandemic would have exacerbated any of the Residents' pre-existing behavioral issues and would have impaired Elderwood's ability to take remedial measures.

Dr. Fremed concludes:

[B]ased on the records reviewed, and beyond a reasonable degree of medical certainty, that AC suffered from a neurodegenerative disorder affecting his cognitive abilities rendering him incapable of controlling his speech or behavior given his disinhibited state. CD and MR likewise suffered from dementia and cognitive impairment, also affecting their behavior, and rendering them incapable of controlling their speech and behavior given their likely disinhibited state. The records indicate that all possible measures were deployed to diffuse and deescalate the numerous situations documented, but none of the measures would have been expected to be successful every time.

(Doc. 112-4 at 26.)

### 2.    Attorney Horowitz's Opinions.

Mr. Horowitz is an attorney who obtained his Juris Doctor from Weidner University School of Law. From 2000 to 2012, Mr. Horowitz served as Assistant Regional Counsel for the U.S. Department of Health and Human Services' ("HHS")

Office of General Counsel. In that position, he "represented the Centers for Medicare and Medicaid Services ('CMS') in matters of regulatory compliance regarding skilled nursing facilities ('SNF')[.]" (Doc. 114-4 at 3.) Thereafter, Mr. Horowitz entered private practice and is currently "Of Counsel" at Arnall Golden Gregory LLP, where he specializes in healthcare law and "handl[es] complex regulatory issues concerning Medicare providers such as skilled nursing facilities, hospices, and home health agencies." (Doc. 114-6 at 2.)

In addition to representing the federal government and SNFs in multiple states, Mr. Horowitz has written several articles and textbook chapters regarding the regulations that govern SNFs. He has also given over one hundred presentations on the topic, focusing on federally mandated resident rights. Mr. Horowitz has served as an adjunct professor "at two medical center/university-based health care programs." (Doc. 114-4 at 20.) There is no evidence that Mr. Horowitz has been previously qualified as an expert witness in state or federal court.

In his report, Mr. Horowitz's explores the law "governing SNFs[.]" *Id.* at 4. He describes federal and state statutory mandates, sub-regulatory guidance, and HHS's Office of the Inspector General ("OIG") oversight. Mr. Horowitz also analyzes caselaw regarding "transfer trauma[,]" and laws concerning the use of chemical and physical restraints by SNFs. *Id.* at 7 (internal quotation marks omitted). He opines that:

> It is common knowledge that there are residents in SNFs, like the . . . [R]esidents involved with the EEOC action, who have documented neurocognitive disorders, including Alzheimer's disease and/or vascular dementia in addition to other co-morbidities. One doesn't have to be a nurse or a nurse aide to appreciate that individuals who require skilled nursing care and have dementia or Alzheimer's disease (which is a form of dementia), are frequently disinhibited, unaware of their surroundings[,] or even who they are. Likewise, their speech—to the extent they still have the ability to speak which will eventually be lost, may often be unintelligible, aggressive, offensive, or even incoherent.

> It is a fact of life that some residents who suffer from Alzheimer's disease and other forms of dementia may say inappropriate and even offensive things. But, that does not permit a facility to evict or mummify a resident with chemicals or shame that resident for exhibiting those behaviors. Presumably, any fair-minded person who chooses to work in a nursing

5

facility recognizes and understands that reality. This concept was even recognized by one of the individuals who worked in food services that was interviewed by the EEOC. It is puzzling that the [Staff] comprised of five seasoned nurses and a nurse aid[e] who have received training about working with these types of residents are seemingly unaware of dementia, Alzheimer's[,] and the common and unfortunate behaviors associated with those conditions. Relative to workplace discrimination, there is a yawning chasm between cognitively impaired residents who live in a nursing facility and employees who work in a nonclinical workplace. The two environments could not be more different. It would be na[ï]ve to pretend there is no difference. People who live in SNFs are residents, not employees. A critical distinction is that employers can control or terminate employees who exhibit discriminatory and offensive speech. However, it would be a fool's errand to try to control the speech of residents with Alzheimer's disease or dementia.

***

Based on my deep familiarity with the governing federal regulations and their history, I unequivocally state that an involuntary discharge or a chemical or physical restraint of any resident—and especially a resident with dementia—absent one of the only six permitted criteria not present in this instance, would be unlawful and result in severe enforcement actions as well as potential collateral litigation. More importantly, it would unnecessarily jeopardize the health and safety of a resident in need of skilled nursing care and proper medical supervision.

Based on my review of voluminous documents, including the medical records of the . . . [R]esidents at issue, I state with a reasonable degree of certainty that Elderwood did all that could reasonably be done to mitigate if not remove the unfortunate situation that is the subject of the pending EEOC litigation. Unfortunately, virtually identical situations exist in many, if not most[,] of the approximately 15,000 nursing facilities in America. Such facts concerning Alzheimer's disease and other dementias are more common than not and are generally accepted by healthcare professionals who cho[o]se to work in SNFs.

*Id.* at 19-20 (footnote omitted).

## B.    The EEOC's Expert Witness Opinions.

Ms. Carnarius is a registered nurse who obtained her Associate's Degree in Registered Nursing in 1993 and has been a licensed nursing home administrator since 1994. From 1989 to 2016, Ms. Carnarius held various management positions at different SNFs. During her position as Executive Director of Balfour Cherrywood Village from

6

2002 through 2016, Ms. Carnarius "[d]esigned [a] dementia-care unit and trained start-up staff" which became a "multi-award-winning senior living residence[.]" (Doc. 113-7 at 3.) She was thereafter "[c]ertified by the Alzheimer's Association through their *Excellence in Dementia Care* program[.]" *Id.* Since 2016, Ms. Carnarius has owned and operated Memory Care Consulting, LLC, through which she "provide[s] consultation services regarding building design and program consulting, care management[,] and caregiving to families and facilities relating to best practices in dementia care[.]" (Doc. 113-8 at 3.)

From 1996 to 2011, Ms. Carnarius served on the Alzheimer's Association Education Committee, and from 1998 to 2004, she was an adjunct faculty member at the Geriatrics Department for Naropa University. Ms. Carnarius has conducted trainings and given lectures on care management and caregiving, and in 2015, she published a book, titled *A Deeper Perspective on Alzheimer's and Other Dementias: Practical Tools with Spiritual Insights.* In 2018, she co-founded The Alchemy of Aging Project, an organization that "facilitates education, workshops, and retreats promoting contemplative and positive ideas and approaches to aging." *Id.* at 4.

Ms. Carnarius was retained by the EEOC "as an expert in the senior care industry to provide a response to the conclusions reached" by Dr. Fremed and Mr. Horowitz. *Id.* at 3. In her report, Ms. Carnarius explains the stages of dementia and the senior care industry standards concerning how to respond to residents with dementia. After reviewing only AC's medical records, she opines as follows:

> [AC's] racist language and physical attacks are egregious, intense, and are far beyond typical behavior of a person with dementia. The records I reviewed document his scary, aggressive, predatory[,] and inappropriate acts towards Black caregivers. While caregivers in the senior care industry know that dementia clients can have difficult behaviors, can be disinhibited, and may not be able to control themselves, this situation did not present a typical dementia situation. This is much more extreme than an occasional inappropriate verbal comment or someone striking out with frustration during care.

*Id.* at 81.

With respect to AC, Ms. Carnarius states:

[AC's] obsessive persistent pursuit and stalking and persistent angry racially abusive language towards Black staff became a way to express how angry he was[.] . . . [H]e was not confused about his consistent rage. With dementia, confused people forget what they were angry about, who they interacted with, or what just happened. He was targeting people in a way that does not seem confused, even if identified as disinhibition. He was too consistent and motivated to continue these attacks. It is likely [AC] had a comorbidity of mental health issues coupled with severe depression, poor adjustment to placement, and disinhibition with decompensation. This is important [] not only to responding to his inappropriate behaviors, but also to keeping staff safe.

*Id.*

Ms. Carnarius opines as follows regarding Elderwood's remedial measures:

[I]t is my opinion that, contrary to the conclusions reached by Dr. [] Fremed and [Mr.] Horowitz, Elderwood . . . did not timely take all reasonable and generally accepted measures in the senior care industry to address [AC's] racist behaviors toward Black staff. For example, Elderwood . . . failed to:

- Maintain a policy or clear practice on how to address caregiver complaints of inappropriate behaviors by residents, such as [AC's] racist behaviors towards Black staff;

- [T]imely investigate [AC's] racist behaviors towards Black staff or document the same;

- [E]mploy a team approach to [AC's] care that included collaboration and communication with frontline, impacted caregivers about his racist behaviors and how to track and document the same;

- [P]roactive[ly] inform Black staff in advance of [AC's] racist behaviors;

- [P]rovide advanced, targeted training to caregivers regarding [AC's] atypical behaviors towards Black staff or appropriate responses to it;

- [T]imely attempt to identify an appropriate placement for [AC]; or

- [E]xplore alternative interventions, such as the assignment of a one-on-one caregiver.

*Id.* at 87-88.

In her report, Ms. Carnarius finds the following regarding medication

8

interventions for AC:

> In situations involving egregious behavior like that of [AC,] medication is often a consideration to help bridge a dementia patient's difficult period. Medications can provide more calm for the individual and greater safety for the caregivers. As noted, dementia progresses and such treatment will likely not be necessary long term[] but assessed periodically to decrease or cease.

> The medical doctor can be supportive with medication intervention when that is warranted, and medication choices exist to address specific issues. For example, if the person is already on an anti-depressant, hypertensive, pain, or seizure medication, an adjustment of medications can provide treatments for these comorbidities while also helping to calm the impulsive caustic verbal abuse or agitation. Successful medical interventions require a team approach with engagement from all caregivers and proper documentation of triggers, behaviors, medical history, and other interventions, because medication alone is not likely to ever address all egregious behaviors.

> The same is true for addressing [AC's] racist behaviors towards Black staff. Medication may have assisted in addressing some of his most difficult periods, but without the other actions by management discussed here, these medications alone would not likely address all his racist behaviors towards Black staff.

(Doc. 113-8 at 86-87.) Ms. Carnarius concludes:

> In the senior care industry, there are generally accepted ways to handle dementia residents with inappropriate verbal and physically aggressive behaviors. Senior care facilities must protect their caregivers while working proactively in a timely manner with residents, families, caregivers, and doctors to curtail the inappropriate and dangerous behavior. If discharge to a more appropriate setting is not possible, senior care facilities must increase the level of urgency in their care responses if they continue to provide care, as well as the level of training and support provided to caregivers. Elderwood at Burlington had multiple opportunities, significantly in the first six months following [AC's] admission, to address [AC's] racist behaviors towards Black staff and obtain better outcomes, but failed to take the appropriate actions consistent with generally accepted industry standards.

*Id.* at 88. She does not provide opinions regarding CD and MR. It does not appear that Ms. Carnarius has been previously qualified as an expert witness in state or federal court.

## C.    Conclusions of Law and Analysis.

### 1.    Standard of Review.

Expert testimony is governed by Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 requires the court to serve as gatekeeper for expert testimony, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

In determining the reliability of expert testimony, the court engages in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. Under *Daubert* and its progeny, relevant factors to assess reliability include:

(1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community[.]

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) (quoting *Daubert*, 509 U.S. at 593-94).

"[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). In determining whether an expert witness's testimony is admissible, "the district court should undertake a rigorous

10

examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). The court must "make certain that an expert, whether basing [his or her] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 265-66 (internal quotation marks omitted) (quoting *Kumho Tire*, 526 U.S. at 152).

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266. For this reason, expert testimony should be excluded "if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison[.]" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citations and internal quotation marks omitted). "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020) (internal quotation marks omitted) (quoting *Boucher*, 73 F.3d at 21); *see also Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 536 (S.D.N.Y. 2024) ("Rule 702 'embodies a liberal standard of admissibility for expert opinions.'") (quoting *Nimely v. City of N.Y.*, 414 F.3d 381, 395 (2d Cir. 2005)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (emphasis in original); *see also Amorgianos*, 303 F.3d at 265 ("[T]he district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case."). "The proponent of the expert testimony has the burden to establish these admissibility requirements[.]" *See In re*

11

*Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).

Courts may exclude expert witness opinions when the moving party demonstrates that those opinions are inadmissible and may grant summary judgment if "the admissible evidence is insufficient to permit a rational juror to find in favor of the [non-moving party.]" *Amorgianos*, 303 F.3d at 267. "The standard for admissibility [of an expert witness's opinion] is the same at the summary judgment stage as it is at trial." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) ("On a motion for summary judgment, disputed issues of fact are resolved against the moving party[.] . . . But the question of admissibility of expert testimony is not such an issue of fact[.]").

### 2.    Whether Dr. Fremed's Opinions Should Be Excluded.

The EEOC argues that Dr. Fremed's opinions must be excluded because they are "irrelevant, unreliable, and exceed[] his expertise while attempting to usurp the jury's role." (Doc. 112-1 at 4.)

### a.    Whether Dr. Fremed's Opinions Are Relevant.

Characterizing Dr. Fremed's testimony as irrelevant, the EEOC asserts that Dr. Fremed provides only "generalized opinions about AC's, CD's[,] and MR's cognitive abilities" which "do not bear on any fact of consequence in this matter." *Id.* at 4. In fulfilling its gatekeeping role,

> the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*Amorgianos*, 303 F.3d at 265 (internal quotation marks omitted) (alteration adopted) (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)).

As framed by the EEOC, "[t]his case centers on whether [Elderwood] took prompt, effective remedial measures to address its racially hostile work environment." (Doc. 112-1 at 5) (emphasis omitted). Determining what constitutes sufficient remedial

12

action for a hostile work environment claim is a fact-specific inquiry based on the totality of the circumstances. *See Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 266-67 (E.D.N.Y. 2019) ("The [c]ourt analyzes whether an employer's remedial actions were sufficient based on the totality of the circumstances.") (citations omitted); *Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) ("What constitutes prompt remedial action is a fact-specific inquiry and 'not every response by an employer will be sufficient' to absolve the employer of liability under Title VII.") (citation omitted). Determining whether Elderwood took sufficient remedial measures requires considering the severity of the Residents' cognitive impairments and whether Elderwood could have and should have taken other or additional remedial measures to respond to them. The court thus finds that Dr. Fremed's opinions are relevant in that they pertain to the issues before the court on summary judgment and address issues which may potentially be presented to a jury at trial.

### b.    Whether Dr. Fremed's Opinions Are Reliable.

The EEOC argues that Dr. Fremed's opinions are unreliable because "(1) his report and testimony merely advances [Elderwood's] case theory; (2) Dr. Fremed cherry picks and recharacterizes information from documents that speak for themselves; (3) his medical opinions exclude medically relevant considerations; and (4) his analysis and resulting conclusions crucially fail to consider time." (Doc. 112-1 at 7.)

Although this court has held it is impermissible to use an expert's opinions as "merely a conduit for the opinions of [a party] and [their] counsel[,]" *Est. of Puppolo v. Welch*, 2017 WL 4042342, at *16 (D. Vt. Sept. 12, 2017), *aff'd sub nom. Puppolo v. Welch*, 771 F. App'x 64 (2d Cir. 2019), Dr. Fremed is not such a conduit. In *Welch*, this court concluded that the expert's opinion was a conduit for the plaintiff's arguments because the expert "performed none of the legal research presented in [his report]" and only made "minor revisions" to the report which was prepared for him by the plaintiff's counsel. *Id.* Dr. Fremed independently prepared his own expert witness report based on his medical expertise and his personal review of the Residents' medical records.

The EEOC relies on *In re Acetaminophen - ASD-ADHD Products Liability*

13

*Litigation* ("*Acetaminophen*"), 707 F. Supp. 3d 309 (S.D.N.Y. 2023) to argue that Dr. Fremed's report impermissibly cherry picks information from the Residents' medical records, thereby generating unreliable opinions. *Acetaminophen* involved an expert witness's opinion regarding causation. In that case, the court described "[c]herry-picking [as] a form of 'result-driven analysis which undermines principles of the scientific method by applying methodologies (valid or otherwise) in an unreliable fashion.'" *Id.* at 336 (citation omitted). The court found that the expert's opinion was unreliable because he "cherry pick[ed] isolated findings in studies measuring multiple outcomes, ignore[d] inconsistent results, and dismisse[d] the express limitations of study authors." *Id.* at 357.

According to the EEOC, Dr. Fremed's report recharacterizes the facts by "de-emphasiz[ing] or entirely omit[ting] descriptions of racial harassment and related complaints to management[,]" which renders his opinions "unreliable and inadmissible because they merely serve as a vehicle for [Elderwood's] alternative factual narrative." (Doc. 112-1 at 8, 10.) Because expert reports are generally not admitted as evidence at trial, the EEOC's concern about the inclusivity of Dr. Fremed's report may be addressed through cross-examination.[3]

"Experts may use the facts from the evidentiary record in order to show how 'a document is supportive of an opinion' but cannot 'go beyond recitation' of the facts by 'characterizing the document for the purposes of having the fact finder accept that interpretation as fact.'" *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, 2021 WL 234550, at *12 (E.D.N.Y. Jan. 19, 2021) (alterations adopted) (quoting *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), *aff'd sub*

---

[3] *See, e.g., CNY Fair Hous., Inc. v. Wellclover Holdings LLC*, 2024 WL 2049047, at *2 (N.D.N.Y. May 8, 2024) ("Since expert reports are generally not admissible at trial, the parties should focus on the expert opinions [p]laintiffs are seeking to admit at trial to which [d]efendants object."); *Winfield v. City of N.Y.*, 2017 WL 2880556, at *4 n.2 (S.D.N.Y. July 5, 2017) ("Expert reports themselves are typically the subject of hearsay objections and not admitted into evidence at trial.") (citation omitted), *objections overruled*, 2017 WL 5054727 (S.D.N.Y. Nov. 2, 2017); *Gabel v. Richards Spears Kibbe & Orbe, LLP*, 2009 WL 1856631, at *2 (S.D.N.Y. June 26, 2009) ("Expert reports are for the guidance of counsel during discovery, not for the jury to consider during trial.").

14

*nom.*, *ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019)). To the extent Dr. Fremed's opinions impermissibly recharacterize evidence, he cannot testify in that manner because the medical records are the best evidence of the Residents' diagnoses and treatments. Insofar as the EEOC challenges Dr. Fremed's opinions as "cherry-picking" medical records and failing to consider certain information to reach a desired conclusion, that issue impacts the weight, not admissibility, of his opinions because Dr. Fremed's opinions have a sufficient basis in the medical evidence to render them reliable. *See, e.g.*, *Sokolovic v. CVS Health*, 2023 WL 2742148, at *10 (E.D.N.Y. Mar. 31, 2023) ("[E]ven assuming that [expert witness] failed to review any safety data sheets, exclusion is not warranted on this basis."); *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 2011 WL 13228299, at *2 (D. Conn. Jan. 21, 2011) ("[A]n expert's failure to consider important facts and materials can be adequately 'explored on cross examination and goes to the weight of the evidence[.]'"). Vigorous cross-examination is likely to expose any material omissions of relevant factual information and any result-oriented bias.

The EEOC next argues that Dr. Fremed's opinions are unreliable because he does not consider relevant psychiatric and psychological information, such as AC's suicidal ideations and major depressive disorder upon arrival at Elderwood, and his estranged wife's description of AC's violent tendencies and racism prior to his admission. Again, this challenge goes to the weight of his opinions, not their admissibility, and can be raised on cross-examination. *See Dover v. Brit. Airways, PLC (UK)*, 254 F. Supp. 3d 455, 461 (E.D.N.Y. 2017) ("Any arguable weakness in . . . methodology, or the possibility that relevant factors were omitted, goes to weight, not admissibility [of an expert opinion].") (citation omitted).

As the EEOC correctly points out, in his report, Dr. Fremed's descriptions of the Residents' diagnoses do not specify when those diagnoses were made. However, Dr. Fremed considered medical records which contain those diagnoses and the dates on which they were rendered. Dr. Fremed's opinions are not inadmissible simply because they are not anchored to a specific time period. The facts of the case supply the time

15

periods involved. *See Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 507 (S.D.N.Y. 2008) ("To the extent [d]efendants have any questions about the weight or the sufficiency of the evidence upon which [expert witness] relied, or the conclusions generated therefrom, those questions can be asked on cross-examination."); *see also In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) ("[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."). To the extent Dr. Fremed ascribes a single mental and cognitive state to AC throughout his stay at Elderwood, that opinion is inadmissible because it is not grounded in the facts of this case and the medical records upon which Dr. Fremed relied in forming his opinions.[4]

### c.    Whether Dr. Fremed's Opinions Exceed His Expertise.

The EEOC claims that "Dr. Fremed's opinions on [Elderwood's] allegedly responsive actions to its hostile work environment must be excluded because they exceed his area of expertise and usurp the role of the jury." (Doc. 112-1 at 14.) Although Dr. Fremed does not have experience operating or practicing in an SNF, he is a doctor and neurologist with over forty years of experience. This provides sufficient education, training, and expertise for him to render medical opinions regarding the Residents' cognitive functioning. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 281 (E.D.N.Y. 2022) ("[C]aselaw is clear that experts may be qualified based on their general expertise even when they lack more

---

[4] For example, upon admission at Elderwood, AC's cognitive state was described as "without behavioral disturbance[.]" (Doc. 112-8 at 2) (capitalization removed). At multiple times throughout the medical record, he was described as "pleasant and cooperative[,]" (Doc. 113-8 at 67), he had relatively benign Brief Interview for Mental Status scores, and he was discharged from the emergency room because his behavior was unremarkable there and did not pose a danger to himself or others. An expert may not mislead the jury by changing the facts of the case. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . misleading the jury[.]"); *see also Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, 2025 WL 2592224, at *14 (S.D.N.Y. Sept. 8, 2025) ("It is inappropriate for experts to act as a vehicle to present a factual narrative in effect simply accumulating and putting together one party's story.") (internal quotation marks and citation omitted) (alteration adopted).

16

specific expertise in the industry in question.") (citation omitted).

The EEOC's argument that Dr. Fremed's opinions exceed his expertise because he rendered conclusions based on legal, moral, and ethical principles, for which he has no qualifications, gains more traction. In his deposition, Dr. Fremed testified that he considered Elderwood's legal, moral, and ethical obligations in deciding whether to release a patient:

> Dr. Fremed: [Elderwood] had a legal, moral, ethical obligation to provide a safe discharge plan which was not possible in this case, so I did lump that under medical perspective, but I understand what you're trying to parse out so . . .
>
> The EEOC's counsel: So your conclusions in this report are not just based on your medical perspective, but, also, your practical and moral perspective?
>
> Dr. Fremed: So, as I just answered, I considered that part of the medical perspective. In other words, medicine is advocating for your patient. I know there's no doctor/patient relationship in my case, but advocating for your patient would not allow for unsafe discharge. So that is medical.

(Doc. 112-5 at 21:4-18.) The court agrees that, to the extent Dr. Fremed's opinions are based on legal, moral, or ethical obligations beyond those imposed upon healthcare providers, they are inadmissible. He is not qualified to render a legal opinion and his opinions regarding a party's moral obligations are irrelevant. These opinions are thus excluded. A physician may, however, be bound by ethical considerations that would preclude recommending a patient's discharge to an unsafe environment. To the extent such obligations exist, Dr. Fremed is competent to testify to them.

> ### d.      Whether Dr. Fremed's Opinions Usurp the Role of the Jury.

Federal Rule of Evidence 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, expert testimony is prohibited if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (internal quotation marks omitted) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). "When an

17

expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Id.* (emphasis in original).

For a claim of hostile work environment, the EEOC must establish that Elderwood "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000). "What constitutes prompt remedial action is a fact-specific inquiry and not every response by an employer will be sufficient to absolve the employer of liability under Title VII." *Dike v. Columbia Hosp. Corp. of Bay Area*, 2025 WL 315126, at *5 (5th Cir. Jan. 28, 2025) (internal quotation marks and footnote omitted).

The EEOC argues that Dr. Fremed offers two legal conclusions: "The records indicate that all possible measures were deployed to diffuse and deescalate the numerous situations documented, but none of the measures would have been expected to be successful every time[,]" and "[f]rom the medical perspective, I therefore do not see what else could have been done to remedy [AC's] behavior and make the work environment better for the affected employees and residents." (Doc. 112-4 at 25-26.)

For a hostile work environment claim, it is the jury's role to decide whether a defendant took effective and prompt remedial measures. *See Dobrich v. Gen. Dynamics Corp., Elec. Boat Div.*, 106 F. Supp. 2d 386, 394 (D. Conn. 2000) ("The promptness and adequacy of an employer's response is generally a question of fact for the jury.") (citations omitted). By opining that "all possible measures were deployed" and nothing else "could have been done[,]" (Doc. 112-4 at 25-26), Dr. Fremed is usurping the role of the jury. *See Wells Fargo Bank, N.A. v. United States Life Ins. Co. in City of N.Y.*, 2025 WL 2220948, at *23 (S.D.N.Y. Aug. 4, 2025) ("[A] crucial factual question in this litigation is when [decedent] in fact was born, as its answer will dispose of the threshold legal issue of whether her age was misstated in the Policy. If her age was not misstated, [defendant] cannot prevail in this action. By not just opining on [decedent]'s date of birth, . . . [expert witness]'s testimony would usurp the fact-finding function of the jury."); *see also Red Hawk, LLC v. Colorforms Brand LLC*, 638 F. Supp. 3d 375, 383 (S.D.N.Y.

18

2022) ("When an 'expert acts outside of [his] limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination,' the testimony usurps the role of the jury in applying the law to the facts.") (quoting *Duncan*, 42 F.3d at 101). Accordingly, Dr. Fremed's opinions that Elderwood took all possible measures to remedy the allegedly hostile work environment and that Elderwood could not have done anything further to redress the situation are excluded. He may, however, opine as to whether other remedial measures would have been consistently successful in light of the Residents' cognitive impairments. This opinion is within his expertise, is relevant, and may be helpful to the jury.

For the reasons stated above, the EEOC's motion to exclude Dr. Fremed's opinions is GRANTED IN PART and DENIED IN PART.

### 3.    Whether Mr. Horowitz's Opinions Should Be Excluded.

The EEOC argues that Mr. Horowitz's opinions should be excluded for three reasons: they provide "impermissible legal conclusions that usurp the role of this [c]ourt and the jury[,]" contain "conclusory statements that reflect unreliable methods[,]" and are "based on inappropriate credibility assessments" and "overlook[] key, relevant facts." (Doc. 114-1 at 2.)

### a.    Whether Mr. Horowitz's Opinions Exceed His Expertise or Involve Lay Matters.

The parties do not dispute that Mr. Horowitz is qualified as a legal expert in SNF law.[5] "An expert must, however, stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994), *aff'd sub nom.*, *Lappe v.*

---

[5] After notifying the parties at oral argument of its concerns, the court *sua sponte* considers whether certain opinions of Mr. Horowitz exceed his expertise or involve lay matters. *See Funk v. F & K Supply, Inc.*, 43 F. Supp. 2d 205, 222 n.8 (N.D.N.Y. 1999) ("Although this issue was not raised by plaintiffs, I may raise it *sua sponte*.") (citation omitted); *Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 255 n.8 (S.D.N.Y. 1993) ("Although neither plaintiff nor defendants brief this issue, the [c]ourt is entitled to address it *sua sponte*."); *Royal Park Invs. SA/NV v. Bank of New York Mellon*, 2019 WL 652841, at *7 n.3 (S.D.N.Y. Feb. 15, 2019) ("This [c]ourt has the discretion to consider arguments which were not raised by the parties.") (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)).

*Honda Motor Co. of Japan*, 101 F.3d 682 (2d Cir. 1996).

> "In other words, 'where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of their expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case.'"

*Walker v. Schult*, 365 F. Supp. 3d 266, 276 (N.D.N.Y. 2019) (citation omitted).

Mr. Horowitz opines that the Residents have Alzheimer's disease and/or dementia, and "[a]s such, these [R]esidents, like any resident with advanced dementia, can hardly be expected to stop uttering offensive words just because he/she is asked to do so." (Doc. 114-4 at 18.) Mr. Horowitz concludes that:

> It is common knowledge that there are residents in SNFs, like the . . . [R]esidents involved with the EEOC action, who have documented neurocognitive disorders, including Alzheimer's disease and/or vascular dementia in addition to other co-morbidities. One doesn't have to be a nurse or a nurse aide to appreciate that individuals who require skilled nursing care and have dementia or Alzheimer's disease (which is a form of dementia), are frequently disinhibited, unaware of their surroundings or even who they are. Likewise, their speech – to the extent they still have the ability to speak which will eventually be lost, may often be unintelligible, aggressive, offensive, or even incoherent.
>
> It is a fact of life that some residents who suffer from Alzheimer's disease and other forms of dementia may say inappropriate and even offensive things.

*Id.* at 19.

Mr. Horowitz's opinions regarding the behaviors associated with Alzheimer's disease and dementia are medical opinions and beyond his expertise as a legal expert.[6] To the extent that Mr. Horowitz's opinions are based on "common knowledge" or "fact[s] of life[,]" *id.*, that testimony "is 'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help[]'" and is inadmissible. *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (citation omitted); *see also Chalmers v.*

---

[6] In his report, Mr. Horowitz claims that he "ha[s] a[n undated] clinical background as a registered nurse and respiratory therapist[,]" however, there is no evidence of these alleged qualifications in his CV. (Doc. 114-4 at 20.) Moreover, as Elderwood admits, he was offered as a legal expert in this case, not a medical expert.

*City of N.Y.*, 2022 WL 4330119, at *8 (S.D.N.Y. Sept. 19, 2022) ("Proposed expert testimony should be excluded if it will not assist the factfinder because it is based on 'common sense, the antithesis of expert knowledge.'") (citation omitted).

Mr. Horowitz's opinions regarding what may be expected from patients with neurocognitive disorders are beyond his expertise and are excluded.

### b.    Whether Mr. Horowitz's Opinions Contain Legal Conclusions.

The EEOC contends that Mr. Horowitz's opinions "primarily consist[] of his legal conclusions that: (1) the EEOC's Complaint and Amended Complaint are not legally cognizable; (2) [Elderwood] did all [it] reasonably could do without violating CMS regulations; and (3) Title VII must give way to CMS, such that [Elderwood] [is] not liable here." (Doc. 114-1 at 5) (internal citations omitted). The court agrees that none of these opinions are admissible.

In a July 17, 2023 Opinion and Order ("July 17, 2023 Order"), this court determined that the EEOC's hostile work environment claim was legally cognizable and denied Elderwood's motion for judgment on the pleadings as a result. *See* Doc. 42 at 11 ("[The CMS] regulations do not entitle Elderwood to judgment on the pleadings because the EEOC has plausibly alleged that remedial measures remained available.") (citation omitted). In his report, Mr. Horowitz finds that "[t]he EEOC's Complaint is [] not legally cognizable based on the CMS regulations, state law[,] and the limitations placed on [SNFs] with respect to what can be imposed on residents[.]" (Doc. 114-4 at 3.) In his deposition, he testified that he disagreed with the court's conclusion in its July 17, 2023 Order, declining to grant judgment on the pleadings. In this respect, he purports to instruct the court and the jury as to the law. This is not permissible. *See Vengalattore v. Cornell Univ.*, 36 F.4th 87, 101 (2d Cir. 2022) (stating that "[t]he matter of whether a complaint states a claim on which relief can be granted is [] a question of law" which courts decide). As an expert witness, it is not Mr. Horowitz's role to "explain[] why the EEOC's Complaint lacks merit[.]" (Doc. 114-4 at 4.) Accordingly, Mr. Horowitz cannot testify as to whether the EEOC's claim is legally cognizable or meritorious.

21

Mr. Horowitz offers explanations of the federal and state regulatory scheme surrounding resident care in SNFs and OIG oversight, caselaw regarding transfer trauma, and the legal landscape concerning resident rights, discharge, and the use of chemical and physical restraints. In doing so, Mr. Horowitz describes "the intent of Congress[]" in implementing CMS regulations, *id.* at 3, and "explains the meaning of regulations so that the [c]ourt understands the limitations imposed on Elderwood[][.]" (Doc. 121 at 8.) However, as this court and courts in the Second Circuit have long held, "[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Gordon v. New England Cent. R.R., Inc.*, 2019 WL 4068639, at *3 (D. Vt. Aug. 28, 2019) (internal quotation marks omitted). "[E]ach courtroom comes equipped with a legal expert, called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Grajeda v. Vail Resorts Inc.*, 2023 WL 2613543, at *3 (D. Vt. Mar. 23, 2023) (internal quotation marks omitted) (quoting *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)). As a result, "an expert's testimony on issues of law is inadmiss[i]ble[,]" *Bilzerian*, 926 F.2d at 1294, and "experts are prohibited from testifying as to the content or application of the law." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 96 (S.D.N.Y. 2001) (citations omitted).[7] "The danger is that the jury may

---

[7] *See also Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge."); *In re ACTOS Antitrust Litig.*, 783 F. Supp. 3d 749, 770 (S.D.N.Y. 2025) ("Experts are . . . not permitted to give opinions as to the meaning and scope of the law, as those issues are reserved for the judge alone.") (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 754 F. Supp. 3d 456, 467 (S.D.N.Y. 2024) ("[A]n expert is barred from giving testimony on issues of law."); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 381 (S.D.N.Y. 1999) ("[T]he testimony of an expert on matters of domestic law is inadmissible for any purpose."); *Gordon v. New England Cent. R.R., Inc.*, 2019 WL 4024726, at *6 (D. Vt. Aug. 27, 2019) ("[Expert witness] may testify that, in determining his cost estimate, he considered the need to comply with certain regulations, but he may not opine on what federal, state, or local regulations require in this case."); *Gelwan v. Vermont Mut. Ins. Co.*, 2009 WL 3682489, at *1 (S.D.N.Y. Nov. 2, 2009) ("[Expert witness] may not, of course, give any expert testimony nor any testimony as to what the law is."); *DeGregorio v. Metro-N. R.R. Co.*, 2006 WL 3462554, at *3 (D. Conn. Nov. 1, 2006) ("[A]n expert should not be permitted to express an opinion that is merely an interpretation of federal

think that the 'expert' in the particular branch of the law knows more than the judge—surely an inadmissible inference in our system of law." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

To the extent that Mr. Horowitz explains the meaning and application of regulations and sub-regulatory guidance governing SNFs, caselaw interpreting such regulations, and OIG oversight and enforcement, Mr. Horowitz is again testifying regarding the content, application, and proper interpretation of the applicable law and usurping the role of the court. *See Gordon*, 2019 WL 4068639, at *3 ("[The expert witness]'s opinion that 49 C.F.R. § 213.33 sets forth the 'standard of care to which the [defendant] was subject,' is a legal conclusion that is the province of the court. Similarly, [the expert witness]'s opinion that a fifty-year rain event is 'not outside the range of "expected storm water flow for the area concerned" as required for adequate drainage pursuant to 49 C.F.R. § 213.33,' is inadmissible as it . . . offers a legal definition of the applicable federal regulation[.]") (alterations adopted) (internal citations omitted); *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 2019 WL 1304452, at *3 (S.D.N.Y. Mar. 21, 2019) (excluding an expert witness's opinions entirely because his testimony "attempts to instruct the jury on the governing law in this case and its application to the facts as [expert witness] describes them[]" and his "report functions as a legal brief, and in some portions as an argument in summation[]" which "is not admissible testimony from an expert[]"). Although it would be permissible for Mr. Horowitz to identify the relevant statutes, regulations, and caselaw governing Elderwood as an SNF,[8] this same function

---

statutes or regulations, as that is the sole province of the [c]ourt.") (citations omitted); *Wantanabe Realty Corp. v. City of N.Y.*, 2004 WL 27720, at *2 (S.D.N.Y. Jan. 5, 2004) ("[Expert witness] will not be permitted to . . . offer opinions on the law."); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2000 WL 1694321, at *1 (S.D.N.Y. Nov. 13, 2000) ("No expert may testify as to what the law is."); *U.S. Media Corp. v. Edde Ent., Inc.*, 1997 WL 61368, at *1 (S.D.N.Y. Feb. 13, 1997) ("The law is plain in this circuit that a party may not call an 'expert' to testify as to the substance of domestic law."); *Martin v. Valley Nat'l Bank of Arizona*, 140 F.R.D. 291, 312 (S.D.N.Y. 1991) ("[I]t is improper to offer expert witnesses to testify as to purely legal questions governed by domestic law.") (citations omitted).

[8] *See Bilzerian*, 926 F.2d at 1294 (holding expert witness properly testified to "general background on federal securities regulation and the filing requirements of Schedule 13D, which

may be achieved through judicial notice. *See, e.g., Equal Emp. Opportunity Comm'n v. 98 Starr Rd. Operating Co.*, 682 F. Supp. 3d 414, 425 (D. Vt. 2023) ("Courts are permitted to take judicial notice of the contents of the Federal Register and the Code of Federal Regulations and guidance from administrative agencies.") (internal quotation marks and citation omitted). Because the court and the parties have the ability to identify the applicable law governing Elderwood for the jury, the identification of statutes, regulations, and caselaw surrounding SNFs does not require special expertise. Mr. Horowitz's opinions identifying the relevant law would therefore not be helpful.

To the extent Mr. Horowitz opines that the six criteria of 42 C.F.R. § 483.15(c)(1) and Vermont's Licensing and Operating Rules for Nursing Homes § 3.14(a), which permit involuntary discharge or transfer of an SNF resident in certain circumstances, were not satisfied or do "not . . . apply in this case[,]" (Doc. 114-4 at 5), he again states legal conclusions. Mr. Horowitz renders similar opinions throughout his report, including the following statements:

- "None of the above prerequisites for an involuntary transfer/eviction exist in the pending matter[]";

- "Inappropriate discharges, such as what the EEOC would have had Elderwood undertake are [] unlawful";

- "None of the three [R]esidents identified in the EEOC Complaint experienced a sufficient improvement in their health that would remotely justify an involuntary discharge[]";

- "Arguably, in addition to violating the specific right again[st] chemical restraints, forcing a resident to have an inappropriate dose of an antipsychotic drug simply for the convenience of the staff would also violate their right to refuse medication and their right to be treated with dignity and respect[]";

---

he presented by referring to a blank form[]"); *Uzhca v. Wal-Mart Stores, Inc.*, 2023 WL 2529186, at *11 (S.D.N.Y. Mar. 15, 2023) (finding expert witness "is not permitted to testify to the meaning, intent, or applicability of any FMCSA regulations or other federal regulations[]" and "may not state to the jury, in any form, whether a regulation was violated[]" but "is permitted to reference the relevant federal regulations if his testimony is based on such regulations in addition to his industry experience[]"); *United States v. Parasmo*, 2021 WL 4264762, at *1 (E.D.N.Y. Sept. 20, 2021) ("Expert witnesses are permitted to make reference to rules and regulations that govern their area of expertise[.]").

24

- "[A]n involuntary discharge would violate more than one regulatory prohibition[]";

- "Arguably, evicting a resident who needs skilled nursing care without a legitimate reason or chemically restraining a resident for the convenience of the staff would trigger Vermont's elder abuse laws, in addition to the federal prohibitions[]";

- "Using antipsychotic medications solely for the convenience of the staff who do not want to hear offensive language would seem to constitute a form of abuse under Vermont law, as well as under federal statutes and regulations. So too, would an impermissible involuntary discharge/eviction constitute a form of neglect under both state and federal laws[]";

- "Providing an excessive dose of antipsychotic or any other medication to a resident would be unacceptable and unlawful based on CMS'[s] regulations[]"; and

- "[I]t would be a major violation of the applicable federal regulation to attempt to chemically restrain or inappropriately 'quiet' these residents with the inappropriate use of antipsychotics or any other drug."

(Doc. 114-4 at 6-18.)

Opinions as to whether conduct violates certain statutes and regulations are legal conclusions which are impermissible and assume the functions of the jury. *See Gordon*, 2019 WL 4068639, at *4 ("To the extent [expert witness] seeks to opine that Defendant violated 42 C.F.R. § 213.33 by failing to remove a metal plate from a culvert and that Defendant's alleged violation of 42 C.F.R. § 213.33 caused the embankment to collapse, these are ultimate conclusions that are exclusively the province of the jury."); *United States v. Hatfield*, 2010 WL 11515681, at *1 (E.D.N.Y. Mar. 2, 2010) ("[Expert witness] may not specifically opine concerning whether [d]efendants' conduct violated any applicable law and regulation.") (citation omitted); *DeGregorio v. Metro-N. R.R. Co.*, 2006 WL 3462554, at *4 (D. Conn. Nov. 1, 2006) ("[I]f [an expert witness's] testimony is based on certain regulations in addition to his industry experience, he may reference those regulations. [The expert] may not, however, offer an opinion that concludes or opines that such regulations were violated.") (internal quotation marks omitted). Mr. Horowitz thus may not testify that Elderwood would have violated applicable regulations

25

by taking certain remedial actions. Elderwood's counsel may, however, make this argument to the jury without the need for an expert witness opinion.

For the reasons stated above, Mr. Horowitz's opinions on the merits of the EEOC's claim, the laws governing SNFs, and the legality of certain remedial measures are excluded. Although it is permissible to call an expert witness to identify relevant statutes and regulations, judicial notice will serve this same function.

### c.   Whether Mr. Horowitz's Opinions Usurp the Role of the Jury.

Like Dr. Fremed, Mr. Horowitz opines that Elderwood "took prompt remedial action to address any concerns that were raised by" the Staff and "did all that could reasonably be done to mitigate if not remove the unfortunate situation that is the subject of the pending EEOC litigation." (Doc. 114-4 at 3, 20.) These statements tell the jury what conclusion to reach. *See Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 179 (S.D.N.Y. 2008) ("While the expert can make factual conclusions that embrace an ultimate issue to be decided by the [factfinder], the expert cannot give testimony stating ultimate legal conclusions based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating.") (citations omitted). These opinions are thus also inadmissible.

### d.   Whether Mr. Horowitz's Opinions Contain Conclusory Statements That Reflect Unreliable Methods.

The EEOC argues that Mr. Horowitz's testimony must be excluded because "it is full of conclusory and speculative statements that the circumstances permitting the involuntary discharge of, or the use of chemical or physical restraints on, residents were not present in this case." (Doc. 114-1 at 10.) Elderwood counters that Mr. Horowitz's statements are not conclusory or speculative because he reviewed "a significant amount of documents, including the medical records of [the Residents], in rendering his opinion[,]" and "[a]ccordingly, as a matter of logic, it makes sense that there would be no specific documents to 'prove the negative[.]'" (Doc. 121 at 9.)

"An expert's testimony must not be conclusory or speculative and must be grounded in reliable evidence." *Brush v. Old Navy LLC*, 687 F. Supp. 3d 452, 466 (D. Vt.

2023) (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)); *see also Vale v. United States of Am.*, 673 F. App'x 114, 116 (2d Cir. 2016) ("Expert testimony is inadmissible as unreliable where it consists of conclusory and speculative opinions, or where it lacks foundation.") (citations omitted). "When presented with an expert opinion that is not sufficiently grounded in reliable facts, 'a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 285 (S.D.N.Y. 2013) (alteration adopted) (quoting *Joiner*, 522 U.S. at 146). A court need not "admit opinion[s] . . . connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. "Conclusory opinions are a form of '*ipse dixit*,' and often provide an insufficient basis upon which to assess reliability." *Est. of Jaquez v. City of N.Y.*, 104 F. Supp. 3d 414, 426 (S.D.N.Y. 2015) (citation omitted). A further concern is argumentative opinions whereby an expert witness essentially offers a closing argument. *See, e.g., Averbach v. Cairo Amman Bank*, 802 F. Supp. 3d 605, 641 (S.D.N.Y. 2025) ("Nor may an expert supplant the role of counsel in making argument at trial.") (internal quotation marks and citations omitted). Such opinions are unhelpful to the jury because they do not reflect the same rigor that could be expected of an expert rendering opinions in his or her field outside the courtroom. *See Kumho Tire*, 526 U.S. at 152 (holding that an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[]").

In *Securities and Exchange Commission v. Badian*, 822 F. Supp. 2d 352 (S.D.N.Y. 2011), the SEC brought a civil enforcement action against an individual for violating securities laws by allegedly manipulating the stock price of a corporation. The defendant sought to introduce expert testimony from a professor. The court excluded the expert's testimony because it was "replete with inadmissible generalized statements of law, legal conclusions[,] and conclusory statements[.]" *Id.* at 357. In so ruling, the *Badian* court cited the following examples: "[The defendant] appears to have complied with all rules applicable to him in the sale of [the corporation's] common stock[]" and "[t]he SEC alleges that . . . the defendant[] violated various SEC rules . . . . These rules, however,

27

apply to regulated broker-dealers and their associated persons, not to [the defendant]." *Id.* at 357-58 (second ellipses in original).

Mr. Horowitz opines that, under federal law and Vermont law, a facility cannot "transfer or discharge [a] resident from the facility, unless one of the six enumerated criteria exist, none of which are present in this matter." (Doc. 114-4 at 16) (alteration adopted) (internal quotation marks and citation omitted). Under federal and Vermont law, discharge is permitted, among other circumstances, when necessary for the resident's welfare or needs, when the safety of the individuals in the facility is endangered due to the behavioral status of the resident, or when the health of the individuals in the facility would otherwise be endangered. *See* 42 C.F.R. § 483.15(c)(1)(i)(A), (C), and (D); Vermont's Licensing and Operating Rules for Nursing Homes § 3.14(b)(1)-(3). Mr. Horowitz's opinions that the six criteria necessary for discharge do not apply to this case constitute impermissible "generalized statements of law, legal conclusions[,] and conclusory statements[.]" *Badian*, 822 F. Supp. 2d at 357.

Mr. Horowitz also concludes that Vermont regulations precluded Elderwood from using chemical or physical restraints on the Residents and that "chemically restraining a resident for the convenience of the staff would trigger Vermont's elder abuse laws[.]" (Doc. 114-4 at 17.) As a threshold matter, Mr. Horowitz does not claim to be an expert in Vermont's elder abuse laws. Even if he claimed that status, Vermont law permits chemical and physical restraints in emergencies, as authorized by a physician, "for a specified and limited period of time, or when necessary to protect the resident from injury to himself or herself or to others[.]" Vermont's Licensing and Operating Rules for Nursing Homes § 3.17(a). Mr. Horowitz seeks to offer these legal opinions which are not grounded in the applicable law or the facts in the case.[9]

---

[9] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 301 (E.D.N.Y. 2022) ("An expert report is deficient if . . . it does not set forth a complete statement of basis and reasons for the expert's opinions.") (alterations adopted) (internal quotation marks and citations omitted); *Piepes v. NAI Ent. Holdings LLC*, 394 F. Supp. 3d 315, 317-18 (E.D.N.Y. 2019) ("Unsupported assertions 'made without explanation or elaboration that would allow a fact finder to follow his reasoning and come to the same conclusion' are

### e.    Whether Mr. Horowitz's Opinions Are Based on Credibility Assessments.

The EEOC contends that "[Mr.] Horowitz's testimony must be excluded because it is based on inadmissible credibility assessments of the [Staff] and a record review that overlooked key materials." (Doc. 114-1 at 12.) "[T]he credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." *Cameron v. City of N.Y.*, 598 F.3d 50, 61 (2d Cir. 2010) (internal quotation marks and citations omitted). As a result, "expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony." *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988).

In his deposition, Mr. Horowitz stated, "I don't necessarily accept [the Staff's allegations] as true[.]" (Doc. 121-9 at 12:24.) When asked what he meant, Mr. Horowitz explained:

> I question any of the assertions that were not witnessed by an employee of [Elderwood]. So if there was an unwitnessed allegation that he slapped me or he poked me with his finger, but it was unwitnessed by anybody . . . I would question that as an unverified allegation.

*Id.* at 13:11-16. Mr. Horowitz stated that he would "question the truthfulness of any unwitnessed physical contact[]"because "it's been my experience over my lifetime that people often embellish, exaggerate[,] or lack veracity when they make certain claims, particularly if there is money involved, potentially." *Id.* at 14:1-15. When asked if he believed the Staff embellished their allegations, Mr. Horowitz stated, "I don't know. All I am saying is that I would not accept as true any allegation, unless it was witnessed by someone. Any unwitnessed assertion is just that." *Id.* at 14:22-25.

Mr. Horowitz also stated that, because of AC's physical characteristics, AC could

---

inadmissible expert opinions.") (citation omitted); *Bermudez v. City of N.Y.*, 2018 WL 6727537, at *6 (E.D.N.Y. Dec. 21, 2018) ("Although plaintiff and [expert witness] identify the materials that [expert witness] reviewed in preparing his initial report, neither adequately explain how [expert witness] reached his offered conclusions. . . . [Expert witness] does not explain the bases of his conclusions, nor the assumptions or foundations upon which his conclusions lie.").

not "pose a legitimate and credible threat to anybody[,]" and "I do not feel that [the] safety of any individual in [Elderwood] was seriously at risk." *Id.* at 11:4-5, 11:19.[10] In his report, Mr. Horowitz opines that "any fair-minded person who chooses to work in a nursing facility" should recognize and understand "residents who suffer from Alzheimer's disease and other forms of dementia may say inappropriate and even offensive things[,]" and "[s]uch facts concerning Alzheimer's disease and other dementias are more common than not and are generally accepted by healthcare professionals who cho[o]se to work in SNFs." (Doc. 114-4 at 19-20.) Mr. Horowitz muses as follows: "It is puzzling that the [Staff] comprised of five seasoned nurses and a nurse aid[e] who have received training about working with these types of residents are seemingly unaware of dementia, Alzheimer's[,] and the common and unfortunate behaviors associated with those conditions." *Id.* at 19. None of these statements have anything to do with Mr. Horowitz's expertise in the law governing SNFs, they are well outside his role as an expert witness, they are framed in argumentative and unprofessional language, and they appear to be grounded only in his concept of common sense.

Although Mr. Horowitz claims his statements are based on "my experience over my lifetime[,]" (Doc. 121-9 at 14:12-13), jurors have similar expertise and do not need an expert witness to help them assess credibility based upon his or her personal experience. *See Scop*, 846 F.2d at 142 ("[E]ven expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible[.]") (citation omitted).

To the extent Mr. Horowitz exceeds his expertise, addresses lay matters within the ken of the average juror, explains the law and how it applies, tells the jurors what conclusions to reach, offers legal conclusions, uses unreliable methods, and makes credibility assessments, his opinions are excluded. The only admissible testimony

---

[10] The biased nature of this opinion alone renders it of questionable reliability. The undisputed facts include three occasions on which Elderwood employees called 911 and had AC removed from the premises because he was a danger to others. Mr. Horowitz does not opine that the 911 calls were unwarranted.

remaining is the identification of statutes and regulations that apply to SNFs, however, the court may take judicial notice of such laws and Mr. Horowitz's opinion on them is thus unnecessary. For these reasons, the EEOC's motion to exclude Mr. Horowitz's opinions is GRANTED.

### 4.    Whether Ms. Carnarius's Opinions Should be Excluded.

Elderwood claims that the opinions of the EEOC's rebuttal expert witness, Ms. Carnarius, must be excluded because she is not qualified to rebut Elderwood's experts, and her opinions are grounded in unreliable methodology and improper hearsay, contain speculation, and include subject matters beyond the scope of rebuttal.

"The 'task of a rebuttal expert is different from that of an affirmative expert.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (citation omitted). "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Id.* (internal quotation marks and citation omitted). "However, rebuttal experts must still meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 139 (S.D.N.Y. 2022) (alteration adopted) (internal quotation marks omitted) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016)).

"Expert rebuttal evidence is allowed if it 'is intended solely to contradict or rebut evidence on the same subject matter identified by another party.'" *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013) (alteration adopted) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)); *see also United States v. Casamento*, 887 F.2d 1141, 1172 (2d Cir. 1989) ("The function of rebuttal evidence is to explain or rebut evidence offered by the other party.") (citation omitted). "The scope of a rebuttal is limited to the 'same subject matter' encompassed in the opposing party's expert report, but district courts have been 'reluctant to narrowly construe the phrase "same subject matter" beyond its plain language.'" *Allen*, 2013 WL 211303, at *5 (internal citation omitted). As a

result, it is proper for a rebuttal expert "to use new methodologies . . . 'for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness[,]'" but improper for a rebuttal expert to "present[] new arguments, unless presenting those arguments is substantially justified and causes no prejudice." *Id.* (internal quotation marks and citations omitted). "A district court has wide discretion over what evidence may be presented on rebuttal." *Casamento*, 887 F.2d at 1172.

Elderwood claims that Ms. Carnarius's testimony exceeds the scope of rebuttal because she offers opinions on the following issue: "Generally accepted practices in the senior care industry relating to the care of residents with dementia and other cognitive diseases, with an emphasis on practices targeted at addressing inappropriate behaviors, such as racial harassment of caregivers." (Doc. 113 at 18) (quoting Doc. 113-8 at 3). This is within the general subject matter of Dr. Fremed's testimony, wherein he explains the remedial measures and practices that Elderwood implemented to address the Residents' behavior. Although Ms. Carnarius purportedly bases her opinions on generally accepted practices in the senior care industry, Ms. Carnarius's opinions remain within the scope of rebuttal. *See Capri Sun GmbH*, 595 F. Supp. 3d at 138 (admitting rebuttal expert testimony despite the rebuttal expert's use of a different methodology to render a "competing analysis"); *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009) (finding the rebuttal expert properly used "new methodologies" in his rebuttal report); *see also Sec. & Exch. Comm'n v. McGinnis*, 2019 WL 13172408, at *6 (D. Vt. Feb. 21, 2019) ("The two experts provide alternative perspectives of the same data. [Rebuttal expert]'s Rebuttal Report is thus properly considered rebuttal.").

### a.    Whether Ms. Carnarius Is Qualified.

Under Federal Rule of Evidence 702, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education[.]" "The initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on his or her perception[.]'" *Nimely*, 414 F.3d at 396 n.11 (alteration adopted) (citation omitted).

"The admission and qualification of experts pursuant to Federal Rule of Evidence 702 is in the broad discretion of the district court." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997) (citation omitted). "Courts within the Second Circuit 'have liberally construed expert qualification requirements' when determining if a witness can be considered an expert." *Sec. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).

Elderwood argues that Ms. Carnarius's lack of formal advanced education beyond an associate's degree for nursing renders her unqualified to rebut Dr. Fremed's opinions, which are based on his medical expertise and Mr. Horowitz's opinions, which are based on his legal expertise. Because Mr. Horowitz's opinions are excluded in their entirety, the court need not determine whether Ms. Carnarius is sufficiently qualified to rebut them.

Insofar as Elderwood argues that Ms. Carnarius lacks expertise to opine regarding medication interventions because she cannot prescribe medication, this alone does not render Ms. Carnarius unqualified. *See Cole v. Perry*, 2019 WL 4165304, at *11 (S.D. Ind. Apr. 30, 2019), *on reconsideration*, 2019 WL 2210809 (S.D. Ind. May 22, 2019) ("There is no dispute that [the n]urse [] cannot prescribe medications or other medical procedures, but it does not follow that [the n]urse [] is not qualified as an expert to offer testimony as to whether those things will be necessary."). Although Ms. Carnarius lacks expertise to provide an opinion on how certain medications would affect AC's behavior, she may opine regarding potential medication interventions based on general practices in the senior care industry. *Compare Smith v. Christus Health Ark-La-Tex*, 2011 WL 13217905, at *5 (E.D. Tex. Apr. 25, 2011) ("As a licensed registered nurse who is prohibited by law from administering medications without an order from a physician, [expert witness] lacks the qualifications to testify as to the nature of a medication's side effects in this instance.") (citation omitted), *with Cooper v. Guider*, 2021 WL 75761, at *2 (W.D. Wis. Jan. 8, 2021) ("Even though [nurse expert witness] is not authorized to prescribe medication, as a registered nurse he has some knowledge of prescription practices and he may be able to provide testimony on the standard of care applicable to [plaintiff]'s claim.").

Ms. Carnarius has over twenty years of experience in direct management of memory care at SNFs and other senior care facilities, owns and operates a consulting service for senior caregiving to individuals with dementia, and published a book about caring for individuals with Alzheimer's disease and dementia. This is sufficient experience to qualify Ms. Carnarius as an expert in the care of patients with memory loss for purposes of this litigation. *See, e.g., Reynolds v. Arnone*, 645 F. Supp. 3d 17, 25 (D. Conn. 2022) ("[Expert witness] has substantial practical experience in corrections, particularly in developing correctional policies. Those practical experiences sufficiently qualify him as an expert witness who can testify about 'correctional best practices.'") (internal citation omitted); *see also In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."). Any challenges to the extent and nature of her experience may be addressed through cross examination.[11]

For the reasons stated above, the court finds that Ms. Carnarius is qualified as an expert witness to rebut the opinions offered by Dr. Fremed regarding remedial measures.[12]

---

[11] Elderwood contends that Ms. Carnarius's alleged lack of knowledge surrounding the impact of COVID-19 on SNFs renders her unqualified to rebut Dr. Fremed's opinions which mention the effects of the pandemic. However, Ms. Carnarius's knowledge, or lack thereof, concerning COVID-19 impacts the weight of her opinions, not her qualifications. *See, e.g., McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("[The defendant's] quibble with [the expert's] academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level) . . . went to his testimony's weight and credibility—not its admissibility.") (citation omitted).

[12] Elderwood claims that Ms. Carnarius's opinions are speculative but does not cite examples of such speculation. Instead, Elderwood challenges Ms. Carnarius's expertise. *See* Doc. 113 at 17 ("Ms. Carnarius'[s] speculation into areas outside of her expertise serve as additional grounds for precluding her testimony.") (citations omitted); Doc. 126 at 10 ("Ms. Carnarius'[s] testimony here is speculatory since she is limited to rebutting Dr. Fremed . . . which [is an] area[] outside of her expertise."). Ms. Carnarius is qualified and her opinions are not speculative.

### b.    Whether Ms. Carnarius's Opinions Are Based On Unreliable Methodology.

For an expert's opinion to be reliable, there must be "a sufficiently rigorous analytical connection between th[e] methodology and the expert's conclusions." *Nimely*, 414 F.3d at 396. To determine whether an expert's opinion is reliable, the Second Circuit has instructed:

> [A] district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."

*Amorgianos*, 303 F.3d at 267 (citations omitted).

Elderwood argues that Ms. Carnarius's opinions lack a legitimate methodology because she "is not a doctor, and not a lawyer, and has never worked in a [SNF] . . . in the State of Vermont" and her "report has a dearth of references to any authority beyond a publication that she authored herself in 2015." (Doc. 113 at 14-15.) Generally, an expert qualified through experience "may properly testify as to 'the customs and standards of an industry[] and opine as to how a party's conduct measured up against such standards.'" *Lippe v. Bairnco Corp.*, 2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002) (alteration adopted) (citation omitted).[13] The expert witness "must explain how [his or her] experience leads to the conclusion reached, why [his or her] experience is a sufficient basis for the opinion, and how [his or her] experience is reliably applied to the facts."

---

[13] *See also Bilzerian*, 926 F.2d at 1295 ("[Expert] testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice[.]") (citation omitted); *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 541 (S.D.N.Y. 2024) (explaining that an expert's "methodology employed [must be] rooted in the expert['s] practical experience[]") (alteration in original) (internal quotation marks and citations omitted); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 463-64 (S.D.N.Y. 2010) (finding the expert could testify to industry standards for conducting hedge fund due diligence and to his opinion on whether plaintiffs satisfied those standards).

Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702.

In her report, Ms. Carnarius explains the generally accepted practices in the senior care industry, explores Elderwood's implementation of those practices, and provides specific examples of remedial measures that Elderwood could have undertaken in light of senior care industry norms. She provides an adequate explanation of how her experience applies to her analysis which renders her opinions sufficiently reliable. With respect to Ms. Carnarius's citations to her own publication, it is not impermissible for an expert witness to rely on his or her own publication or publications in rendering an expert opinion. To the contrary, expert witnesses often do so. In any event, any challenge to the source of Ms. Carnarius's citations goes to the weight, not the admissibility, of her testimony. *See, e.g., In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 420 ("[A] lack of specific citation in [the expert's] report goes to the weight of her opinions, not their admissibility.").

For the foregoing reasons, the court finds that Ms. Carnarius's opinions are sufficiently reliable.

### c.    Whether Ms. Carnarius's Opinions Rely on Hearsay.

"Although the [Federal] Rules [of Evidence] permit experts some leeway with respect to hearsay evidence, 'a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.'" *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (internal citation omitted). "For this reason, 'an expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony.'" *Mobius v. Quest Diagnostics Clinical Lab'ys, Inc.*, 687 F. Supp. 3d 357, 376 (W.D.N.Y. 2023) (citation omitted).

Elderwood argues that Ms. Carnarius's opinions should be excluded because a "large majority" of her report recounts medical records and caregiver notes concerning the Residents. (Doc. 113 at 15.) As previously noted, expert witness reports are generally not admitted as evidence at trial, *see CNY Fair Hous., Inc. v. Wellclover Holdings LLC*, 2024 WL 2049047, at *2 (N.D.N.Y. May 8, 2024), and Ms. Carnarius may cite medical

36

records as the basis for her opinions just as Dr. Fremed has done so.

### d.    Whether Ms. Carnarius's Opinions Contain Legal Conclusions.

Ms. Carnarius opines that "Elderwood . . . did not timely take all reasonable and generally accepted measures in the senior care industry to address [AC's] racist behaviors towards Black staff."[14] (Doc. 113-8 at 87-88.) Because the jury's role is to determine whether Elderwood took effective and prompt remedial measures, *see Dobrich*, 106 F. Supp. 2d at 394, for the same reasons the court excluded certain opinions of Dr. Fremed that usurped the jury's function, Ms. Carnarius cannot testify that Elderwood did not take "all reasonable and generally accepted" remedial measures. (Doc. 113-8 at 87.)

For the foregoing reasons, Elderwood's motion to exclude Ms. Carnarius's opinions is GRANTED IN PART and DENIED IN PART.

## II.    Elderwood's Motion for Summary Judgment.

### A.    Factual Background.

#### 1.    Undisputed Facts.

Elderwood is an SNF and subacute nursing facility located in Burlington, Vermont. It is subject to state and federal regulations governing SNFs pertaining to resident rights, medication of residents, abuse of residents, and discharge of residents. Each of the Staff was employed as a healthcare provider at Elderwood during the March 2020 to March 2021 time frame. In 2020 and 2021, Elderwood employed, either individually or jointly through staffing agencies, over five hundred individuals.

During the relevant time period in this case, Elderwood had three, fifty-bed skilled units for its residents: the Chittenden Unit, the Mansfield Unit, and the Champlain Unit. The Mansfield and Champlain Units were for long-term care residents while the Chittenden Unit was for short-term care residents; however, "it sometimes also housed residents whose rehabilitation stays had ended but were in need of long-term care." (Doc.

---

[14] Elderwood does not argue that Ms. Carnarius makes legal conclusions. Because the court excludes portions of Dr. Fremed's and Mr. Horowitz's opinions on this basis, the court considers the issue *sua sponte*.

37

128-1 at 6) (citations omitted).

Healthcare professionals employed at Elderwood include Licensed Nursing Assistants ("LNAs"),[15] Licensed Practical Nurses ("LPNs"), and Registered Nurses ("RNs"). LNAs can assist residents with the daily activities of life such as dressing, feeding, and bathing a resident but cannot perform medical assessments of residents; LPNs can contribute to medical assessments of residents, take vital signs, and provide medication passes to residents; and RNs can provide more in-depth medical assessments of residents. Neither LNAs, LPNs, nor RNs can render a medical diagnosis of a resident, and only "a physician is qualified to render a medical diagnosis such as dementia." *Id.* at 9, ¶ 16 (citations omitted). When providing care to residents, Elderwood's RNs and LPNs wrote notes in a PointClickCare electronic record system (the "PCC system"). LNAs did not have access to enter notes and make reports in the PCC system.

### a.    Resident AC.

On March 31, 2020, Elderwood admitted AC, an eighty-three-year-old man, as a resident in the Chittenden Unit. At the time of his admittance, AC was diagnosed with "unspecified dementia, unspecified severity, without behavioral disturbance[.]" (Doc. 128-21 at 16) (capitalization removed). On February 3, 2021, Elderwood transferred AC to the Mansfield Unit because the Chittenden Unit closed. AC resided in the Mansfield Unit from February 3, 2021, until mid-March 2021 when he was discharged from Elderwood to his son's care. On May 19, 2021, AC passed away as a result of his comorbidities.

"Within days of AC being admitted to" Elderwood, AC called Nurse Ferguson and another Black employee "racial slurs, including 'monkeys,' told them to go back to Africa, and told them to get the head of their 'tribe' for approximately [fifteen] minutes." (Doc. 134-1 at 11, ¶ 33) (citation omitted). Nurse Ferguson discussed the incident with her unit managers. Shortly thereafter, on April 5 and April 9, 2020, employees "documented in [Elderwood's] PCC system that AC 'displayed fits of anger and agitation

---

[15] Elderwood used LNA and Certified Nursing Assistant ("CNA") interchangeably. The court will refer to these nurses as LNAs.

when staff attempted to redirect him back into []his room' and telling staff to 'go back to your country and comb your hair.'" *Id.* at ¶ 34 (alterations adopted) (citation omitted).

On April 24, 2020, AC had a Brief Interview for Mental Status ("BIMS") conducted and scored a 14 out of 15. *See* Doc. 112-8 at 20. BIMS is a cognitive assessment tool, with scores ranging from 0, on the lowest end, to 15, on the highest end. Elderwood's Administrator, Ronald Cheli ("Administrator Cheli"),[16] testified that a BIMS score of 14 "means [AC] really doesn't have much cognitive impairment at all. He's very much with it mentally." (Doc. 128-11 at 56:17-19.) According to Administrator Cheli, an individual with a BIMS score of 14 is "capable of being told that the use of racial slurs and physical threats and attacks towards Black staff are not acceptable[.]" *Id.* at 56:21-57:2.

The following month, Nurse Murphy entered a PCC note dated May 7, 2020, stating that "AC 'continues to have periods of agitation [with] combative behaviors.'" (Doc. 134-1 11, ¶ at 35) (alteration adopted) (citation omitted). Approximately one week later, Nurse Murphy entered another PCC note on May 15, 2020, indicating that "AC had 'periods of combative and resistant behavior.'" *Id.* at 12, ¶ 36 (citation omitted). The following day, on May 16, 2020, Nurse Murphy documented in the PCC system "that AC was 'ambulating in and outside of his room [with his] walker,' 'became verbally abusive towards staff using racist language,' and called 'staff coons, etc.'" *Id.* at ¶ 37 (citation omitted). Several days later, on May 22, 2020, Elderwood's Director of Social Work, Cortney Starace ("DSW Starace"),[17] noted in the PCC system that a social worker "took [AC] outside today" and AC "enjoyed the outing[ and] was calm and pleasant[]" and that "[w]hen he is not upset[, AC] is a good conversationalist[.]" (Doc. 128-21 at 92.)

The following month, on June 2, 2020, Nurse Murphy made a note in the PCC system, stating that "AC continues to be verbally abusive towards staff and making racially insensitive remarks to staff," "was walking in the hallways in his briefs," and

---

[16] Administrator Cheli was Elderwood's Administrator from March 30, 2020, until October 2, 2020.

[17] DSW Starace was Elderwood's DSW from November 2019 until summer 2022.

39

"called [Nurse] Murphy a f**king n****r[.]" (Doc. 134-1 at 12, ¶ 38(a)) (internal quotation marks and citation omitted). In the same note, Nurse Murphy indicated that a "supervisor was made aware and followed up[.]" *Id.* (alteration adopted). With respect to that incident, an RN "spoke with AC about using racial slurs towards staff members and reminded him to be respectful of staff and to be kind, [and] that AC stated he was kind but they are pigs[.]" *Id.* at 13, ¶ 38(b) (internal quotation marks and citation omitted). On that same day, June 2, 2020, an RN informed Elderwood's Assistant Administrator, Valerie Cote ("AA Cote"),[18] Director of Nursing, Cassie Lambert ("DON Lambert"),[19] and unit managers that she witnessed AC call Nurse Murphy a "f**king n****r" and that Nurse Murphy no longer wanted to care for AC. *Id.* at 42, ¶ 96 (internal quotation marks and citations omitted). AA Cote responded as follows: "Unfortunately[,] staff can't deny caring for someone unless their personal safety is involved. We can offer Caucasian staff as available. But [it is] not always available. This is a tough situation, but alas what it is to work in healthcare." *Id.* (alteration adopted) (internal quotation marks and citation omitted).

A few days later, on June 5, 2020, an LPN documented that "AC punched him in the face when he tried to redirect AC and was 'very disrespectful toward staff.'" *Id.* at 13, ¶ 39 (citations omitted). Shortly thereafter, on June 13, 2020, Nurse Murphy entered the following note in the PCC system: "AC approached [Nurse] Ndour aggressively and punched [him] in the chest while calling him racial names, AC continued to attempt to hit [Nurse] Ndour while being held back by other staff, AC became angry at other staff members and started threatening them [with] physically aggressive behavior and verbally abusive language, [and] AC became aggressive towards another resident[.]" (Doc. 134-1 13, at ¶ 40(a)) (alterations adopted) (internal quotation marks and citations omitted).

---

[18] It is unclear during what time period AA Cote was employed by Elderwood. The EEOC states that she was Elderwood's AA "[b]etween approximately [s]ummer 2022 and October 1, 2020," (Doc. 134-1 at 4, ¶ 11), but that appears to be incorrect because AA Cote is referenced as the AA in the record as of June 2, 2020.

[19] DON Lambert was Elderwood's DON from August 2019 until December 2020.

Nurse Murphy submitted a PCC note documenting the same incident, which states that "AC was abusive towards [Black] staff, calling staff n****rs" and "AC became physically aggressive towards staff, staff was walking towards [the] nursing station when AC shoved staff and started calling him racial slurs, AC was separated from staff but continued to attempt to assault staff while calling everyone on the unit n****rs, [B]lack bastards, and [B]lack bitches[.]" *Id.* at 14, ¶ 40(b) and (d) (alterations adopted) (internal quotation marks and citations omitted). Elderwood supervisors, including DON Lambert and unit managers, were made aware of this incident, and subsequently "911 was called to transport AC to the emergency room [('ER'),]" but AC was transported back to Elderwood after the "ER doctor stated that [AC] showed no behaviors that warranted medical intervention or admission[.]" *Id.* at ¶ 40(b) and (c) (internal quotation marks and citations omitted).

The following day, on June 14, 2020, an LPN noted that "AC 'was combative towards staff and grabbing when staff attempted to grab [his] breakfast tray,' AC 'started [directing] racial slurs towards staff,' that AC 'attempted to take [his] breakfast tray out himself and slipped," [and] that AC 'got up very fast[]' and [] did not have injuries[.]" *Id.* at 14-15, at ¶ 41(a) (citation omitted). On the same day, Nurse Murphy entered a PCC note, describing that "AC became physically aggressive towards staff" because an employee "was walking towards [the] nursing station when [AC] shoved [the employee] and started calling him racial slurs[.]" *Id.* at 15, ¶ 41(b) (alterations adopted) (internal quotation marks and citation omitted). As a result, "'AC was separated from [the employee] but continued to attempt to assault [the employee] while calling everyone on the unit "n****rs," "[B]lack bastards[,]" and "[B]lack bitches," and [a] supervisor [was] aware of [the] incident[.]'" *Id.* (alterations adopted) (citation omitted). That same day, on June 14, 2020, DSW Starace reached out to AC's ex-wife regarding an alternate placement for AC. AC's ex-wife was comfortable with SNFs Birchwood Terrace Rehabilitation and Healthcare ("Birchwood") and St. Albans Healthcare and Rehabilitation ("St. Albans"). One day later, DSW Starace sent referrals to Birchwood and St. Albans for AC, but each had waitlists.

41

Nurse Murphy entered the following note in the PCC system on June 15, 2020: "AC 'was in [the] hallway verbally taunting [an] LNA and hit [the] LNA,' '[AC] hit two nurses who were trying to stop AC from actively following the LNA,' and [AC] said he physically hit [the] LNA because 'I don't like those people and they should go back to Africa[.]'" (Doc. 134-1 at 15, ¶ 42(a)) (alteration adopted) (citations omitted). An RN reported the incident to AA Cote, DON Lambert, and unit managers. Other doctors and LPNs submitted the following PCC system notes documenting the June 15, 2020 incident: "AC was 'out of his room' using 'aggressive language towards staff,' including 'racist comments' and 'threatening words of hitting staff[]'[;] AC was 'attempting to go after a particular staff member[ and] fixated on [that] staff member]'"; "AC 'has been targeting a [B]lack male LNA and LPN for several days' and 'pursued' a '[B]lack nurse going down the hall' and 'tried to go into the room that the nurse had gone into stating that he is going to "punch him in the face"'"; and "AC 'continues with inappropriate behaviors as well as racial slurs at the colored staff, calling them coons and no good fat asses[.]'" *Id.* at 16, ¶¶ 42(b)-(d) (alterations adopted) (citations omitted). On the night of June 15, 2020, an RN sent an email to many Elderwood employees, including DON Lambert, DSW Starace, Administrator Cheli, and AA Cote, summarizing AC's behavior as follows:

> AC – approximately [six to seven] notes written on his behaviors this evening. Verbally abusive, threatening staff, hitting staff, disrupting the unit, refuses to wear [a] mask, refuses to stay in [his] room, [and] attempted to hit another resident. Incredible amount of work for staff to keep him and everyone else safe.

(Doc. 128-46 at 2.)

The following day, on June 16, 2020, AA Cote emailed other Elderwood management employees, including DSW Starace and DON Lambert, the following:

> I am reviewing [AC's] plan of care. He is still care planned for wanting to return home. I know of the safety concerns. However, his last BIMS is a 14/15. He is walking all over the unit on his own. If I were a surveyor, it would appear to me we are holding him here against his will. Is he incompetent to make his own [discharge] decisions? Do we have that documented and I am not seeing it? If he can make his own [discharge]

decisions, we need to get him home. If he can't, then we should be getting him a guardian.

(Doc. 128-51 at 2-3.) DSW Starace responded: "[W]e can start by having [AC] seen by [D]r. [H]all[,] but he can't figure out how to call a cab to get out of here[,] and certainly we can't put [twenty-four-hour] care into place. We can update his care plan and put some more supporting documentation into place." *Id.* at 2. AA Cote replied: "I agree with [AC] not going home, but if you review his chart, it literally looks like we are holding him against his will and not giving him the option to [discharge against medical advice]. [W]e just need more documentation on his capacity for [discharge] decision[-]making." *Id.*

That same day, on June 16, 2020, AC's diagnosis was changed to "unspecified dementia with behavioral disturbance[,]" with a diagnosis date of April 28, 2020. (Doc. 128-21 at 16) (capitalization removed). A couple of days later, on June 18, 2020, DSW Starace requested that an Elderwood doctor, Jennifer Hall, perform a cognitive assessment on AC to determine if he was capable of being discharged to his home because he repeatedly expressed a desire to go home. In her request, DSW Starace wrote that AC's ex-wife "had a restraining order against [AC] in the past because of [his] abusive behaviors[]" and that AC was previously involved with a counseling service "due to his past aggression, suicidal thoughts[,] and anger." (Doc. 128-39 at 4.) Based on her assessment, Dr. Hall concluded that AC "did not have decision[-]making capacity to return home independently based on poor self[-]care in the context of an underlying neurocognitive disorder that would ultimately place him at risk for death." (Doc. 128-1 at 50, ¶ 108) (citation omitted).

The next month, on July 1, 2020, an LPN entered a PCC system note, reporting that "AC 'refused to have [the LPN] touch him due to the fact that she is [B]lack[,] but AC did not use that word' and [that AC] told her to 'not let the door hit me in the [a]**.'" (Doc 134-1 at 17, ¶ 44) (alterations adopted) (citation omitted). Two days later, on July 3, 2020, AC had a BIMS assessment and scored a 13 out of 15. *See* Doc. 112-8 at 21. Administrator Cheli testified that an individual with a BIMS score of 13 reflects "[v]ery

43

minimal cognitive impairment[]" and "someone with a BIMS score of 13 [would] be capable of being told that their use of racial slurs and physical threats and attacks towards Black staff are not acceptable[.]" (Doc. 128-11 at 58:3-9.)

A few days later, on July 8, 2020, Nurse Murphy documented in the PCC system that "AC 'walked outside of his room and [threw] water at [an LNA] who attempted to give him his dinner[]' [and] 'physically attacked an LNA by grabbing his arm and attempting to push him[.]'" (Doc. 134-1 at 17, ¶ 45) (alterations adopted) (citation omitted). Nurse Murphy stated that "when the [LNA] walked away[,] AC followed him and attempted to block his way and started calling him n****r," and the incident was reported to DON Lambert. *Id.* (internal quotation marks and citation omitted).

Two weeks later, on July 22, 2020, DSW Starace sent a second referral to St. Albans for AC, but no beds were available. The following month, an Elderwood doctor, Isaura Menzies, documented in the PCC system, on August 18, 2020, that "AC 'stalks and threatens staff[,]'" and Nurse Murphy documented in the PCC system, on August 20, 2022, that "AC was 'verbally abusive to staff.'" *Id.* at 17-18, ¶¶ 46-47 (alteration adopted) (citations omitted).

A few days thereafter, on August 24, 2020, Nurse Ivy attempted to intervene in an altercation between AC and another Elderwood resident, and when Nurse Ivy did so, "AC repeatedly called her 'n****r,' told her to 'go back to Africa[,]' [said] 'if it's one thing I can't stand[,] it's a n****r,' and physically threatened her while attempting to strike her[.]" *Id.* at 18, ¶ 48(a) (alteration adopted) (citation omitted). RN, Katharine Stones, entered a note regarding the same incident, stating that she "witnessed AC verbally and physically attack and threaten [Nurse] Ivy . . . by calling her the [N]-word approximately [ten] to [twenty] times and monkey, telling her to go back to Africa, striking her with his wheelchair and hands, and making violent threats towards her[.]" *Id.* at ¶ 48(c)(i) (internal quotation marks and citations omitted). RN Stones noted that AC "ran over [Nurse Ivy's] foot with his wheelchair and raised his hand to strike her before she was able to step out of his reach[,]" and when RN Stones attempted to intervene, AC called RN Stones an "N-word lover" and "ran over [her] foot with his wheelchair[]" and

44

"attempted to strike [her] before [she] also stepped[]away." (Doc. 128-21 at 62); (Doc. 134-1 at 19, ¶ 48(c)(iii)) (alteration adopted) (internal quotation marks and citations omitted).

The same day, RN Stones also wrote in the PCC system that "[AC] continues to verbally target Nurse Ivy with the N-word whenever he sees her[]" because, as RN Stones testified, "every time [AC] saw [Nurse Ivy], he would shout the N[-]word at her, including right after this incident happened." (Doc. 128-29 at 14:20-21, 15:9-11) (internal quotation marks omitted). RN Stones testified that, immediately after Nurse Ivy's August 24, 2020 incident with AC, she witnessed Nurse Ivy crying and Nurse Ivy "stepped through the doors off the floor itself to take . . . a break, and [AC] followed her up to the doors and sat right outside them. And then, when [Nurse Ivy] came back . . . a few minutes later, he started shouting the same things at her right away and follow[ed] her, shouting them." *Id.* at 15:11-16.

That same day, on August 24, 2020, a physical therapist at Elderwood reported AC's incident with Nurse Ivy to AA Cote and DSW Starace via email, stating that AC called Nurse Ivy a "n****r" and told her "to go back to Africa" while "threatening to hit staff and run them over." (Doc. 128-47 at 3.) AA Cote responded minutes later: "Unfortunately in this case[,] it is [AC's] right to speak like that and we have to just minimize contact that may get him 'riled' up. It is one of those tough situations [where] our hands are tied." *Id.* at 2. Administrator Cheli testified that this email from AA Cote was "not professional." (Doc. 128-11 at 52:15.)

DSW Starace sent AA Cote an email on the same day, stating:

I'm not sure how to address this with staff. He certainly is being mean this morning, seems to have woken up that way. I can't just tell him he needs to be nice or find him another place to live. We can have him a[ss]essed . . . again[,] but that's not going to change his personality. Potentially [we] could move [AC] to [a different] room[,] . . . but that puts him real[ly] close to [the] exit doors.

(Doc. 128-48 at 2.) AA Cote responded to DSW Starace: "Unfortunately[,] there isn't a lot to address. It is who [AC] is. He has the right to be downright cruel and mean to

staff." *Id.*

RN Stones also documented and reported AC's August 24, 2020 incident with Nurse Ivy to a unit manager within twenty minutes after it occurred and wrote a note in the PCC system, stating that "AC was 'aggressive towards [B]lack people[.]" (Doc. 134-1 at 19, ¶ 49(a).) Two days later, on August 26, 2020, Elderwood's Nurse Educator, Ashley ("Nurse Educator Ashley"),[20] reported the incident between AC and Nurse Ivy to AA Cote and Elderwood's Regional Nurse Consultant, Karen Yakey ("RNC Yakey").[21] Regarding the incident, RN Stones testified that:

> [She w]itnessed [AA] Cote and [RNC] Yakey rolling their eyes in response to Nurse Educator Ashley telling them that [Nurse] Ivy was upset that AC called her the [N]-word numerous times;

> [She w]itnessed Nurse Educator Ashley delete her initial documentation of AC's August 24, 2020 racial harassment of [Nurse] Ivy from [Elderwood's] PCC system;

> [She r]ewrote a second narrative in [Elderwood's] PCC system of the August 24, 2020 incident involving AC and [Nurse] Ivy, with Nurse Educator Ashley's assistance and edits, that excluded the details of AC's racial harassment of [Nurse] Ivy and that AC was "aggressive towards [B]lack people" and focused on AC's minimal physical contact with another resident;

> [She t]old Nurse Educator Ashley that[,] without documenting the details of AC's racial harassment of [Nurse] Ivy in [Elderwood's] PCC system[, the PCC note] did not "accurately portray AC's violent tendencies" and his racism;

> [She t]old Nurse Educator Ashley that AC's regular racist verbal and physical attacks on Black employees needed "to be reported and tracked somewhere," otherwise it would continue and "people would continue to be harmed";

> [She c]ame to understand that [Elderwood] did not have a specific place or means for all staff to document AC's racial harassment of Black employees;

> [She w]as frustrated that [Elderwood was] not taking additional steps to address AC's racial harassment of Black employees, "such as reporting and

---

[20] The parties identify Elderwood's Nurse Educator only by her first name.

[21] RNC Yakey was Elderwood's RNC from November 2019 until August 2021.

supporting staff or trying to put in place some measures to protect Black employees in the first place," and effectively having Black employees "put up with it"; and

[She t]old Nurse Educator Ashley that "staff was more hurt that no one in management was even acknowledging the problem after the fact, with any simple words of sympathy, never mind empathy[.]"

*Id.* at 19-21, ¶¶ 49(a)-(i) (alterations adopted) (internal citations omitted).

After the August 24, 2020 incident between Nurse Ivy and AC, Elderwood management held a meeting with Nurse Ivy and other employees regarding procedures for resident-to-resident altercations (the "August 2020 Meeting"). Nurse Ivy testified that, at the August 2020 Meeting, in response to her inquiry about what measures were being implemented to address AC's behaviors, Elderwood's corporate nurse, Melissa Yanks ("CN Yanks"), stated, "this was AC's home[,] and he had the right to call them the [N]-word." *Id.* at 52, ¶ 126 (internal quotation marks and citations omitted). At the August 2020 Meeting, Nurse Ivy testified that Elderwood's "managers, including [RNC] Yakey, . . . told [Nurse] Ivy and others that they 'were poor excuses for nurses[] and threatened their licenses.'" *Id.* at 51, ¶ 125 (alterations adopted) (citation omitted).

Elderwood's "only investigation into the August 24, 2020 AC incident was initiated on August 26, 2020, after AC's physical contact with another resident was reported to [AA] Cote, and focused on AC's physical contact with the other resident, which was required to be reported to the state of Vermont." *Id.* at 50-51, ¶ 123 (citations omitted). Nurse Ivy testified that Elderwood management was "'only concerned' with AC's contact with the other resident, not his racial attack on her." *Id.* at 51, ¶ 124 (citation omitted).

The following month, on September 2, 2020, Nurse Murphy entered a note in the PCC system, recording that "AC started calling staff members n****rs and threatening bodily harm," "physically block[ed] a staff member from exiting the dayroom," and stated "he would kill all the n****rs if he had a gun[.]" (Doc. 134-1 at 21, ¶ 50) (alteration adopted) (internal quotation marks omitted). When AC was "told 'he didn't have access to a gun,'" "he 'said he [would] find something else[.]'" *Id.* DON Lambert

was informed of the incident. On the same day, September 2, 2020, AA Cote entered a PCC note, stating that "AC made 'socially inappropriate comments about some staff members (non[-]Caucasian) while they would pass by.'" *Id.* at 22, ¶ 51 (citation omitted). That same day, AA Cote recommended that AC be moved from the Chittenden Unit to the Champlain Unit because the Champlain Unit was "calmer" and had "more Caucasian staff[,]" but the move never occurred. *Id.* at 46, ¶ 110 (internal quotation marks and citations omitted).

Several days later, on September 14, 2020, an RN entered a note in the PCC system, stating that AC was "[a]ble to move all extremities[,]" "using [his] walker," and had a "steady" gait. (Doc. 128-21 at 57.) The RN also noted AC had "[n]o behaviors noted[]" for that shift and was "[p]leasant and cooperative with all care and staff." *Id.*

On September 20, 2020, Nurse Robinson entered a note in the PCC system, documenting that "AC 'became verbally abusive' to her and told her [to] 'go back to your country on your boat[ and y]ou don't belong here.'" (Doc. 134-1 at 22, ¶ 52) (citation omitted). Around this time in September 2020, Administrator Cheli, Elderwood's Chief Operating Officer, Philip Quillard ("COO Quillard"),[22] and Elderwood's Director of Memory Care, Elizabeth Laczi ("DMC Laczi"),[23] first became aware of AC's behavior and the complaints of racial discrimination. "At this time, COO Quillard was informed only of one of AC's physical attacks on staff and AC's use of the [N]-word, but no other racially derogatory language used by AC towards Black employees." *Id.* at 43, ¶ 100 (citation omitted). In response, COO Quillard testified that he "[t]old DON Lambert that AC's use of the [N]-word towards Black employees was not appropriate[,]" "[r]ecommended training that would specifically address AC's racial slurs and derogatory language towards Black employees[,]" and "[r]ecommended roundtable discussions with employees regarding facility environment and how staff feel on issues that have [occurred] or are occurring[.]" *Id.* at 46-47, ¶¶ 111(a)-(c) (internal quotation marks and

---

[22] COO Quillard was Elderwood's COO from July 2013 until October 2024.

[23] DMC Laczi was Elderwood's DMC from 2019 until May 2023.

citations omitted).

The following month, on October 4, 2020, Nurse Ivy documented in the PCC system that, while she was sitting at a desk, AC came out and "told her you need to go back to Africa where you came from, America is for white people, and [you are] nothing but dirt[]" and "[y]ou are a n****r and that's where you belong[,]" asked "why do they hire n****rs like her[,]" and "threatened to hit her in the mouth if she was a man[.]" *Id.* at 22-23, ¶ 53(b) (alterations adopted) (internal quotation marks and citation omitted). On the same day, October 4, 2020, Nurse Robinson entered several notes in the PCC system, describing an incident between herself, Nurse Ivy, and AC:

> AC "began verbally abusing the nurse assigned to the opposite hall and [me]"; said "'You need to shut your mouth,' 'You need to go back to Africa,' 'You're nothing[]but dirt.' . . . 'Shut your n****r mouth[,]'[] 'You're a n****r[,]'[] 'I'm better than you because I'm white[,]'[] 'You don't belong here.' 'Why do they hire n****rs here?'"; AC said he was going to "stand here and abuse [me][]"; and "continued using racially abusive language and continued calling the nurse for the opposite hall a n****r";

> ***

> . . . AC called [me] a "dumb bitch" and threatened to punch [me] "in the f**king mouth"; [and]

> . . . AC told [me] "there's too many colored people," verbally and physical[ly] threatened to punch [me], and "ambulate[d] to his room and then return[ed] to the nurses' station and continued verbally harassing [me] and the other nurse[.]"

*Id.* at 23, ¶¶ 53(c), (e), and (f) (alterations adopted) (internal citations omitted).

In mid-October 2020, DMC Laczi completed a behavioral assessment for AC, wherein she noted that Elderwood's care plan for AC "[h]ad conflicting information about AC's capacity" and "[h]ad no behavioral management plan[,]" "no interventions or approaches for staff[,]" and "no documented life story, [which is] an important component in addressing AC's behaviors, assisting with staff interventions, and properly planning for AC[.]" *Id.* at 47-48, ¶¶ 112(a), (b), (d), and (e) (alterations adopted) (internal quotation marks and citations omitted). DMC Laczi "has no recollection of doing any other behavioral assessment for AC." (Doc. 134-1 at 48, ¶ 113) (citation omitted).

49

In mid-October 2020, Elderwood held a training for employees regarding dementia, which had been planned since 2018. The training did not specifically address AC or his racially targeted behavior, although DMC Laczi recommended that employees be provided with "education and approaches concerning AC" in addition to the dementia training held in October 2020. *Id.* at 48, ¶ 116 (citation omitted). On October 22, 2020, COO Quillard circulated a memorandum to all Elderwood employees that "encouraged staff who felt unsafe, or uncomfortable due to a resident or co-worker, to speak with their supervisor, human resources coordinator, or to call Elderwood's compliance hotline." (Doc. 128-1 at 54, ¶ 116) (citation omitted). The following day, on October 23, 2020, Elderwood management "recommended having roundtable discussions by unit and discipline regarding facility environment and how staff feel, which COO Quillard wanted to begin in late October 2020." (Doc. 134-1 at 49, ¶ 117) (alteration adopted) (internal quotation marks and citations omitted). In their depositions, COO Quillard and DON Lambert indicated that they were unsure if the roundtable discussions took place. For purposes of summary judgment, Elderwood concedes they did not.

On October 21, 2020, a unit manager documented in the PCC system that, after entering AC's room, AC "told [the unit manager] to 'get [the] F…[]out of my room, you stupid n***a'" and said to "'shut the door and never come back.'" *Id.* at 24, ¶ 54 (citation omitted). The following month, on November 5, 2020, Elderwood, through its counsel, contacted the Commissioner of the Department of Disabilities, Aging and Independent Living for Vermont, Monica Hutt ("Commissioner Hutt"). Commissioner Hutt proposed meeting on December 1, 2, or 3, 2020, to discuss the issues surrounding AC's behavior. However, shortly thereafter, on November 25, 2020, Elderwood experienced a COVID-19 outbreak which lasted until January 20, 2021. Due to this outbreak, Elderwood postponed its meeting with Commissioner Hutt until January 2021. It is not clear why the meeting could not take place by video conference.

On November 7, 2020, Nurse Robinson made a note in the PCC system, reporting that AC called her and another nurse "[d]umb f**king n****rs[.]" (Doc. 134-1 at 24, ¶ 55) (internal quotation marks and citation omitted). In the note, Nurse Robinson stated

50

that she "did not approach nor address AC as staff have been instructed to honor his [r]ights." *Id.* (alterations adopted) (internal quotation marks and citation omitted). The following day, Nurse Robinson entered another PCC system note, stating that "AC 'began saying racial slurs and hateful statements toward [herself] and other [B]lack staff.'" *Id.* at 25, ¶ 56 (citation omitted). A few days later, on November 12, 2020, AC had a BIMS score of 4 out of 15. *See* Doc. 112-8 at 22.

The same month, on November 23, 2020, Nurse Robinson documented in the PCC system that "AC saw a Black male LNA and stated, 'that [B]lack mother[]f\*\*ker is a good for nothing n\*\*\*\*r and a coon,' AC told her and another nurse '[y]ou're n\*\*\*\*ers and coons and need to go back to Africa where you're from[]' . . . and [] [the] 'supervisor on duty' was notified." (Doc. 134-1 at 25, ¶ 57) (citation omitted). The following day, on November 24, 2020, Elderwood's new Administrator, Lisa Peacock ("Administrator Peacock"),[24] "spoke with" Nurse Robinson. (Doc. 128-1 at 26, ¶ 61.)

Approximately one month later, on December 27, 2020, an LPN documented that "AC charged at her and began throwing punches[,]' that AC physically attacked her[] and a[n L]NA who escorted [AC] back to his room; that AC came back out of his room to the nurse[s'] station and 'threw an object at [the LPN,] striking her in the back'; [and] that AC 'physical[ly] attacked' the two [L]NAs who escorted AC back to his room 'while shouting racial slurs[.]'" (Doc. 134-1 at 25, ¶ 58(a)) (alterations adopted) (internal quotation marks and citations omitted). Subsequently, 911 was called and AC was sent to the hospital at University of Vermont Medical Center ("UVMMC"). On that day, December 27, 2020, Administrator Peacock sent an email to Dr. Menzies, informing Dr. Menzies that "AC is at [the] UVM[MC] ER after punching out two staff members" and inquiring as to whether Dr. Menzies "ha[d] any pull to have the hospital keep [AC] for a psych evaluation." *Id.* at 44, ¶ 102 (internal quotation marks and citations omitted). On the same day, Dr. Menzies responded as follows:

In my [eight] years of experience, patients with dementia do not get

---

[24] Administrator Peacock was Elderwood's Administrator from November 2, 2020, until January 20, 2022.

51

admitted to the psych service because they operate at maximum capacity and have borders in the E[R,] but more importantly[,] there is no psychiatric plan or treatment for dementia with behaviors. They do not have a way to treat these folks. We will need to start something more sedating for [AC] at Elderwood[;] e[.]g[.,] Depakote at bedtime and titrate up to target behaviors.

One of the issues I have observed is that we have not taught our LNAs how to d[e]fuse [AC's] behaviors. Of course[,] I do not know what happened today and it may have been inevitable[,] but I observed [three] LNAs interacting with him last week and I intervened to get them to stop standing too close in front of [AC,] telling him what not to do.

(Doc. 128-49 at 2) (capitalization removed). The following day, on December 28, 2020, Administrator Peacock replied to Dr. Menzies: "Is there a Geriatric Psych Unit anywhere in the state[?] I'm not convinced that all of [AC's] behaviors are related to [d]ementia. I would like to speak to you about it. The ER sent him back last night[,] but he is much the same." *Id.*

AC returned to Elderwood from the hospital on December 27, 2020, because AC "had 'no behaviors, outburst[s,] or physical violence towards' hospital staff." (Doc. 134-1 at 26, ¶ 58(b)) (citation omitted). A few days later, on December 31, 2020, DSW Starace documented in the PCC system that she helped AC with his telehealth appointment and that AC "was pleasant and cooperative during the conversation." (Doc. 128-21 at 43.)

The following day, on January 1, 2021, an LPN documented in the PCC system that "AC called [the LPN] 'a stupid colored with blond[e] hair looking stupid'" and that the LPN "asked another nurse to give [AC] medicine because of 'his racist[,] slanderous behavior[.]'" (Doc. 134-1 at 26, ¶ 59) (citation omitted).

On an unspecified date in January 2021, DSW Starace and Administrator Peacock met with Commissioner Hutt to discuss AC's behavior. It appears the meeting took place via phone call. *See* Doc. 115-11 at 8-9, ¶ 26 ("[Administrator] Peacock and [DSW Starace] joined Commissioner Hutt . . . *on a call* regarding the recent media reports alleging race discrimination by . . . AC against . . . staff.") (emphasis supplied). That same month, DSW Starace sent referrals for AC to seven senior care facilities throughout Vermont. All seven facilities either advised that they had no beds available or did not

respond. On January 12, 2021, AC had an "Alzheimer's disease with late onset" diagnosis added to his medical records, with a diagnosis date of October 22, 2020, and AC's dementia diagnosis was changed to "dementia in other diseases classified elsewhere with behavioral disturbance[,]" with a diagnosis date of January 12, 2021. (Doc. 128-21 at 13) (capitalization removed). On January 29, 2021, AC had a BIMS conducted and scored a 0 out of 15. *See* Doc. 112-8 at 23.

The following month, in February 2021, Elderwood made referrals for AC to two senior care facilities in New York, but both declined his admission. On February 3, 2021, an LPN documented in the PCC system that "AC said 'get me out of this dump, away from the fat asses[] and (racial slur).'" (Doc. 134-1 at 27, ¶ 61) (citation omitted). Approximately one week later, on February 12, 2021, an RN entered a note in the PCC system, stating that, "after AC was prevented from entering a female resident's room, AC 'became violent' by 'hitting and punching at [the] caregiver's arm while yelling, swearing, and using racial slurs.'" *Id.* at 27, ¶ 62 (citation omitted). An LPN documented in the PCC system, on February 25, 2021, that "AC was 'verbally abusive' and punched her on her arm and said '[l]et go of me[,] you [B]lack bitch,' and a nurse manager assisted." *Id.* at ¶ 63 (citation omitted). The following day, on February 26, 2021, an LPN entered a PCC system note, indicating that AC "is in [his] room" and "pleasant and cooperative[,]" with "[n]o behavior issues noted this shift." (Doc. 128-21 at 35.)

A week later, on March 3, 2021, an LPN entered a note in the PCC system, describing that "AC was 'very nasty to staff, using racial slurs, body shaming, calling people stupid,'" and that "AC's 'name calling and slurs were in front of other residents[,] upsetting them,' including 'one [resident who] was[]in tears[, saying] "I just can't believe he is allowed to talk to anyone like that[. Y]ou poor girls."'" (Doc. 134-1 at 27-28, ¶ 64) (alterations adopted) (citation omitted). The next day, on March 4, 2021, AC "attempted to leave/elope from the facility by opening an emergency door[] and [] became agitated and grabbed the wrists of two LNAs, one of which . . . [was] white." (Doc. 128-1 at 58, ¶ 126) (citations omitted). That same day, an RN Supervisor emailed Elderwood management, including unit managers and DSW Starace, as follows:

53

> Just wanted you all to know what the vibe on [the] Champlain [Unit] is tonight. [There s]eems to be a lot of stress and lots of frustration, which is due to AC's behaviors.
>
> I had Angela in the dining room, crying because [AC] tore into her last night[,] [] calling her a "n****r" repeatedly. Angela stated that [another resident] was in tears because of his outbursts. Angela is worried about losing her license, about being harassed, [and about] verbal abuse. She also said "[i]f they don't do something about [AC,] then I will just go and get another job[.]"
>
> Jessie is frustrated because she has a lot o[n] her plate, but I am helping her out. She also said "I'm thinking about giving my notice tonight. I'm upset about how [AC] treats us[,] and it's not okay[.]"
>
> Lots of concerns from staff about the fear of losing their license, statements about leaving [Elderwood] for another job (where they feel safe and protected).
>
> I'm well aware we ALL know his behaviors. I just wanted to let you all know what staff has said to me tonight. Maybe they have already told you, but I felt I should send an email and follow through. I, like you all, know this is a difficult situation[, b]ut [the] staff is feeling very discouraged.

(Doc 128-50 at 2.)

Approximately one week later, on March 12, 2021, DSW Starace made a note in the PCC system, indicating "that the police were called because AC was at risk of harm to others and transferred to the hospital." (Doc. 134-1 at 28, ¶ 65) (internal quotation marks and citation omitted). That same day, Dr. Menzies emailed DSW Starace and UVMMC staff members the following: "I am writing to let you know that AC was transferred to the E[R] just a few minutes ago because of physical aggression and that Elderwood's leadership has decided that he should not be returned to the building at this time. I support this decision. Please do not agree to accept[] him back." (Doc. 128-35 at 2.) A few days later, on March 15, 2021, while AC was still at the UVMMC hospital, DSW Starace emailed an RN Supervisor, stating:

> [AC] is still at the hospital and[,] at this point[,] we cannot take him back due to him still being at risk[.] I don't know the long[-]term plan yet[,] but we will be working with the hospital to put together something safe. We can't manage him how he is right now though.

(Doc. 128-36 at 2.) Subsequently, AC was discharged from the ER to his son's care.

54

AA Cote testified that "AC never used racial slurs against white employees." (Doc. 134-1 at 28, ¶ 66) (citing 128-12 at 24:1-7). Nurse Robinson similarly testified that, "[w]hen AC was terrorizing [w]hite individuals, it was because he saw them sympathizing with Blacks, and he called them N-word lovers[]" and that she "witnessed AC being cruel to [w]hite individuals who were kind to Blacks. He called them N-word lovers." (Doc. 128-18 at 16:4-6, 16:13-14.)

DSW Starace testified that "AC 'regularly,' i.e., more than weekly, used racial slurs, such as the [N]-word, 'coons,' and 'monkeys[,]' towards employees and 'regularly,' i.e., more than weekly, called employees the [N]-word[.]" (Doc. 134-1 at 29, ¶ 67) (citation omitted). She further testified that "AC's racial harassment was not just limited to those employees assigned to him, but also those in his vicinity." *Id.* at ¶ 68 (citation omitted). According to Nurse Bradstreet's testimony, "AC 'was mostly outside of his room[,]' and when outside his room, he would 'sit in his red chair[] by the nurse[s'] station.'" *Id.* at ¶ 69 (alteration adopted) (citation omitted).

### b.     Resident CD.

CD was a resident at Elderwood, and its predecessor, from July 5, 2016, to December 21, 2020, when she passed away as a result of COVID-19. Various notes in the PCC system record that CD "prefer[red]" white individuals to provide her care and that CD "struggle[d]" with non-white caregivers. (Doc. 134-1 at 36, ¶¶ 77-78) (internal quotation marks and citations omitted). On June 3, 2020, an LPN entered a note in the PCC system, stating that "CD has complaints about there being too many [B]lack workers here." *Id.* at 37, ¶ 79 (internal quotation marks and citation omitted). In late August 2020 and early October 2020, two different LPNs noted CD was "expressing that she doesn't want any colored LNA's in her[] room for her care[,]" and "CD has a history of having difficult behaviors toward non-white staff and threw her wash basin on the floor . . . after [a] [B]lack LNA was trying to assist her." *Id.* at ¶¶ 80-81 (alterations adopted) (internal quotation marks and citation omitted). On October 5, 2020, an LPN documented in the PCC system that "CD '[was] seemingly looking for ways to get [a B]lack LNA in trouble this morning'" and that CD "'has made prejudice[d] statements in

the past.'" *Id.* at 38, ¶ 82 (citation omitted).

Nurse Robinson provided care to CD approximately ten to twenty times during her employment and testified that she requested "not to work on the Mansfield Unit because 'there were multiple residents on that unit who . . . were very racist and felt they were free to express their racism,' including CD." *Id.* at 38, ¶ 83 (citation omitted). Nurse Bradstreet also provided care to CD approximately ten to twenty times during her employment, and, in her deposition, she testified that "CD called her the [N]-word whenever CD was on her assignment[.]" *Id.* at 39, ¶ 86 (internal quotation marks and citation omitted). Nurse Ivy testified that "she heard CD use 'racist language.'" (Doc. 134-1 at 40, ¶ 89) (citation omitted). According to Nurse Bradstreet, "CD did not want Black employees to provide [her] care" and this "was 'an ongoing problem.'" *Id.* at 38, ¶ 85 (citation omitted).

CD's daughter spoke with Elderwood management regarding her mother's racial preference for caregivers. "DON Lambert testified that[,] in communicating CD's racial preference, CD's daughter said 'something more derogatory' than 'a [B]lack caregiver' and [that DON Lambert was] 'feeling different' about how CD's daughter communicated CD's racial preference." *Id.* at 40, ¶ 90 (citation omitted).

Nurse Bradstreet testified that she told unit managers about CD's racial preference for white caregivers and CD's use of racial slurs and requested removal from CD's assignment. In response, a unit manager told Nurse Bradstreet "he would try to put somebody else in the room with [Nurse Bradstreet] to try to help [her] do the care[]" but, because CD was on Nurse Bradstreet's assignment, Nurse Bradstreet "couldn't just not service [CD]." (Doc. 128-14 at 33:8-11.) No supervisors offered to transfer Nurse Bradstreet to another unit or remove her from CD's care.

### c. **Resident MR.**

MR was a resident at Elderwood, and its predecessor, from October 3, 2018, until December 27, 2022. The PCC records for MR "state[] that she makes 'racial comments[.]'" (Doc. 134-1 at 40, ¶ 91) (citation omitted). In the care plan section of Elderwood's medical records for MR, it states to "[p]rovide Caucasian only staff

members for [MR]'s care as able[]" and "provide Caucasian staff members as available."
(Doc. 112-10 at 6-7.)

Nurse Bradstreet was "mostly" assigned to care for MR during her final weeks of employment at Elderwood in February and March of 2021. (Doc. 134-1 at 40, ¶ 92) Nurse Bradstreet testified that MR did not want Black employees to provide her with care and that Nurse Bradstreet reported MR's racial preference to a unit manager, but the unit manager told her "no one else was available[]" to care for MR. *Id.* at 41, ¶ 93 (citation omitted).

### d.    The Staff.

On October 6, 2020, RN Stones, Nurse Ivy, and Nurse Bradstreet started a text message group chat, which Nurse Ferguson, Nurse Murphy, and Nurse Robinson joined at some point thereafter. In the group chat, Nurse Murphy refers to AC as a "rat bastard" and "[t]hey [] discuss seeking $42,000,000 from Elderwood[.]" (Doc. 128-1 at 33, ¶ 81) (internal quotation marks omitted).

### i.    Nurse Murphy.

Nurse Murphy was an LPN at Elderwood from April 2020 to October 2020. Nurse Murphy had limited interactions with CD and cannot recall ever providing care to MR. She never called Elderwood's compliance hotline to complain about the Residents. She filed a charge of discrimination with the EEOC, dated November 29, 2020, alleging racial harassment.

In her deposition, Nurse Murphy testified as follows:

AC targeted Black employees;

[S]he "tried not to be in his room alone" because he would say "things like he's not going to take medication from an" N-word;

[I]n approximately May or June 2020, after working with AC for three weeks, she asked that AC be removed from her assignment because of his "racist language and behaviors";

[S]he sent AC to the hospital on one occasion because: "He was throwing things at the [Black] staff as well as the typical name calling. No one could go in his room and calm him down and he could either hurt himself or hurt one of us";

[S]he witnessed one incident on September 2, 2020, in which AC barricaded [Nurse] Ndour into various resident rooms and followed him around, threatened to shoot up the place, hit her and [Nurse] Ndour, used the [N]-word, and blocked and "trapped" Black staff from leaving other residents' rooms;

[A]fter the September 2, 2020 incident[,] she informed her recruiter of AC's racially "abusive behavior" and "target[ing] Black staff," including calling them "N[-word]s, N[-word] bitches, monkeys, et[c.,] on a regular basis";

AC's wife/ex-wife told her AC "was violent" and had a "history of racism[]" that included AC and his friend going "n****r hunting";[25] and

[S]he requested to transfer off the Chittenden Unit the last three weeks of her employment with [Elderwood] "because the last incident with AC [w]as so out of control and . . . no one seemed to care about our side[,]" but this request was not honored by DON Lambert until after [Nurse] Murphy "called out[.]"

(Doc. 134-1 at 34-35, ¶¶ 75(a)-(h)) (alterations adopted) (internal citations omitted).

### ii.     Nurse Ndour.

Nurse Ndour was an LNA at Elderwood from February 2017 to July 2019 and again from September 2019 to February 2021.[26] Nurse Ndour never called Elderwood's compliance hotline to complain about the Residents; however, he submitted a handwritten complaint to Elderwood on January 17, 2020. He does not remember MR. He worked in the Chittenden Unit, where AC resided, and was offered the opportunity to transfer units but refused the offer. He never filed a workers' compensation claim and never sought medical treatment relating to any interaction with AC. He filed a charge of discrimination with the EEOC, dated January 14, 2021.

Nurse Ndour testified that:

[H]e was in [] Elderwood . . . "all the time" because he worked [sixteen]-hour days and often seven days a week;

---

[25] Although Elderwood does not dispute this fact, the pages of Nurse Murphy's deposition which the EEOC cites in support of it were not provided to the court.

[26] As the EEOC points out, the Elderwood facility "previously had a different owner, and at some point during [Nurse] Ndour's employment, [] Elderwood purchased the facility, becoming [Nurse] Ndour's employer." (Doc. 128-1 at 29) (citation omitted).

AC called him the [N]-word and "[B]lack bastard," and said "I will take my gun and shoot all the [B]lack people. I hate you. I want to kill all of you";

AC followed and "chased" [Nurse] Ndour in the hallways, and [AC] would hear [Nurse] Ndour's voice and come out of his room saying, "I'm going to kill you, you [B]lack bastard. Go back to Africa[,] you [B]lack bastard";

[D]uring a meeting with DON Lambert, [RNC] Yakey, and [CN Yanks] from "Elderwood headquarters," [Elderwood's] managers told him and other employees that AC "has the right to call them n****r" and "has the right to talk to [them] like that and treat [them] like that";

[A]fter he explained to [CN Yanks,] who was "high up in Elderwood[,]" about AC hitting him in the chest on one occasion, she and the unit manager both laughed;

[H]e was "very unhappy" working while AC was at [] Elderwood . . . , but . . . "didn't want to leave. That would be very easy. [When s]omebody is treating people like that, [and] we all leave, [it] makes it easy and he will do it to other people. For me at that point[,] we needed to fight this thing so it stops. Nobody should go through that while [they] are at work helping these people[.]"

*Id.* at 31, ¶¶ 71(a)-(f) (alterations adopted) (internal citations omitted).

### iii.    Nurse Ivy.

Nurse Ivy was an LPN at Elderwood from August 3, 2020, to October 10, 2020. Nurse Ivy was never assigned to care for AC, but she worked in the Chittenden Unit, where AC resided, three to four times a week. She "witnessed [AC] get in an altercation with a white resident[,]" and AC called her "fat and ugly." (Doc. 128-1 at 21, ¶¶ 46-47) (citation omitted). She never requested a transfer to a different unit.

Nurse Ivy provided care to MR once or twice but had no issues. She provided care to CD four or five times, and CD called her a "[B]lack bitch[.]" *Id.* at 22, ¶ 50) (internal quotation marks omitted). Nurse Ivy never called Elderwood's compliance hotline to complain about the Residents. She filed a charge of discrimination with the EEOC alleging racial harassment in the fall of 2020.

Nurse Ivy testified to the following in her deposition:

[S]he heard AC threaten to fight her and [Nurses] Ndour and Murphy "every day"; []

AC used the [N]-word every time she worked on the Chittenden Unit and

59

"so many times she can't count," even though she was not assigned to him; and

[P]rior to working with AC, no one told her about AC, including his harassment [of] employees[.]

(Doc. 134-1 at 33, ¶¶ 73(a)-(c)) (alteration adopted) (internal citations omitted).

### iv.    Nurse Robinson.

Nurse Robinson was an RN at Elderwood from August 31, 2020, to November 28, 2020. Nurse Robinson never called Elderwood's compliance hotline to complain about the Residents. She worked in the Chittenden Unit, where AC resided, and when asked if she would prefer a transfer from that unit, Nurse Robinson indicated that she did not want to move her assignment. She worked in the same unit as CD for one shift and cannot recall any interactions with MR. She filed a charge of discrimination with the EEOC, dated December 2, 2020, alleging racial discrimination.

In her deposition, Nurse Robinson testified that:

AC's behaviors were "racist . . . , lashing out at Black employees, making racist comments, seeing a Black employee in the hallway and starting to go after them, saying he wanted to kill us, to hang us, beat us, put us on a ship and send us back to where we came from";

AC called her and other employees "bitches, coons, N-words, and hyenas," described them "as being dirty, being evil, and being something from hell," and described them "as the most atrocious creatures on the face of this earth every singl[e] day that [they] worked on the unit";

[T]he frequency of AC['s] statements about race was "too many to count" and "from the time AC woke up to the time he went to sleep, we were terrorized";

AC asked for ropes, a pair of scissors, a shotgun, and a knife "so that he could kill all of the N[-]words";

[O]n one occasion, AC "was fixated on killing" and "trying to get to" [Nurse] Ndour and said "killing Blacks made his blood boil";

[S]he "witnessed AC being cruel to [w]hite individuals who were kind to Blacks" and that AC "called them N-word lovers";

"[T]here were instances of behaviors of AC's that she witnessed and another nurse may have documented"; and

[S]he was told by two managers that [] Elderwood . . . "was the residents'

60

home," the residents "had a right to . . . say what they wanted to in their home," and she "should be used to the racism because she is from the South."

*Id.* at 33-34, ¶¶ 74(a)-(h) (alterations adopted) (internal citations omitted).

### v.    Nurse Ferguson.

Nurse Ferguson was an LPN at Elderwood from November 7, 2019, to October 16, 2020. Nurse Ferguson provided care to AC during her employment at Elderwood. She never asked to be transferred from AC's care and never called Elderwood's compliance hotline to complain about the Residents. Nurse Ferguson only cared for CD one time for ten minutes, during which CD made no statements about her race, and she never cared for MR. In the fall of 2020, Nurse Ferguson filed a charge of discrimination with the EEOC alleging racial harassment.

In her deposition, Nurse Ferguson testified that she:

[D]irectly or indirectly provided care for AC, which included interactions with AC even when he was not formally assigned to [Nurse] Ferguson's care;

[H]eard AC use the [N]-word [thirty to forty] times;

[W]as called a "monkey" by AC;

[H]eard AC use the racial slur "coon";

[W]as told by AC to "go back to Africa" and heard AC say things like "go get the head of your tribe," "this place should be shut down for employing people like you," and "this is not the place for you["]; . . .

[W]as told by AC more than once that he could hang Black employees and wanted to get a gun to shoot Black employees;

[W]as physically hit by AC with his walker by ramming it back and forth into her knees; and

[R]eported incidents of AC using racial[] slurs and derogatory language to [Elderwood's] managers, including . . . DON Lambert[.]

*Id.* at 32, ¶¶ 72(a)-(h) (alterations adopted) (internal citations omitted).

### vi.    Nurse Bradstreet.

Nurse Bradstreet was an LNA at Elderwood from July 26, 2020, to March 6, 2021. Nurse Bradstreet never called Elderwood's compliance hotline to complain about the

61

Residents. She declined her fourth contract for employment with Elderwood in February 2021 because she moved to Louisiana to care for her mother. On July 14, 2021, Nurse Bradstreet filed an amended charge with the EEOC, alleging, among other things, unlawful discrimination. Nurse Bradstreet testified in her deposition as follows:

> [T]hat on her first day working at [] Elderwood . . . , AC told her "to get her n****r ass out of his room" and that only after this initial interaction was she made aware that AC "does not like [B]lack people at all";

> [T]hat AC called her and "most of the [B]lack employees" "monkey," and told her "to go back to Africa";

> [A]bout one specific incident she and [Nurse] Murphy witnessed in which AC "tried to enter the kitchen area to actually attack" [Nurse] Ndour, [Nurse] Ndour used his body to keep the door shut, AC called [Nurse] Ndour "n****rs, go back to Africa" while trying to get in the room, AC said he "wanted to kill all the n****rs that were on the unit" and "didn't want no [B]lacks working there at all"; and

> [T]hat during [the] August 2020 [M]eeting with [AA] Cote, [CN Yanks], other managers, [Nurse] Ivy, and other staff that was to discuss AC's "altercation" with another resident, [Nurse] Ivy asked "about the situation of AC on the unit with the [B]lack employees[,]" to which [CN Yanks] said it was AC's home and "he had the actual right to call us n****rs."

*Id.* at 30, ¶¶ 70(a)-(d) (alterations adopted) (internal citations omitted).

### e.    Elderwood's Practices.

While none of the Staff called Elderwood's compliance hotline to complain about the Residents, Elderwood received "three confidential complaints" through its compliance hotline relating to AC's behavior on September 24, 2020, September 29, 2020, and October 12, 2020. (Doc. 128-1 at 52, ¶ 112) (citation omitted).

At Elderwood, residents could be assigned a one-on-one caregiver, "the 'number one' reason" for which "is 'usually [] a violent temperament, physical[ly] violent temperament.'" (Doc. 134-1 at 7, ¶ 22) (alteration adopted) (citation omitted). None of the Residents were assigned one-on-one caregivers.

Generally, Elderwood's policy "is to not accommodate residents' racial preferences for caregivers, because doing so would be 'discriminatory.'" *Id.* at 10, ¶ 31 (citation omitted). Specifically, COO Quillard testified that "we don't" provide "racial

preferences for caregivers in residents' care plans[]" because "[i]t would be discriminatory." (Doc. 128-6 at 17:12-22.) In DMC Laczi's deposition, when asked whether it is "appropriate to include in a care plan a racial preference for caregivers[,]" DMC Laczi answered "no." (Doc. 128-16 at 23:5-8.) When DMC Laczi was asked whether, in a care plan, "you would[] specifically say assign only Caucasian caregivers, if available[,]" DMC Laczi answered "[n]o." *Id.* at 23:21-23. DON Lambert testified that she "did not recall [Elderwood] having a policy specific to residents and racial preferences, but when [Elderwood was] able to meet the resident's preference for [w]hite caregivers[,] and also things that we know might help with behaviors, then [Elderwood] tr[ies] to honor those." (Doc. 134-1 at 36, ¶ 76) (internal quotation marks and citation omitted).

Each morning, Elderwood management reviewed the PCC notes that had been entered within the previous twenty-four hours, or seventy-two hours if it was a Monday. The DSW, DON, and unit managers usually attended these meetings.

Elderwood provided workplace harassment training to its employees through an Anti-Harassment PowerPoint. It maintained an employee handbook, which included sections titled "Equal Employment Opportunity and Zero-Tolerance for Discriminatory Conduct" and "Complaint Procedure." (Doc. 128-1 at 12, ¶ 20) (internal quotation marks omitted). AA Cote testified that "she understood [Elderwood's] anti-discrimination policy to apply to staff discriminating against staff, not residents racially discriminating against staff." (Doc. 134-1 at 8, ¶ 23) (citation omitted). Elderwood had training PowerPoints titled "Approaches for Dementia PowerPoint" and "De-Escalation PowerPoint." (Doc. 128-1 at 12, ¶ 21) (internal quotation marks and citations omitted).

RN Stones testified that "while AC was a resident at [] Elderwood . . . , [Elderwood] did not communicate a clear policy on how employees should report residents' racial harassment of employees to management." (Doc. 134-1 at 50, ¶ 121) (citations omitted). Elderwood's policy or practice for employees complaining of racial discrimination was to have those complaining employees call Elderwood's hotline or bring their complaints to their supervisors. If a complaint of racial discrimination was

63

lodged, COO Quillard was supposed to be notified. If an employee raised a complaint about racial discrimination by a resident, Administrator Cheli was supposed to call an emergency meeting with DON Lambert and the resident's social worker, legal guardian, and ombudsman. Administrator Cheli testified that "if a resident was using racial slurs, he would typically call an emergency meeting with the DON, the resident's social worker, the resident's legal guardian, and [the resident's] ombudsman." *Id.* at 9, ¶ 30 (citation omitted). An emergency meeting was never held for this purpose concerning any of the Residents.

In his deposition, Administrator Cheli acknowledged that he "never interviewed any employees at Elderwood . . . about allegations of racial discrimination[.]" (Doc. 128-11 at 52:17-22.) According to Administrator Cheli, "if he had known about incidents involving AC's racial verbal and physical attacks on Black employees, he would have conducted an investigation, including gathering employee and stakeholder statements, and gotten [AC's] ombudsman involved." (Doc. 134-1 at 55, ¶ 135) (citation omitted). He testified that, "even though he would have expected to be notified if a resident was sent to the hospital for aggressive behaviors, he was never informed that a resident at [] Elderwood . . . was sent to the hospital for aggressive behaviors." *Id.* at 45, ¶ 105 (citation omitted).

In his deposition, COO Quillard testified that, between 2020 and 2021, he was not aware if Elderwood ever "[c]onsider[ed] developing internal policies to address when a resident racially harasses employees[,]" "[c]onsider[ed] developing a training for employees that address[ed] situations in which residents racially harass employees[,]" "[c]onsider[ed] assigning AC a one-on-one caregiver[,]" or "[had] a written policy clearly stating that residents cannot choose or request caregivers based on race[.]" *Id.* at 53, ¶¶ 129(a)-(d) (citations omitted). Administrator Cheli similarly testified that he was not aware if Elderwood ever "[c]onsider[ed] developing a training for employees that addressed situations in which residents racially harass employees" or "[c]onsider[ed] assigning AC a one-on-one caregiver[.]" *Id.* at ¶¶ 130(a)-(b) (citations omitted). AA Cote testified that she was not aware if Elderwood ever "[d]iscuss[ed] [] creating [] a policy

64

that addressed situations in which a resident racially harassed employees" or "[d]iscuss[ed] developing a rac[ial] harassment training in response to AC's behavior[.]" *Id.* at 54, ¶¶ 132(a)-(b) (citations omitted).

In her deposition, Administrator Peacock testified that she:

> Never contemplated developing a policy or practice to specifically address situations in which residents racially harass employees; [] [n]ever contemplated or discussed developing a policy or practice to address how to document instances where residents were racially harassing employees; [] [n]ever contemplated or discussed developing a policy or practice on how to report residents' racial harassment of employees, whether as a victim or bystander; [] [n]ever contemplated or discussed developing a policy or practice to address how to investigate residents' racial harassment of employees; and [c]ould not recall ever contemplating or discussing assigning AC a one-on[-]one caregiver[.]

*Id.* at 54, ¶¶ 131(a)-(e) (internal citations omitted).

COO Quillard and Administrator Cheli both "testified that [Elderwood's] residents do not have a right to use racial slurs towards employees and it would be incorrect for any of [Elderwood's] managers to state otherwise." (Doc. 134-1 at 8, ¶ 24) (citations omitted).

Regarding DMC Laczi's lack of knowledge about AC's behaviors prior to September 2020, the following colloquy took place between EEOC's counsel and DMC Laczi:

> Q. . . . [A]re you surprised that no one at [] Elderwood . . . reached out to you concerning AC until September of 2020?
>
> ***
>
> A. I'm surprised.
>
> Q. And why[?] [C]an you just explain why you're surprised?
>
> A. Usually[,] if we were having that many behaviors, there would be someone who would reach out . . . for help to mitigate those behaviors in finding different ways of approach[ing] [] what was going on with that individual as well as any sort of things that we needed to do for interventions, medications, looking at different places that he needed to be as well as what the interactions with the staff[] are going to look like. Overall[,] we would need a behavior plan for him.

65

\*\*\*

Q. But a behavioral plan wasn't developed [for AC] until you did one in October of 2020, correct?

\*\*\*

A. I did my documentation review starting in September [of 2020], and then the resident behavior management plan was in October [of 2020].

(Doc. 128-16 at 81:5-82:13.)

In his deposition, COO Quillard testified that he was not aware of AC's behavior until September 2020. During his deposition, he reviewed PCC notes and incident reports concerning AC's behavior from April 2020 to August 2020. Regarding his review of the notes, the following colloquy took place:

Q. And you testified earlier today that you were never informed of any incidents concerning AC's racial harassment of staff prior to September of 2020?

A. Correct.

Q. [COO] Quillard, I just showed you a few documents dating between April 2020 and August 2020 concerning a few incidents involving AC's[] use of racially derogatory language towards [B]lack staff. Are you surprised by any of these documents?

A. I'm surprised by the level, yes.

Q. What do you mean you were "surprised by the level"?

A. There's a big difference between telling me there's a problem patient and somebody that's conducting themselves that way.

Q. And you're referring to how [DON] Lambert described to you[] AC and —

A. [Administrator] Cheli — I didn't mean to interrupt. [Administrator] Cheli.

Q. [Administrator] Cheli described him to you that way?

A. That we had a problem patient.

\* \* \*

Q. Okay. Looking at the documents that I just showed you . . . , does that change anything of how you would have handled anything in the fall of 2020?

A. . . . Yes.

66

Q. What would have changed?

A. . . . [H]ad I known sooner, I would have acted sooner.

Q. Okay. You would have acted soon to try and stop the . . .

A. To bring support in to assist the facility and the staff in dealing with AC.

(Doc. 134-1 at 56, ¶ 138) (alterations adopted) (citations omitted).

### 2.    Disputed Facts.

According to Elderwood, AC "suffered from numerous psychologically and physically debilitating ailments including, but not limited to: late[-]onset Alzheimer's disease, late[-]stage dementia with behavioral disturbances, cataracts, blindness in one eye, hearing loss, asthma, numerous diagnoses related to his balance and gait, numerous diagnoses related to his heart and circulation, a unilateral inguinal hernia, and calculus of kidney." (Doc. 128-1 at 38, ¶ 88) (citation omitted). The EEOC disputes these facts to the extent that Elderwood claims AC had Alzheimer's or late-stage dementia with behavioral disturbances diagnoses at the time of his admission on March 31, 2020. In addition, at times during his residency at Elderwood, AC's BIMS score reflected no or minimal cognitive impairment. On August 24, 2020, DSW Starace attributed AC's behavior to his "personality[]" and AA Cote agreed, "[i]t is who [AC] is." (Doc. 128-48 at 2.) In mid-October 2020, DMC Laczi noted Elderwood "[h]ad conflicting information about AC's capacity[.]" (Doc. 124-1 at 48, ¶ 112(e)) (citation omitted).

Elderwood contends that AC "was not able to ambulate far on his own and utilized a wheelchair, and [RN] Stones advised that she never saw [AC] walk farther than five steps during his time as a resident at Elderwood." (Doc. 128-1 at 45, ¶ 98) (citation omitted). In response, the EEOC "denies that AC never walked farther than five steps during his entire time as a resident at [] Elderwood[,]" pointing to evidence that AC did not "exclusively use[] a wheelchair[]" and evidence that "AC would sometimes walk on his own or walk utilizing a walker, rather than only using a wheelchair throughout his time at Elderwood." *Id.* at 45 (emphasis omitted). A June 2020 email indicates that AC was "walking all over the unit on his own." (Doc. 128-51 at 2.)

With respect to AC's ER visits, Elderwood avers that AC visited UVMMC in

October of 2020, but the EEOC denies this, maintaining that AC only visited the hospital on June 13, 2020, December 27, 2020, and March 12, 2021, and pointing out that "[t]he progress notes in AC's medical records do not indicate that he was ever sent to UVMMC in October 2020." (Doc. 128-1 at 53) (citation omitted).

Elderwood alleges that Nurse Bradstreet never provided care to AC during her employment at Elderwood, but the EEOC "denies this fact to the extent it suggests that [Nurse] Bradstreet was never assigned to AC, never interacted with AC, and never attempted to provide care to AC." *Id.* at 14 (citation omitted).

According to Elderwood, Nurse Bradstreet "had no hesitation renewing her contracts with Elderwood . . . despite her purported experiences with [AC]." *Id.* at ¶ 26 (citation omitted). The EEOC concedes that Nurse Bradstreet "did not have any hesitation in renewing her contract for the second assignment at [] Elderwood . . . from September 20, 2020[,] to mid-December 2020 despite her experiences with AC[]" but "denies that [Nurse] Bradstreet offered any testimony on whether she hesitated in renewing her contract for a third assignment from mid-December 2020 to March 6, 2021." *Id.* at 14 (citation omitted). Elderwood asserts that, "[i]n [Nurse] Bradstreet's experience, she has been called the N-[w]ord by disabled residents at most of the long-term care facilities she has worked at throughout her career." *Id.* at 16, ¶ 31 (citation omitted).

The EEOC admits that Nurse Bradstreet "has been called the N-word by residents at most of the long-term care facilities she has worked at but denies that all these residents were disabled[]" but "denies this fact to the extent it implies that [Nurse] Bradstreet was called the N-[w]ord multiple times, repeatedly, consistently, or by multiple residents at most of the facilities she has worked at." *Id.* at 16.

Elderwood contends that Nurse Ndour did not provide care to CD, but the EEOC disputes this claim, pointing out that Nurse Ndour "would give CD water or food[]" and "if CD pushed the call button to ask for help, [Nurse] Ndour was required to respond to her call light and would do so." (Doc. 128-1 at 31) (citation omitted).

According to Elderwood, Nurse Ferguson, Nurse Murphy, and Nurse Robinson

68

joined the text message group chat on October 26, 2020, the group referred to themselves as the "Mysterious 6" and, in the group message, Nurse Murphy "jokes about [AC] getting COVID-19 and dying." *Id.* at 33, ¶ 81 (citation omitted). The EEOC denies that "the cited evidence supports that October 26, 2020[,] is the date the group expanded[,]" denies that the group referred to themselves as the Mysterious 6, and "denies that the cited evidence supports that [Nurse] Murphy jokes about AC dying." *Id.* at 34. The EEOC also contends that Nurse Murphy "jokes about [AC] being 'too evil' to get COVID-19." *Id.*

Elderwood claims that it provided "robust employee training[,]" which "define[d] harassment, cover[ed] racial harassment prevention, advise[d] that the law protects against third[-]party non-employees, advise[d] where to report harassment internally, provide[d] a complaint form, provide[d] the number for Elderwood's corporate compliance hotline, and generally advise[d] that retaliation is prohibited." *Id.* at 9-10, ¶ 17-18 (citations omitted). The EEOC disputes this characterization of Elderwood's training, pointing out that Administrator Cheli testified that, while he worked at Elderwood, he:

- [D]id not recall receiving any training on race discrimination;
- [D]id not receive any training on how to conduct investigations into complaints of race discrimination;
- [W]as unaware of any policies regarding anti-discrimination, racial harassment, and anti-retaliation that applied to [] Elderwood; and
- [W]as unaware of any training that [] Elderwood provided to employees on any anti-discrimination policies[.]

*Id.* at 9-10 (citations omitted).

The EEOC also cites evidence that Elderwood's employee training concentrated on sexual harassment, not racial harassment, and focused on employee-on-employee harassment, not resident-on-employee harassment. Elderwood claims that it provided employees "with training on approaches for dementia and de-escalation[,]" *id.* at 12, ¶ 21, while the EEOC counters that "[Elderwood] did not always provide all its employees, including those working at [the Elderwood] facility, with training on approaches for

69

dementia and de-escalation. In addition, some of [Elderwood's] dementia-related training was not rolled out . . . until October 2020." (Doc. 128-1 at 12-13) (internal citations omitted). Elderwood asserts that it provided an employee handbook to all staff members, but, according to the EEOC, not all Staff received a handbook, or at least not all of them recall receiving a handbook.

The parties dispute what transpired during the November 24, 2020 meeting between Administrator Peacock and Nurse Robinson. As Elderwood claims, Administrator Peacock "spoke with [Nurse] Robinson to address her concerns about [AC], and [Nurse] Robinson thanked her." *Id.* at 26, ¶ 61 (citation omitted). The EEOC "denies that the conversation was to address [Nurse] Robinson's concerns about AC broadly[,]" pointing out that the meeting was to specifically address Nurse Robinson's "November 23, 2020 progress note documenting AC's fixation on killing the Black staff—in particular, [Nurse] Ndour—that day." *Id.* at 26 (citations omitted). The EEOC further "denies that cited evidence notes that [Nurse] Robinson 'thanked' Administrator Peacock[,]" clarifying that "[t]he cited memo notes that [Nurse] Robinson 'said she truly appreciated Administrator Peacock's effort in discussing this with her.'" *Id.* at 26-27 (alteration adopted).

The parties also disagree regarding what occurred during the meeting between DSW Starace, Administrator Peacock, and Commissioner Hutt. Elderwood claims that, at the meeting, DSW Starace, Administrator Peacock, and Commissioner Hutt discussed AC's severe cognitive impairment and insensitive comments, and Commissioner Hutt discouraged Elderwood from discharging AC, "advis[ing] Elderwood to care plan him for a potential to be a victim of abuse given the hostility that some staff members were projecting." *Id.* at 56, ¶ 122. The EEOC disputes this, citing Commissioner Hutt's testimony wherein she stated, "I don't remember [Administrator Peacock] asking" "for [] assistance in transferring [AC,]" "I don't remember [Administrator Peacock] asking" "what the options were in transferring [AC,]" "I do not recall saying" "that [I was] concerned about staff abusing [AC,]" and "I don't remember ever saying" "that discharging [AC] would not be in his best interest[.]" (Doc. 128-27 at 9:12-19; 10:1-6;

13:9-12.)

Nurse Ivy is currently a party to a Chapter 13 bankruptcy proceeding in Memphis, Tennessee. Elderwood contends that Nurse Ivy did not disclose this lawsuit to the trustee in her bankruptcy proceeding. The EEOC counters that, on November 6, 2024, Nurse Ivy filed an amended Form 106 A/B, Schedule A/B: Property in her bankruptcy proceeding, wherein she disclosed this action.

## B.    Conclusions of Law and Analysis.

### 1.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue,

71

a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment: "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

Ordinarily, the existence of disputed issues of material fact precludes granting summary judgment. *See Anderson*, 477 U.S. at 248-49. However, exceptions to this general rule exist. For example, a plaintiff may fail to proffer admissible evidence to support an essential element of his or her claim, or a movant may otherwise demonstrate he or she is entitled to summary judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322-23. Or alternatively, even after resolving the disputed facts in a party's favor, no reasonable jury could find for him or her. *See, e.g., Anglin v. Hunter*, 2025 WL 968046, at *16 (D. Vt. Mar. 31, 2025) ("Viewing the evidence in the light most favorable to [p]laintiff and resolving any disputed facts in his favor, no rational jury could find [p]laintiff has satisfied this burden.").

### 2. Whether Elderwood Is Entitled to Summary Judgment on Nurse Ivy's Hostile Work Environment Claim Due to Judicial Estoppel.

Judicial estoppel is an equitable doctrine that generally applies when "1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695-96 (2d Cir. 2011) (internal quotation marks and citations omitted). The doctrine "is commonly applied in order 'to

prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy.'" *Ibok v. SIAC-Sector Inc.*, 470 F. App'x 27, 28 (2d Cir. 2012) (quoting *Coffaro v. Crespo*, 721 F. Supp. 2d 141, 148 (E.D.N.Y. 2010)).

Elderwood argues that "[f]ederal courts have concluded that judicial estoppel—an equitable doctrine—may be applied to bar EEOC from seeking monetary and other relief on behalf of claimants who did not disclose their claims in the context of a bankruptcy proceeding." (Doc. 115-1 at 30.) The EEOC claims that Nurse Ivy amended her bankruptcy disclosures and disclosed this proceeding therein, but Elderwood counters that Nurse Ivy failed to amend her bankruptcy disclosure "until after Elderwood alerted the EEOC that it caught her in the lie, [which] is exactly the type of situation that judicial estoppel protects." (Doc. 134 at 14) (citation omitted).

Elderwood cites *EEOC v. Dave's Detailing, Inc.*, 2008 U.S. Dist. LEXIS 36202 (W.D. Ky. May 1, 2008) wherein the court dismissed the EEOC's claims because the claimants failed to disclose their pending EEOC case in their bankruptcy proceeding. In doing so, the court reasoned that the claimants "specifically denied the existence of their EEOC charges and potential claims against [the defendant] by marking 'None' on their bankruptcy petition[]" and made statements to the bankruptcy court denying that they had filed EEOC charges and denying that they had potential claims against the defendant. *Id.* at *7. The United States Supreme Court is presently considering the applicability of judicial estoppel in this context and has not yet rendered a decision. *See Keathley v. Buddy Ayers Constr., Inc.*, 2025 WL 673434, at *5 (5th Cir. Mar. 3, 2025), *cert. granted*, 146 S. Ct. 326 (2025).

There is no evidence in this case regarding Nurse Ivy's representations to the bankruptcy court other than a single form which has since been amended. Because of the amendment, the court does not find, as a matter of law, that Nurse Ivy's claim is barred by judicial estoppel. *See Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 279 (2d Cir. 2019) (distinguishing a case where the plaintiff failed to disclose his EEOC claim in bankruptcy court and failed to "remed[y] [that omission] *at any time* prior to the closing of his

bankruptcy case[]") (emphasis in original); *see also id.* at 280 ("[T]he concerns for judicial integrity cited by the district court, based on a case in which a pending claim was never disclosed to the bankruptcy court, are considerably less weighty under the distinct factual circumstances presented by this case."). There is also no evidence indicating that the bankruptcy court accepted Nurse Ivy's prior representation which omitted this pending action. *Cf. Keathley*, 2025 WL 673434, at *5 (finding plaintiff was judicially estopped because the bankruptcy court "accepted his prior position of having no pending personal injury cause of action by omitting any reference to [plaintiff's] personal-injury claim in the modified plan[]" even though, "[h]ad the bankruptcy court been aware of his claim, it may well have altered the plan[]") (alterations adopted) (internal quotation marks and citations omitted). Nor is there sufficient evidence to find, as a matter of law, that Nurse Ivy's failure to disclose this action was anything other than inadvertent. *See, e.g., Braman v. Pub. Emp. Risk Mgmt. Ass'n, Inc.*, 2025 WL 894957, at *8 (N.D.N.Y. Mar. 24, 2025) ("Courts have declined to impose this estoppel if there was an inadvertent failure to disclose from lack of knowledge of the facts for the claim or the lack of a motive to conceal the claim.") (alteration adopted) (internal quotation marks and citation omitted).

For the reasons stated above, Elderwood is not entitled to summary judgment on Nurse Ivy's claim on judicial estoppel grounds.

### 3. Whether Elderwood Is Entitled to Summary Judgment on the EEOC's Hostile Work Environment Claim.

Title VII prohibits an employer from discriminating "against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Section 1981 [of Title VII] has been interpreted to 'provide a cause of action for race-based employment discrimination based on a hostile work environment.'" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320 (2d Cir. 2015) (alteration adopted) (citation omitted). Under Section 706 of Title VII, the EEOC may file a charge against a private employer on behalf of a "person or persons aggrieved" by an unlawful employment

practice. 42 U.S.C. § 2000e-5(f)(1).

As an initial matter, although the EEOC's Amended Complaint seeks relief on behalf of the Staff and "other similarly aggrieved Black employees who were adversely affected[,]" Elderwood points out that the EEOC has not identified additional aggrieved Black employees other than the Staff. (Doc. 67 at 1.) Because discovery has closed in this case, the EEOC may not join additional aggrieved Black employees to its suit unless granted leave by the court.

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Duplan v. City of N.Y.*, 888 F.3d 612, 627 (2d Cir. 2018) (alteration adopted) (internal quotation marks omitted) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)). "The test for a hostile work environment involves 'both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'" *Chislett v. New York City Dep't of Educ.*, 157 F.4th 172, 187 (2d Cir. 2025) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).

Courts "employ a totality of the circumstances approach to evaluate whether an environment is hostile and abusive, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 262 (2d Cir. 2023) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). However, "[n]o single factor is required[,]" and "there is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 229 (2d Cir. 2024) (alteration adopted) (internal quotation marks and

citation omitted).

When the EEOC brings a hostile work environment claim on behalf of aggrieved persons under Section 706, each aggrieved person must satisfy the essential elements of the claim.[27] In other words, aggrieved persons "may not 'aggregate' their allegations in order to depict an overall hostile work environment." *Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 253 (E.D.N.Y. 2016). Despite an individualized analysis, "[e]vidence of harassment directed at co-workers can be relevant to an employee's own hostile work environment claim, even if the employee was not present when the comments were made and only learned of them second-hand." *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 348 (S.D.N.Y. 2006) (citations omitted); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment[.]") (internal citations omitted).

The inquiry is whether the work environment, as a whole, was hostile with respect to each individual aggrieved person.[28] *See Moll*, 94 F.4th at 232 (denying summary

---

[27] *See EEOC v. Vill. at Hamilton Pointe LLC*, 2020 WL 13568924, at *2 (S.D. Ind. Sept. 29, 2020) ("The EEOC brings this suit under Section 706 of Title VII for the purpose of recovering individual relief . . . on behalf of aggrieved individuals. The EEOC must prove that [defendant] violated Title VII with respect to each claimant. In other words, there must be individualized proof for every element of each claim.") (citations omitted), *aff'd,* 102 F.4th 387 (7th Cir. 2024); *EEOC v. Swissport Fueling, Inc.*, 916 F. Supp. 2d 1005, 1021 (D. Ariz. 2013) ("[C]ourts in this district have analyzed the EEOC's hostile work environment claims on a claimant-by-claimant basis in the past.") (collecting cases); *EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 929 (N.D. Iowa 2009) ("[T]he EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all of the elements of their [] harassment claims to obtain individual relief for them."); *EEOC v. O'Reilly Auto. Inc.*, 2010 WL 5391183, *5 (S.D. Tex. Dec. 14, 2010) ("'§ 706 . . . requires individualized proof of every element of each claim. . . . Each claimant will be required to satisfy each element of the claim, including severity or pervasiveness, based on their individual experience.'"); *EEOC v. Evans Fruit Co.*, 2013 WL 633421, at *2 (E.D. Wash. Feb. 20, 2013) ("It is EEOC's burden to present evidence of each element of the hostile work environment claim for each individual claimant[.]") (citation omitted).

[28] Elderwood erroneously argues that "[f]ive of the six [Staff] only worked for Elderwood for

76

judgment for defendant on plaintiff's hostile work environment claim because the evidence "reveals a working environment repeatedly punctuated with sexual comments, innuendo, and statements or treatment demeaning to women"); *Banks*, 81 F.4th at 267 ("A plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.") (alteration adopted) (internal quotation marks and citation omitted); *see also Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) ("In hostile work environment cases, we consider the 'work environment as a whole' rather than individual instances of harassment.") (citation omitted). Courts in the Second Circuit have "cautioned [that] the existence of a hostile work environment is a mixed question of law and fact. These kinds of questions are especially well-suited for jury determination[.]" *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 458 (S.D.N.Y. 2013) (internal quotation marks and citation omitted) (first alteration in original), *aff'd sub nom., Dabney v. Bed Bath & Beyond*, 588 F. App'x 15, 16 (2d Cir. 2014); *accord Ringel v. New York City Dep't of Educ.*, 616 F. Supp. 3d 205, 229 (E.D.N.Y. 2022).

### a.    Whether the Residents' Conduct Was Race-Based.

To establish a hostile work environment claim, "[a] plaintiff must [] demonstrate that [he or] she was subjected to the hostility because of [his or] her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). Hostility is not based on an individual's membership in a protected class when the hostility affects all individuals equally. *See id.* ("[A]n environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes.") (citation omitted). Put differently, "the equal opportunity harasser escapes the purview of Title VII liability." *Brown v. Henderson*, 115 F. Supp. 2d 445, 450 (S.D.N.Y. 2000), *aff'd*, 257 F.3d 246 (2d Cir. 2001). "A hostile work environment is not one that is bad for all living things in a manner that happens to

---

mere weeks or months through temporary staffing agency assignments." (Doc. 115-1 at 7.) None of the Staff only worked at Elderwood for weeks, and the court will address the Staff's length of employment in its individualized analysis.

involve characteristics of the protected class; rather it is one that is discriminatorily hostile to an employee based on his or her membership in the protected class." *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 262 (S.D.N.Y. 2025) (alterations adopted) (emphasis, internal quotation marks, and citations omitted).

Elderwood argues that the Residents' conduct was not race-based because the Residents "had various negative interactions with" Elderwood employees of all races and AC insulted employees on a racially neutral basis, calling individuals "fat, lazy, stupid, dumb[, and] monkeys, among other terms." (Doc. 115-1 at 15) (internal quotation marks and citation omitted). The flaws in Elderwood's argument are threefold.

First, a reasonable jury could find that AC calling Black employees "monkeys" was not racially neutral, especially because AC repeatedly also called Black employees the N-word. *See Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 155 (E.D.N.Y. 2002) (finding employees using the terms "porch monkey" and "jungle bunnies" to refer to Black individuals was race-based hostility) (internal quotation marks omitted).

Second, a reasonable jury could find that AC's behavior was rase-based due to his use of racial slurs, such as the N-word and "coons," and his racially charged threats, including telling Black employees to "go back to Africa" and "get the head of their tribe[,]" asking for "a pair of scissors, a shotgun, and a knife so that he could kill" them, and threatening to "hang" them, "beat" them, "kill all the n****rs if he had a gun[.]" (Doc. 134-1 at 11, 21, 33, 34 ¶¶ 33, 50, 74(a), 74(d)) (internal quotation marks and citations omitted); *see also Love*, 186 F. Supp. 3d at 255 ("[T]he word 'n****r[]' . . . is objectively and inextricably linked to racial animus."); *Hechavarria v. Scorch Bar & Grill Inc.*, 2025 WL 2476346, at *14 (E.D.N.Y. Aug. 28, 2025) ("A hostile work environment can be created because of an employee's protected class when the employee is subjected to racial or ethnic slurs.").

Third, as Nurse Robinson testified, AC was "cruel to [w]hite individuals who were kind to Blacks[,]" and AC insulted [w]hite Elderwood employees *because he saw them sympathizing with Blacks*[,]" calling them "N-word lovers." (Doc. 128-18 at 16:4-6, 16:13-14) (emphasis supplied). Thus, at the very least, the question of whether AC's

racial and race-neutral insults directed at white employees rendered his conduct non-race-based is a question for the jury.

Although Elderwood contends that, because AC's "neurological condition, specifically his dementia, resulted in disinhibition and an inability to control inappropriate behavior[,]" AC was "medically incapable of making comments 'motivated by discriminatory animus,'" (Doc. 134 at 4-5), this issue is hotly disputed including through evidence from Elderwood's own administrators and physicians.[29] In any event, Elderwood offers no evidence that a neurological condition, such as Alzheimer's or dementia, automatically prevents an individual from acting with racial animus. To the contrary, courts have found that a harasser's intent is irrelevant to a hostile work environment claim. *See Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 231 (4th Cir. 2022) ("[I]t matters not if the boy was too young to understand the force of his words or if he lacked intent to harm [plaintiff], for harassment based on a protected characteristic may be actionable where it has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.") (internal quotation marks, emphasis, and citation omitted); *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1228 (10th Cir. 2015) ("A district court's assessment on summary judgment of whether a workplace environment is sufficiently polluted for purposes of a § 1981 claim should not be based on whether an

---

[29] Administrator Peacock admitted she was "not convinced that all of [AC's] behaviors are related to [d]ementia." (Doc. 128-49 at 2.) DSW Starace and AA Cote attributed AC's behavior to his "personality." (Doc. 128-48 at 2.) Elderwood conceded that Nurse Murphy testified AC's ex-wife told her "AC 'was violent' and had a 'history of racism[.]'" (Doc. 134-1 at 35, ¶ 75(g)) (citation omitted). Prior to November 12, 2020, AC had BIMS scores of 14 and 13 out of 15, which meant that AC did not "have much cognitive impairment at all[,]" was "very much with it mentally[,]" and was thus "capable of being told that the use of racial slurs and physical threats and attacks towards Black staff are not acceptable[.]" (Doc. 128-11 at 56:17-57:2.) Moreover, AC was represented as pleasant and cooperative in multiple settings, and AC's diagnosis was changed to unspecified dementia with behavioral disturbance on June 16, 2020, with a diagnosis date of April 28, 2020." As DMC Laczi noted, Elderwood "[h]ad conflicting information about AC's capacity[.]" (Doc. 134-1 at 48, ¶ 112(e)). Based upon the disputed facts and competing expert witness opinions, a rational jury could find that AC's conduct was race-based despite his neurological condition.

alleged harasser possessed the motivation or intent to cause discriminatory harm or offense.") (collecting cases).

Likewise, whether CD and MR were motivated by racial animus is a disputed issue of material fact. CD called Black employees the N-word, threw a wash basin at a Black LNA, and expressed a racial preference for caregivers, and MR made "racial comments" and requested that white employees provide her care. (Doc. 134-1 at 40, ¶ 91) (internal quotation marks and citation omitted). These facts indicate race-based behavior, and neither Elderwood nor Dr. Fremed claim that CD's and MR's neurological conditions prevented them from engaging in racially motivated discriminatory conduct.

For the reasons stated above, a reasonable jury could find the Residents' conduct was race-based.

### b.    Whether the Residents' Conduct Was Severe or Pervasive.

To establish a hostile work environment claim, "a plaintiff must 'produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Banks*, 81 F.4th at 261 (citation omitted). The test for whether conduct was severe or pervasive "is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his or] her employment *altered for the worse*.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (emphasis in original) (citation omitted). This standard does not require that a plaintiff's work environment be "'unendurable' or 'intolerable[]'" or "psychologically injurious." *Id.*; *Harris*, 510 U.S. at 22.

In determining whether a plaintiff suffered a hostile work environment, courts must consider the totality of the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Banks*, 81 F.4th at 262 (quoting *Harris*, 510 U.S. at 23). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous

80

and concerted in order to be deemed pervasive.'" *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citation omitted).

"Because the analysis of severity and pervasiveness looks to the totality of the circumstances, 'the crucial inquiry focuses on the nature of the workplace environment as a whole,' and 'a plaintiff who [himself or] herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support [his or] her claim.'" *Kaytor*, 609 F.3d at 547 (emphasis and citation omitted). As the Second Circuit has instructed:

> [W]e have previously held that incidents involving other employees, while they "may be of limited probative value, cannot be ignored on summary judgment." Instead, "whether the plaintiff was aware of the incidents during his [or her] employment, and, more significantly, whether in light of these incidents, the incidents the plaintiff experienced more directly 'would reasonably be perceived, and were perceived, as hostile or abusive,' are factual issues" more appropriate for a trier of fact.

*Banks*, 81 F.4th at 267 (alterations adopted) (internal citations omitted) (quoting *Schwapp*, 118 F.3d at 112).

"While the standard for establishing a hostile work environment is high, [courts] have repeatedly cautioned against setting the bar too high[.]" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citations omitted). "The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Whidbee*, 223 F.3d at 70 (internal quotation marks omitted) (quoting *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997)).

Generally, when "racially offensive language . . . is presented in a physically threatening manner[,]" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (internal quotation marks omitted), or used consistently over a long period of time, the conduct is deemed sufficiently severe or pervasive. *See Lumhoo*, 229 F. Supp. 2d at 155 (holding "a reasonable person could find that [plaintiff's] working conditions altered for the worse if[,] over the course of five months or seven months, various management employees as well as a co-worker used" the N-word, "referred to an African-American as a 'moolie,' '[B]lack son of a bitch,' 'tar baby,' 'porch monkey,'

81

made a joke that disparaged [Black people] and referred to them as 'jungle bunnies,' and addressed [B]lack individuals as 'you people[]'"); *Sylla v. New York City Dep't of Educ.*, 664 F. Supp. 3d 311, 325 (E.D.N.Y. 2023) (holding a reasonable jury could find the conduct was severe or pervasive when defendant "subjected plaintiff to consistent racial harassment over the course of seven years by regularly calling plaintiff 'mono' and, on one occasion, placing a banana peel in plaintiff's mop pail[]").

A single use of racially charged language may be insufficient to constitute severe or pervasive conduct. *See, e.g.*, *Love*, 186 F. Supp. 3d at 256 (granting defendant summary judgment because "a single instance of allegedly discriminatory conduct, unless extraordinarily severe, generally cannot sustain a claim based on a hostile work environment[]"); *Philip v. Gtech Corp.*, 2016 WL 3959729, at *24 (S.D.N.Y. July 20, 2016) (granting defendant summary judgment because "isolated, sporadic, and de-personalized epithets are not 'severe or pervasive enough to create an objectively hostile or abusive work environment[]'"). However, some courts have drawn a distinction when the N-word is used:

> "Courts have repeatedly concluded that the use of the N-word in the workplace is particularly odious and offensive." *Anderson v. Phoenix Beverages, Inc.*, 2017 WL 9481014, at* 14 (E.D.N.Y. July 17, 2017), *report and recommendation adopted*, 2017 WL 4767447 (E.D.N.Y. Sept. 30, 2017). As the Second Circuit has "emphasized," "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as the N-word." *Rivera . . .*, 743 F.3d [at] 24 . . . ; *see also White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004) ("'Far more than a []mere offensive utterance, the N-word is pure anathema to African-Americans.'"); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the N-word can have a highly disturbing impact on the listener. Thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile."). In fact, the word is so abhorrent that "there may well exist circumstances where a single use of . . . the N-word would rise to the level of a hostile work environment." *Albert-Roberts v. GGG Const[r]., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013); *see also Lovejoy v. Gure-Perez*, 2014 WL 2459656, at *5 (E.D.N.Y. May 21, 2014) ("Plaintiff testified that she was called the N-

word by her supervisor in an aggressive and intim[id]ating tone, with saliva falling onto her body, and loudly enough for others to hear it. Whether considered alone or with additional evidence, this is sufficient to create a hostile work environment.").

(Doc. 42 at 14) (alterations adopted) (quoting *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 262 (E.D.N.Y. 2019)); *but see EEOC v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 413 (7th Cir. 2024) ("Although certainly still offensive, the use of a racial slur by a resident in the nursing home context would be considered less offensive to a reasonable person than if the same slur were said by a co-worker or supervisor in that same setting. This observation is particularly true when the recipient is a professional trained to give care in a geriatric setting.").

As the Second Circuit has observed, the N-word "has been described as a term that sums up all the bitter years of insult and struggle in America, a pure anathema to African-Americans, and probably the most offensive word in [the] English [language]." *Banks*, 81 F.4th at 266 (internal quotation marks, alteration, and citations omitted). "Courts have also held that use of the word 'monkey' or derivative terms is 'similarly odious' and that their use within the workplace constitutes compelling evidence of a racially hostile work environment." *Id.* (collecting cases).

### i.      Individual Aggrieved Persons.

### A.      Nurse Murphy.

Nurse Murphy worked at Elderwood for approximately six months of AC's residency, from April 2020 to October 2020. In May 2020, she noted that AC "became verbally abusive towards staff[,] using racist language, and called staff coons, etc." (Doc. 134-1 at 12, ¶ 37) (internal quotation marks and citation omitted). The next month, on June 2, 2020, AC called Nurse Murphy "a f**king n****r," and she noted that "AC continues to be verbally abusive towards staff and making racially insensitive remarks to staff[.]" *Id.* at ¶ 38(a) (internal quotation marks omitted). On June 13, 2020, she witnessed AC "punch[]" Nurse Ndour "in the chest while calling him racial names" and threaten other intervening employees with "physically aggressive behavior and verbally abusive language[.]" *Id.* at 13, ¶ 40(a) (internal quotation marks and citations omitted).

During this incident, AC was calling "everyone on the unit[,]" including Nurse Murphy, "n****rs, [B]lack bastards, and [B]lack bitches[.]" *Id.* at 14, ¶ 40(d) (internal quotation marks and citations omitted). The next day, Nurse Murphy witnessed AC "shove[]" an employee and "call[] him racial slurs" and again call "everyone on the unit n****rs, [B]lack bastards[,] and [B]lack bitches[.]" *Id.* at 15, ¶ 41(b) (alterations adopted) (internal quotation marks omitted).

One day later, on June 15, 2020, Nurse Murphy watched AC hit two nurses and heard AC state, in reference to Black individuals, "I don't like those people[,] and they should go back to Africa[.]" *Id.* at 15, ¶ 42(a) (internal quotation marks and citation omitted). The following month, Nurse Murphy observed AC "physically attack[] an LNA by grabbing his arm and attempting to push him," throw water at the LNA "who attempted to give him his dinner," and call the LNA a "n****r[.]" (Doc. 134-1 at 17, ¶ 45) (alteration adopted) (internal quotation marks and citation omitted). On September 2, 2020, Nurse Murphy "witnessed one incident . . . in which AC barricaded [Nurse] Ndour into various resident rooms and followed him around, threatened to shoot up the place, hit her and [Nurse] Ndour, used the [N]-word, and blocked and 'trapped' Black staff from leaving other residents' rooms[.]" *Id.* at 35, ¶ 75(e) (citation omitted). On that day, AC threatened to "kill all the n****rs if he had a gun[.]" *Id.* at 21, ¶ 50 (internal quotation marks and citation omitted).

Nurse Ivy testified that "she heard AC threaten to fight . . . [Nurse] Murphy every day" that she worked on the Chittenden Unit, which was three to four times a week. *Id.* at 33, at ¶ 73(a) (internal quotation marks omitted). Nurse Murphy testified that she "'tried not to be in [AC's] room alone' because [AC] would say 'things like he's not going to take medication from an' N-word[.]" *Id.* at 34, ¶ 75(b) (citation omitted).

In or about May or June 2020, after working with AC for only three weeks, Nurse Murphy "asked that AC be removed from her assignment because of his 'racist language and behaviors[.]'" *Id.* at 35, ¶ 75(c) (citation omitted). Three weeks prior to the end of her employment at Elderwood in October 2020, Nurse Murphy "requested to transfer off the Chittenden Unit . . . 'because the last incident with AC [w]as so out of control and . . . no

84

one seemed to care about our side[.]'" (Doc. 134-1 at 35, ¶ 75(h)) (alterations adopted). Nurse Murphy testified that, on one occasion, she called 911 and AC was sent to the ER because "[h]e was throwing things at the [Black] staff as well as the typical name calling. No one could go in his room and calm him down[,] and he could either hurt himself or hurt one of us[.]" *Id.* at 35, ¶ 75(d) (alteration adopted) (internal quotation marks and citation omitted).

From this evidence, a reasonable jury could find that AC's racist remarks, racially charged threats, and physical attacks on Black employees, whether directed towards Nurse Murphy, taking place in her presence, or conveyed to her, were sufficiently severe or pervasive as to alter the conditions of Nurse Murphy's employment.

### B.    Nurse Ndour.

Elderwood employed Nurse Ndour from February 2017 to July 2019 and again from September 2019 to February 2021. Nurse Ndour thus worked at Elderwood for approximately eleven months of AC's one-year residency. While employed there, Nurse Ndour worked in the Chittenden Unit and worked sixteen-hour days, often seven days a week. Nurse Ndour testified that "AC called him the [N]-word and '[B]lack bastard,' and said 'I will take my gun and shoot all the [B]lack people. I hate you. I want to kill all of you[.]'" *Id.* at 31, ¶ 71(b) (citation omitted). AC repeatedly "followed and 'chased' [Nurse] Ndour in the hallways[,] and [AC] would hear [Nurse] Ndour's voice and come out of his room saying, 'I'm going to kill you, you [B]lack bastard. Go back to Africa[,] you [B]lack bastard[.]'" *Id.* at ¶ 71(c) (citation omitted). Nurse Ivy testified that "she heard AC threaten to fight . . . [Nurse] Ndour . . . every day" that she worked on the Chittenden Unit, which was three to four times a week. *Id.* at 33, ¶ 73(a) (internal quotation marks omitted).

On June 13, 2020, "AC approached [Nurse] Ndour aggressively and punched [Nurse] Ndour in the chest while calling him racial names," including the N-word, which required AC to "be[] held back by other staff[.]" *Id.* at 13, ¶ 40(a) (alterations adopted) (internal quotation marks omitted); *cf. Blethen v. MaineGeneral Rehab. & Nursing Care*, 2012 WL 4325824, at *21 (D. Me. Aug. 1, 2012) (granting summary judgment on hostile

85

work environment claim because "[t]here is absolutely no evidence of offensive physical contact in this case and there is not even a suggestion that [any resident] who made an offensive comment to [plaintiff] was even remotely threatening or that their comments should have humiliated [plaintiff] in the workplace[]"), *report and recommendation adopted,* 2012 WL 4327053 (D. Me. Sept. 18, 2012). After being restrained, "AC became angry at other staff members and started threatening them [with] physically aggressive behavior and verbally abusive language[.]" (Doc. 134-1 at 13, ¶ 40(a)) (internal quotation marks omitted). As a result of AC's aggression, 911 was called and he was sent to the ER. When Nurse Ndour reported that AC had punched him to CN Yanks, "she and the unit manager both laughed[.]" *Id.* at 31, ¶ 71(e) (citation omitted). A few months later, on September 2, 2020, "AC barricaded [Nurse] Ndour into various resident rooms and followed him around, threatened to shoot up the place, hit . . . [Nurse] Ndour, used the [N]-word, and blocked and 'trapped' Black staff from leaving other residents' rooms[.]" *Id.* at 35, ¶ 75(e) (citation omitted).

AC used racial slurs and engaged in physical attacks on numerous occasions in the Chittenden Unit and "was mostly outside of his room" while residing in the unit. *Id.* at 29, ¶ 69 (internal quotation marks omitted). In addition to AC's conduct that was directed at Nurse Ndour, because Nurse Ndour worked at the Chittenden Unit for nearly AC's entire residency with frequent and long shifts, a reasonable inference can be drawn that Nurse Ndour also heard AC use racial slurs and witnessed AC engage in physical violence on other occasions.

Due to AC's racial slurs directed at Nurse Ndour, AC's physical attacks on Nurse Ndour, and AC's general racial remarks and threats, a reasonable jury could find that the discriminatory conduct was sufficiently pervasive or severe as to alter Nurse Ndour's working environment at Elderwood.

### C.    Nurse Ivy.

Nurse Ivy worked at Elderwood for approximately two months, from August 3, 2020, to October 10, 2020. Nurse Ivy provided care to CD four or five times, and CD called Nurse Ivy a "[B]lack bitch" once or twice. (Doc. 128-1 at 22, ¶ 50) (internal

86

quotation marks and citation omitted). Nurse Ivy testified that she heard AC use the N-word "every time she worked on the Chittenden Unit[,]" which was three to four times a week, and heard AC use the N-word "so many times[,] she can't count[.]" (Doc. 134-1 at 33, ¶ 73(b)) (alteration adopted) (internal quotation marks omitted); *see also Husser v. New York City Dep't of Educ.*, 137 F. Supp. 3d 253, 276 (E.D.N.Y. 2015) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.") (internal quotation marks and citation omitted).

On August 24, 2020, AC "repeatedly" called Nurse Ivy an N-word, "approximately [ten] to [twenty] times" on that occasion alone. (Doc. 134-1 at 18, ¶¶ 48(a), (c)(i).) AC also called Nurse Ivy a monkey, told her "to go back to Africa[,]" and said "if it's one thing I can't stand[,] it's a n****r[.]" *Id.* at 18, ¶ 48(a) (alteration adopted) (internal quotation marks omitted). After this incident on August 24, 2020, according to RN Stones, AC "continue[d] to verbally target Nurse Ivy with the N-word whenever he [saw] her[]" and "every time [AC] saw [Nurse Ivy], he would shout the N[-]word at her, including right after this incident happened." (Doc. 128-29 at 14:20-21, 15:9-11) (internal quotation marks omitted). On October 4, 2020, AC told Nurse Ivy "to go back to Africa where you came from, America is for white people, and [you are] nothing but dirt[]" and "[y]ou are a n****r and that's where you belong" and asked "why do they hire n****rs like her[?]" (Doc. 134-1 at 22-23, ¶ 53(b)) (internal quotation marks omitted).

In addition to verbal attacks, AC became physically aggressive with Nurse Ivy. As Nurse Ivy testified, "AC threaten[ed] to fight her . . . every day" that she worked. *Id.* at 33, ¶ 73(a) (internal quotation marks omitted). During the August 24, 2020 incident, AC "physically threatened [Nurse Ivy] while attempting to strike her[,]" struck Nurse Ivy "with his wheelchair and hands," made "violent threats towards" Nurse Ivy, and "ran over [Nurse Ivy's] foot with his wheelchair and raised his hand to strike her before she was able to step out of his reach." *Id.* at 18, ¶¶ 48(a), (c)(i); Doc. 128-21 at 62. On another occasion, AC "threatened to hit [Nurse Ivy] in the mouth if she was a man[.]" (Doc. 134-1 at 23, ¶ 53(b)) (alterations adopted) (internal quotation marks and citation

87

omitted). As a result of the August 24, 2020 incident, Nurse Ivy cried and "stepped . . . off the floor" in order to take a break. (Doc. 128-29 at 15:12-13.) During the subsequent August 2020 Meeting, Nurse Ivy testified that Elderwood's "managers, including [RNC] Yakey, . . . told [Nurse] Ivy and others that they 'were poor excuses for nurses[] and threatened their licenses.'" (Doc. 134-1 at 51, ¶ 125) (alterations adopted) (citation omitted).

Although Nurse Ivy worked at Elderwood for only approximately two months, viewing this evidence in a light most favorable to the EEOC, a reasonable jury could find that AC's racially charged verbal and physical attacks were "sufficiently severe or pervasive to alter the conditions of" Nurse Ivy's employment. *Banks*, 81 F.4th at 261 (internal quotation marks and citation omitted).

### D.    Nurse Robinson.

Nurse Robinson worked at Elderwood for approximately three months, from August 31, 2020, until November 28, 2020. She testified that she witnessed AC "lashing out at Black employees" and "making racist comments[,]" and that AC would "see[] [] Black employee[s] in the hallway and start[] to go after them, saying he wanted to kill us, to hang us, beat us, put us on a ship and send us back to where we came from[.]" (Doc. 134-1 at 33, ¶ 74(a)) (citation omitted). AC called Nurse Robinson and other Black employees "'bitches, coons, N-words, and hyenas,' described them 'as being dirty, being evil, and being something from hell,' and described them 'as the most atrocious creatures on the face of this earth every singl[e] day that [they] worked on the unit[.]'" *Id.* at ¶ 74(b) (citation omitted). In her deposition, Nurse Robinson stated that "the frequency of AC['s] statements about race was 'too many to count'" and that "'from the time AC woke up to the time he went to sleep, we were terrorized[.]'" *Id.* at 34, ¶ 74(c) (citation omitted).

Nurse Robinson heard "AC ask[] for ropes, a pair of scissors, a shotgun, and a knife 'so that he could kill all of the N[-]words[.]'" *Id.* at ¶ 74(d) (citation omitted). She witnessed AC become "'fixated on killing' and 'trying to get to' [Nurse] Ndour" and heard AC state that "'killing Blacks made his blood boil[.]'" *Id.* at ¶ 74(e) (citation

88

omitted). On September 20, 2020, Nurse Robinson documented that "AC 'became verbally abusive' to her and told her [to] 'go back to your country on your boat[ and y]ou don't belong here.'" *Id.* at 22, ¶ 52 (citation omitted).

The following month, on October 4, 2020, AC called Nurse Robinson a "a 'dumb bitch' and threatened to punch her 'in the f**king mouth" and told Nurse Robinson "'there's too many colored people,' verbally and physical[ly] threatened to punch her, and '. . . continued verbally harassing her[.]'" (Doc. 134-1 at 23, ¶¶ 53(e)-(f)) (alteration adopted) (citations omitted). A month later, on November 7, 2020, AC called Nurse Robinson a "[d]umb f**king n****r[][.]" *Id.* at 24, ¶ 55 (internal quotation marks and citation omitted). The next day, Nurse Robinson noted that "AC 'began saying racial slurs and hateful comments toward [herself] and other [B]lack staff.'" *Id.* at 25, ¶ 56 (citation omitted). That same month, on November 23, 2020, Nurse Robinson documented that "AC saw a Black male LNA and stated, 'that [B]lack mother f**ker is a good for nothing n****r and a coon,' [and] AC told her and another nurse '[y]ou're n****ers and coons and need to go back to Africa where you're from.'" *Id.* at ¶ 57 (citation omitted).

In response to AC's racial remarks and physical threats, Nurse Robinson "was told by two managers that [] Elderwood . . . 'was the residents' home,' [and] the residents 'had a right to . . . say what they wanted to in their home,'" and was told that she "'should be used to the racism because she is from the South.'" *Id.* at 34, ¶ 74(h) (alterations adopted) (citation omitted). Nurse Robinson provided care to CD approximately ten to twenty times during her employment and testified that she requested "not to work on the Mansfield Unit because 'there were multiple residents on that unit who . . . were very racist and felt they were free to express their racism,' including CD." *Id.* at 38, ¶ 83 (citation omitted).

In viewing this evidence in a light most favorable to the EEOC, a reasonable jury could find that AC's and CD's racially discriminatory behavior was sufficiently pervasive or severe as to alter Nurse Robinson's working environment at Elderwood.

### E.    Nurse Ferguson.

Nurse Ferguson worked at Elderwood for approximately six and a half months of AC's residency, from November 7, 2018, to October 16, 2020. While employed at Elderwood, Nurse Ferguson provided care to AC, both "directly" and "indirectly[,]" and interacted with AC "even when he was not formally assigned to [her] care[.]" (Doc. 134-1 at 32, ¶ 72(a)) (citation omitted) Nurse Ferguson "heard AC use the [N]-word [thirty to forty] times[,]" "was called a 'monkey' by AC[,]" "heard AC use the racial slur 'coon[,]'" "was told by AC to 'go back to Africa[,]' and heard AC say things like 'go get the head of your tribe,' 'this place should be shut down for employing people like you,' and 'this is not the place for you[.]'" *Id.* at 32, ¶¶ 72(b)-(e) (citations omitted); *cf. Westbrook v. Illinois Dep't of Hum. Servs.*, 2018 WL 1469035, at *8 (N.D. Ill. Mar. 26, 2018) (holding no reasonable jury could find the discrimination of a "criminally insane patient" was severe or pervasive "based on six instances of comments spread over two years[]"). When AC was first admitted to Elderwood, he called Nurse Ferguson and at least one other Black employee "racial slurs, including 'monkeys,' told them go back to Africa, and told them to get the head of their 'tribe' for approximately [fifteen] minutes." (Doc. 134-1 at 11, ¶ 33) (citation omitted).

In addition to the racial remarks, AC threatened Nurse Ferguson with physical harm, telling her, "more than once[,] that he could hang Black employees and wanted to get a gun to shoot Black employees" and became physically violent with her, hitting her "with his walker by ramming it back and forth into her knees[.]" *Id.* at 32, ¶¶ 72(f)-(g).

Viewing this evidence in a light most favorable to the EEOC and in light of Nurse Ferguson's testimony that she was called the N-word by AC or heard AC use the N-word thirty to forty times over her near seven-month employment at Elderwood during AC's residency, a reasonable jury could find that the racial discrimination was sufficiently pervasive or severe as to alter Nurse Ferguson's working environment at Elderwood.

### F.    Nurse Bradstreet.

Nurse Bradstreet worked for Elderwood for approximately seven months of AC's residency, from July 26, 2020, until March 6, 2021. On her first day working at

90

Elderwood, AC told Nurse Bradstreet "to get her n****r ass out of his room[.]" *Id.* at 30, ¶ 70(a) (alteration adopted) (citation and internal quotation marks omitted). Nurse Bradstreet testified that AC "called her and 'most of the [B]lack employees' 'monkey,' and told her 'to go back to Africa[.]'" *Id.* at ¶ 70(b) (citation omitted). On one occasion, Nurse Bradstreet observed "AC 'tr[y] to enter the kitchen area to actually attack' [Nurse] Ndour[.]" *Id.* at ¶ 70(c) (alteration adopted). As a result, "[Nurse] Ndour used his body to keep the door shut," and "AC called [Nurse] Ndour 'n****rs, go back to Africa' while trying to get in the room" and "said he 'wanted to kill all the n****rs that were on the unit' and 'didn't want no [B]lacks working there at all[.]'" *Id.* (citation omitted). During the August 2020 Meeting, Nurse Bradstreet observed "[Nurse] Ivy ask[] 'about the situation of AC on the unit with the [B]lack employees' to which [CN Yanks] said it was AC's home and 'he had the actual right to call us n****rs.'" (Doc. 134-1 at 30, ¶ 70(d)) (citation omitted).

Nurse Bradstreet also provided care to CD approximately ten to twenty times during her employment and testified that "CD called her the [N]-word whenever CD was on her assignment[.]" *Id.* at 39, ¶ 86 (internal quotation marks and citation omitted). According to Nurse Bradstreet, "CD did not want Black employees to provide [her] care" and this "was 'an ongoing problem.'" *Id.* at 38, ¶ 85 (citation omitted). Nurse Bradstreet told unit managers about CD's racial preference for caregivers and use of racial slurs and requested removal from CD's assignment. In response, a unit manager told Nurse Bradstreet "he would try to put somebody else in the room with [Nurse Bradstreet] to try to help [her] do the care[,]" but Nurse Bradstreet "couldn't just not service [CD]." (Doc. 128-14 at 8-11.)

During her final weeks of employment at Elderwood in February and March of 2021, Nurse Bradstreet was "mostly" assigned to care for MR, who "ma[de] 'racial comments'" and preferred white caregivers. (Doc. 134-1 at 40, ¶¶ 91-92) (citation and internal quotation marks omitted). After Nurse Bradstreet reported MR's racial preference to a unit manager, the unit manager told her "no one else was available[]" to care for MR. *Id.* at 41, ¶ 93 (citation omitted); *cf. Shealey v. Pittsburgh Mercy Health*

91

*Sys., Inc.*, 2025 WL 327310, at *12 (W.D. Pa. Jan. 29, 2025) (finding "[a]ny reasonable person in [plaintiff]'s position would not have perceived a severe or pervasive hostile working environment based on S.R.'s repeated use of the N-word[]" because plaintiff was "free to choose the location where she worked[]" but "continued to choose to work at . . . [the] facility where S.R. was housed[]").

In light of Nurse Bradstreet caring for all three Residents who made racially discriminatory remarks, a reasonable jury could find that the racial discrimination Nurse Bradstreet endured and witnessed was sufficiently pervasive or severe as to alter her working environment.

### c.    Whether the Residents' Conduct Was Subjectively Hostile.

In order to establish a hostile work environment claim, the "victim must subjectively perceive the work environment to be [hostile]." *Littlejohn*, 795 F.3d at 321. As the Second Circuit has observed:

> The Supreme Court made clear in *Harris* . . . that Title VII does not require "concrete psychological harm" for a claim to be actionable, as the statute "certainly . . . bars conduct that would seriously affect a reasonable person's psychological well-being." 510 U.S. at 22 . . . . All that is required is that "the environment . . . reasonably be perceived, and is perceived, as hostile or abusive." *Id.* And "the effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Id.* at 23[.]

*Banks*, 81 F.4th at 268.

Elderwood, relying on *Witt v. Moffe*, 2008 WL 324255 (W.D.N.Y. Feb. 6, 2008), contends that the work environment was not subjectively hostile because "it is fatal to a hostile work environment claim where the plaintiff did not actually perceive the conduct to be made for discriminatory reasons." (Doc. 115-1 at 17) (citation omitted). In *Witt*, the court found the plaintiff did not subjectively believe that the defendant's behavior was hostile because the "plaintiff . . . gave a sworn statement indicating that she did not subjectively believe that [the] defendant['s] [] behavior was motivated by an unlawful intent to discriminate." *Id.* at *1. *Witt* is inapplicable here, as no such concession has been made by the Staff.

i.    **Individual Aggrieved Persons.**

A.    **Nurse Murphy.**

Nurse Murphy was called the N-word by AC repeatedly and tried to avoid being alone in AC's room as a result. *See Anderson v. Phoenix Beverages, Inc.*, 2017 WL 9481014, at *14 (E.D.N.Y. July 17, 2017) (finding "a reasonable jury could conclude that [plaintiff] viewed his working environment as subjectively hostile and abusive" because "he was subjected to racially charged epithets"), *report and recommendation adopted sub nom., Anderson v. Pheonix Beverages, Inc.*, 2017 WL 4767447 (E.D.N.Y. Sept. 30, 2017). She requested to be removed from AC's assignment and requested to be removed from the Chittenden Unit due to AC's racial conduct. Nurse Murphy reported AC's use of racial slurs and aggressive conduct to her supervisors on approximately five different occasions. *See Newton v. Kohl's, Inc.*, 2024 WL 4986303, at *22 (D. Vt. Nov. 12, 2024) (finding "a jury could find that [plaintiff] subjectively perceived her work environment to be hostile and abusive[]" in part because "she repeatedly reported [the harasser]'s behavior to her supervisors"). Nurse Murphy filed a charge of discrimination with the EEOC, dated November 29, 2020, alleging racial harassment.

Viewing this evidence in a light most favorable to the EEOC, a reasonable jury could find that Nurse Murphy subjectively perceived the Residents' conduct to be subjectively hostile.

B.    **Nurse Ndour.**

AC called Nurse Ndour the N-word and a "[B]lack bastard" on numerous occasions, "followed and 'chased' [Nurse] Ndour in the hallways," and, whenever AC heard Nurse Ndour's voice, AC "c[a]me out of his room saying, 'I'm going to kill you, you [B]lack bastard. Go back to Africa[,] you [B]lack bastard[.]'" (Doc. 134-1 at 31, ¶ 71(c)) (citations omitted). AC attacked and punched Nurse Ndour, apparently with such aggression and force that it required AC to be "held back by other staff[.]" *Id.* at 13, ¶ 40(a) (internal quotation marks omitted). As Nurse Ndour testified, "he was 'very unhappy' working while AC was at [] Elderwood[,]" and the reason he did not leave was because it would have been "very easy. [When s]omebody is treating people like that,

93

[and] we all leave, [it] makes it easy and he will do it to other people. For me at that point[,] we needed to fight this thing so it stops. Nobody should go through that while you are at work helping these people[.]" *Id.* at 31, ¶ 71(f) (alteration adopted) (internal quotation marks and citation omitted).

Nurse Ndour filed a charge of discrimination with the EEOC, dated January 14, 2021, and submitted a handwritten complaint to Elderwood on January 17, 2020. *See Kirkland v. Speedway LLC*, 260 F. Supp. 3d 211, 224 (N.D.N.Y. 2017) ("[I]t cannot be seriously disputed that [p]laintiff subjectively perceived her work environment to be hostile. Buttressing her position is the written statement [p]laintiff provided to the human resources investigator explaining her concerns."); *DeAngelis v. City of Bridgeport*, 2017 WL 3880762, at *6 (D. Conn. Sept. 5, 2017) ("The fact that plaintiff filed grievances and complained about these acts is . . . evidence for a reasonable factfinder to conclude that plaintiff subjectively perceived the environment as hostile or abusive[.]"). Based on this evidence, a reasonable jury could find that Nurse Ndour subjectively perceived the work environment to be hostile.

### C.    Nurse Ivy.

AC threatened to fight Nurse Ivy every day and used the N-word countless times. After the August 24, 2020 incident where AC called Nurse Ivy the N-word ten to twenty times, physically threatened her, ran over her foot with his wheelchair, and struck her, Nurse Ivy was crying and had to step off the floor for a break. *See Comerford v. Vill. of N. Syracuse*, 2021 WL 950974, at *31 (N.D.N.Y. Mar. 12, 2021) (finding "[p]laintiff has presented evidence that she subjectively experienced a hostile work environment[]" because "[s]he testified that she 'felt like she was going to throw up oftentimes going to work' and she knew it was the stress and 'abuse' she was experiencing at work that was causing her to feel ill[]") (alterations adopted) (citation omitted). Nurse Ivy filed a charge with the EEOC in the fall of 2020, alleging racial discrimination. For those reasons, a reasonable jury could find that Nurse Ivy subjectively perceived her work environment to be hostile.

94

### D.   Nurse Robinson.

Nurse Robinson was called the N-word and other racial slurs by AC on numerous occasions and was threatened by AC with "ropes, a pair of scissors, a shotgun, and a knife[.]" (Doc. 134-1 at 34, ¶ 74(d).) Nurse Robinson appears to have reported AC's racial remarks to a supervisor on one occasion, and, on November 24, 2020, Administrator Peacock spoke with Nurse Robinson concerning her note documenting AC's violent threats. Nurse Robinson also provided care to CD and testified that she requested "not to work on the Mansfield Unit because 'there were multiple residents on that unit who . . . were very racist and felt they were free to express their racism,' including CD." *Id.* at 38, ¶ 83 (citation omitted). She filed a charge with the EEOC, dated December 2, 2020, alleging racial discrimination. *See Copeland v. Georgia Dep't of Corr.*, 2022 WL 3587350, at *5 (S.D. Ga. Aug. 22, 2022) ("The undisputed facts show [p]laintiff likely subjectively perceived the conduct . . . as [hostile] . . . , as shown by the complaint he filed with HR, his EEOC [c]harge, and the filing of this suit."), *aff'd in part, vacated in part on other grounds, remanded,* 97 F.4th 766 (11th Cir. 2024). From that evidence, a jury could find that Nurse Robinson subjectively perceived the work environment at Elderwood to be hostile.

### E.   Nurse Ferguson.

Nurse Ferguson heard AC use the N-word thirty to forty times, was called other racial slurs by AC, and was threatened and physically hit by AC. When AC called Nurse Ferguson racial slurs within days of his admittance, Nurse Ferguson reported the incident to and discussed the incident with her unit managers. Nurse Ferguson testified that she "reported incidents of AC using racial[] slurs and derogatory language to [Elderwood's] managers, including . . . DON Lambert[.]" (Doc. 134-1 at 32, ¶ 72(h)); *see also Philip,* 2016 WL 3959729, at *20 ("And as to the fourth element, relating to [plaintiff]'s subjective sense of abusiveness, his repeated complaints supply a clear basis on which a jury could find that he perceived his work environment as hostile."). In the fall of 2020, Nurse Ferguson filed a charge with the EEOC, alleging racial discrimination. A jury could thus find that Nurse Ferguson subjectively perceived the work environment to be

hostile.

### F.    Nurse Bradstreet.

AC and CD both called Nurse Bradstreet racial slurs repeatedly. Nurse Bradstreet told unit managers about CD's racial preference for caregivers and use of racial slurs and requested removal from CD's assignment but apparently did not receive a transfer. Nurse Bradstreet also reported MR's racial preference to a unit manager, but the unit manager told her "no one else was available[]" to care for MR. (Doc. 134-1 at 41, ¶ 93) (citation omitted). On July 14, 2021, Nurse Bradstreet filed an amended charge with the EEOC, alleging, among other things, unlawful discrimination.

From this evidence, a reasonable jury could find that Nurse Bradstreet subjectively perceived the work environment to be hostile. *See Rosioreanu v. NYC Dep't of Env't Prot.*, 2010 WL 11627229, at *9 (E.D.N.Y. Sept. 20, 2010) (finding "there is no genuine dispute that [plaintiff] subjectively believed her [] work environment to be hostile[]" in part because "she sought supervisory intervention on several occasions in an effort to alleviate the strain" and "requested a transfer out of the audit department, based, at least in part, on a perceived need to remove herself from the [] work environment[]").

### d.    Whether the Residents' Conduct Was Objectively Hostile.

To determine whether a work environment is objectively hostile, courts must consider "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23). "The specific circumstances of the working environment and the relationship between the harassing party and the harassed also bear on whether that line is crossed." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (alteration adopted) (internal quotation marks and citation omitted).

Courts may consider whether the offensive conduct at issue was beyond a patient's or resident's control; however, "[t]here is no general assumption of risk[]" that precludes an employer from liability for a hostile work environment claim based on the conduct of

96

a patient with a mental disorder. *Vill. at Hamilton Pointe LLC*, 102 F.4th at 408.[30] "The specific circumstances of such claims must be judged to determine whether a reasonable person would find the work environment hostile or abusive taking due account of the unique circumstances involved in caring for mentally diseased elderly patients." *Id.* at 407 (internal quotation marks and citations omitted). In other words, while the diminished capacity of SNF residents is a relevant consideration weighing against finding objective hostility, *see, e.g., id.* at 422 (explaining that conduct of nursing home residents "must be given less weight in determining whether a work environment was objectively offensive than the conduct of co-employees[]"), courts may nonetheless find a resident's conduct objectively hostile despite the resident's diminished capacity. *Compare Cadet v. All. Nursing Staffing of New York, Inc.*, 632 F. Supp. 3d 202, 233 (S.D.N.Y. 2022) (finding patient's false 911 call and physical assault were objectively hostile at the motion to dismiss stage because, "[e]ven though [plaintiff] was doubtless aware that she may face difficult circumstances at work due to her patients' disabilities, the law does not require that someone in [her] field of work face such hostility[]"), *with Vill. at Hamilton Pointe LLC*, 102 F.4th at 422 (affirming a grant of summary judgment for employer because even though the nursing home employee overheard residents use the N-word regularly, "the comments were not directed at [the employee][]" and "resident conduct must be given less weight in determining whether a work environment was objectively offensive").

As a threshold matter, Elderwood contends that, "[i]n denying Elderwood's motion for judgment on the pleadings, this [c]ourt distinguished this matter from *Wright* [*v. Monroe Community Hospital*], because *Wright* involved a single patient and the

---

[30] *See also Cadet v. All. Nursing Staffing of New York, Inc.*, 632 F. Supp. 3d 202, 233 (S.D.N.Y. 2022) ("Even though [plaintiff] was doubtless aware that she may face difficult circumstances at work due to her patients' disabilities, the law does not require that someone in [p]laintiff's field of work face such hostility."); *EEOC v. Nexion Health at Broadway, Inc.*, 199 F. App'x 351, 353 (5th Cir. 2006) (noting that there is no "bright-line rule that employees who care for disabled, elderly patients can never succeed on a [T]itle VII claim[]"); *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 326 (5th Cir. 2019) (recognizing "that there is not a categorical bar on hostile [work] environment claims arising from harassment by patients[]") (citation omitted).

EEOC alleged there were a number of patients involved here." (Doc. 115-1 at 21) (citation omitted). Elderwood claims that the court's differentiation of *Wright* is no longer applicable because, "having completed discovery, the EEOC has conceded what Elderwood has maintained throughout this entire litigation, which is that there was only one resident, [AC,] . . . involved in the at issue behavior." *Id.* The EEOC, however, has not conceded that point, nor is that argument supported by the undisputed facts. Although AC was the only Resident who was physically combative, two other Residents, CD and MR, made racially derogatory remarks, including one who used the N-word repeatedly and threw a wash basin on the floor when a Black employee tried to assist her. In any event, *Wright* remains distinguishable. As this court observed:

> Elderwood urges the court to follow *Wright v. Monroe Community Hosp.*, 493 F. App'x 233 (2d Cir. 2012), wherein the plaintiff-nurse brought a hostile work environment claim based on race against her employer for the harassing conduct of a patient who repeatedly called the plaintiff the N-word. The court concluded that the plaintiff failed to allege facts that would "provide 'a specific basis . . . for imputing the objectionable conduct to the employer,' . . . because the hospital cannot be held responsible for the outbursts of a patient suffering from dementia." *Id.* at 235. Because *Wright* is a Summary Order, it is neither precedential nor controlling. *See* 2d Cir. R. 32.1.1 ("Rulings by summary order do not have any precedential effect."). Moreover, unlike *Wright*, this is not a case in which a single patient suffering from dementia is alleged to have uttered racial slurs. Instead, in addition to allegations of physical assaults, the EEOC alleges racially hostile conduct and comments from a number of patients to the [Staff] and further alleges that Elderwood knew of this conduct and repeatedly failed to redress it.

(Doc. 42 at 10.)

To the extent Elderwood relies on *Cain v. Blackwell*, 246 F.3d 758 (5th Cir. 2001) to argue that its work environment was not objectively hostile because of the Residents' mental states and the geriatric care context of this case, that case is distinguishable. In *Cain*, an employee provided home health services to a patient suffering from Alzheimer's and Parkinson's diseases and, during a seven-month period of care, the patient made sexual and racial remarks and performed a lewd sex act in front of the employee. The employee brought a hostile work environment claim against her employer, and the Fifth

98

Circuit affirmed the district court's grant of summary judgment for the employer. In so ruling, the Fifth Circuit explained:

> The home health care industry was created to assist individuals who lack the ability to care for themselves. Many of these individuals become dependent on home health care as a direct result of debilitating diseases such as Alzheimer's and Parkinson's. As [a home health services] employee, [the employee]'s daily routine included dealing with the victims of those diseases and their particular failings. In this context, [the patient]'s improper requests and tasteless remarks [cannot] form the basis of a justiciable claim for sexual harassment. *We note that [the employee] never alleged any physical conduct that made her feel threatened*, nor did she accept [her employer]'s offer of reassignment, relieving her of the responsibility of [caretaking] for [the patient]. [The patient]'s unacceptable but pitiable conduct was not so severe or pervasive as to interfere unreasonably with [the employee]'s work performance or, given the circumstances, to create an abusive work environment.

*Id.* at 760-61 (emphasis supplied).

Elderwood also cites *Equal Employment Opportunity Commission v. Nexion Health at Broadway, Inc.* ("*Nexion*"), 199 F. App'x 351 (5th Cir. 2006) wherein the Fifth Circuit reached a similar conclusion. In *Nexion*, a nursing home resident repeatedly directed racially offensive comments toward a Black employee, "including frequent use of the word 'n****r,' approximately three to four times a week over . . . [a] few months[,]" and "threatened [the employee] physically." *Id.* at 352. The employee brought a hostile work environment claim against his employer, and the district court granted summary judgment for the employer. The Fifth Circuit affirmed, holding that the work environment was not objectively hostile or abusive. It reasoned that, while the resident's comments were "highly discriminatory[,]" "they were not so frequent as to pervade the work experience of a reasonable nursing home employee[.]" *Id.* at 353. The Fifth Circuit explained:

> Although these were more than isolated instances of harassment, they were not so frequent as to pervade the work experience of a reasonable nursing home employee, especially considering their source. [The resident]'s harassment *was not physically threatening or humiliating; it consisted only of offensive utterances*, although those utterances were quite offensive.
> These circumstances alone cannot support a hostile work environment

99

claim absent some objectively detrimental impact on [the employee]'s work performance. The EEOC's claim fails, because the harassment [the employee] suffered did not objectively interfere with his work performance or undermine his workplace competence. [The employee]'s job required him to deal with the tragic failings of elderly people whose minds have essentially failed. Absorbing *occasional verbal abuse* from such patients was not merely an inconvenience associated with his job; it was an important part of the job itself.

This unique aspect of [the employee]'s line of employment is a vital consideration. He worked in a place where most of the people around him were often unable to control what they said or did. It is objectively unreasonable for an employee in such a workplace to perceive a racially hostile work environment *based solely on statements* made by those who are mentally impaired.

*Id.* at 354 (emphasis supplied); *see also Matu-Dadie v. Wernersville State Hosp.*, 2018 WL 3535000, at *3 (E.D. Pa. July 23, 2018) (relying on *Nexion* and granting summary judgment for employer because a "single incident" of a patient making racial remarks was insufficient to support a hostile work environment claim); *but see Cadet*, 632 F. Supp. 3d at 233 (finding *Cain*, *Nexion*, and *Matu-Dadie*, "readily distinguishable or not controlling").

*Aguiar v. Bartlesville Care Center*, 2011 WL 1461541 (10th Cir. Apr. 18, 2011) is instructive. There, a nurse brought a hostile work environment claim against her employer due to sexual harassment by a resident who had physical impairments, including "a prosthetic leg, diabetes, and diabetic retinopathy[,]" but was "able to ambulate throughout the facility." *Id.* at *1. The Tenth Circuit denied the employer summary judgment, finding that a reasonable jury could find for plaintiff because she "presented evidence that the resident 'routinely and consistently subjected her to unwanted touching[.]'" *Id.* at *5 (alteration adopted). In so deciding, the Tenth Circuit distinguished *Cain*: "The unique circumstances in *Cain* are not present in this case, where the resident was not similarly impaired and his conduct was more egregious." *Id.*

*Aguiar*'s reasoning applies with equal force here. There are genuine disputes of material fact concerning the extent of AC's cognitive impairments and their impact on his ability to control his behavior. Elderwood management themselves admitted that more

100

could and should have been done. Although Elderwood argues that the work environment was not objectively hostile because AC, due to his age and physical limitations, was "not a 'threat' to anyone[,]" (Doc. 134 at 6), even the undisputed facts render that claim highly debatable due to Elderwood's acknowledgment of AC's numerous physical assaults and behavior that was race-based, targeted, and extreme.

AC's physical violence is undisputed, and his conduct extended well beyond "occasional verbal abuse[.]" *Nexion*, 199 F. App'x at 354. Unlike the plaintiff in *Cain*, who "never alleged any physical conduct that made her feel threatened," a reasonable jury could find that the Staff felt physically threatened by AC's conduct. *Cain*, 246 F.3d at 760; *cf. Blethen*, 2012 WL 4325824, at *21 (granting summary judgment for employer because "[t]here is absolutely no evidence of offensive physical contact in this case and there is not even a suggestion that [any resident] who made an offensive comment to [plaintiff] was even remotely threatening or that their comments should have humiliated [plaintiff] in the workplace[]").

"Because 'a hostile work environment claim is not based solely on allegations of racial slurs or derogatory remarks' but may also include 'other incidents of different treatment based on race that are related to the terms and conditions of employment,' [a c]ourt may properly consider [] additional acts as contributing to the hostile work environment[.]" *Ward v. Shaddock*, 2016 WL 4371752, at *8 n.8 (S.D.N.Y. Aug. 11, 2016) (alteration adopted) (internal citation omitted).[31] Although Elderwood concedes it "would be discriminatory[]" to "accommodate residents' racial preferences for

---

[31] *See also Watson v. Am. Red Cross Blood Servs.*, 468 F. Supp. 2d 484, 488 (W.D.N.Y. 2007) ("Other incidents of different treatment based on race that are related to the terms and conditions of employment also can constitute acts contributing to a hostile work environment.") (citation omitted); *John v. Wal-Mart Store 2585*, 2024 WL 965091, at *10 (D. Conn. Mar. 6, 2024) ("Though these incidents are not suggestive of 'discrimination, intimidation, ridicule, or insult,' they do evidence disparate treatment, which may, together with other evidence, contribute to a hostile work environment claim.") (alteration adopted) (internal citation omitted); *Abdullah v. Panko Elec. & Maint., Inc.*, 2011 WL 1103762, at *13 (N.D.N.Y. Mar. 23, 2011) ("[R]acially offensive comments or incidents of racial harassment, though different in kind and occurring in different locations, may create a racially hostile work environment in violation of Title VII.") (citation omitted).

101

caregivers," (Doc. 134-1 at 10, ¶ 31) (internal quotation marks and citation omitted), DON Lambert testified that "when [Elderwood was] able to meet the resident's preference for [w]hite caregivers[,] . . . then [Elderwood] tr[ies] to honor those." *Id.* at 36, ¶ 76 (internal quotation marks and citation omitted). AA Cote suggested "offer[ing] Caucasian staff as available[]" to AC and, even though the move never occurred, she also recommended that AC be moved to the Champlain Unit because it was "calmer" and had "more Caucasian staff[.]" *Id.* at 42, 46, ¶¶ 96, 110 (internal quotation marks and citations omitted).

Despite COO Quillard's testimony that Elderwood did not provide "racial preferences for caregivers in residents' care plans[,]" (Doc. 128-6 at 17:12-19), Elderwood's care plan for MR states to "[p]rovide Caucasian only staff members for [MR]'s care as able[]" and "provide Caucasian staff members as available." (Doc. 112-10 at 6-7); *see also Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 915 (7th Cir. 2010) (holding a jury could find a hostile work environment due to defendant acceding to patients' racial preferences for caregivers and "three specific incidents of harassment, two of which . . . involved racial slurs directed toward [plaintiff]"); *Dike v. Columbia Hosp. Corp. of Bay Area*, 2025 WL 315126, at *2-3 (5th Cir. Jan. 28, 2025) (holding a jury could find a hostile work environment due to the defendant's informal policy of making some "race-based work assignments" when patients "request[ed] an assignment change due to race"). This evidence buttresses the conclusion that a reasonable jury could find each of the Staff were subjected to an objectively hostile work environment.

While the court recognizes that "[t]he long-term care workplace is different than many others[,]" (Doc. 115-1 at 18), "the law does not require that" a senior care employee endure a racially discriminatory, hostile work environment. *Cadet*, 632 F. Supp. 3d at 233. Accordingly, a reasonable jury could find that the work environment was objectively hostile to each Staff member.

### e.  Whether Elderwood Took Sufficient Remedial Action.

For a hostile work environment claim, a plaintiff must establish that the employer "knew, or in the exercise of reasonable care should have known, about the harassment yet

102

failed to take appropriate remedial action." *Howley*, 217 F.3d at 154. This inquiry centers on whether the employer took "measures which are both feasible and reasonable under the circumstances to combat the offensive conduct[.]" *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1104 (2d Cir. 1986). "Additionally important to the inquiry is whether the employer's action was effective and prompt." *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 536 (N.D.N.Y. 2021) (citation omitted). This standard does not require that an employer's response be perfect nor "mandate that an employer take any particular remedial action, let alone take the plaintiff's preferred remedial action[,]" *Dikambi v. City Univ. of N.Y.*, 690 F. Supp. 3d 293, 307 (S.D.N.Y. 2023); *see also Felty v. Regeneron Pharms., Inc.*, 2021 WL 860379, at *14 (S.D.N.Y. Mar. 8, 2021) ("Reasonableness in the employer's response, rather than perfection, is the standard imposed by law.") (citation omitted).

"The appropriateness of an employer's remedial action must 'be assessed from the totality of the circumstances.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998)). "The 'reasonableness' of an employer's response 'depends among other things on the gravity of the harassment alleged.'" *Dikambi*, 690 F. Supp. 3d at 307 (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013)). "The more egregious the abuse and the more serious the threat of which the employer has notice, the more the employer will be required under a standard of reasonable care to take steps for the protection of likely future victims." *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 137 (2d Cir. 2001).

Elderwood contends that its compliance with federal and state regulations governing the discharge and restraint of SNF residents relieves it of any Title VII liability. *Ligenza v. Genesis Health Ventures of Massachusetts, Inc.*, 995 F. Supp. 226 (D. Mass. 1998) is persuasive. In that case, an employee brought a hostile work environment claim against her prior employer, who owned long-term care facilities, because the employee was allegedly subjected to sexual harassment by a nursing home resident. The employer filed a motion for summary judgment, arguing that it was prevented from discharging the resident by federal and state regulations, including 42 C.F.R. § 483.12

103

and 130 C.M.R. 610.220(A). The *Ligenza* court disagreed and denied the employer's motion for summary judgment, reasoning that the employer could not "shield itself from liability under Title VII . . . simply by relying on such regulations" because, "[a]lthough patients have rights, employees of long[-]term care facilities also have the right to a workplace free from . . . harassment." *Id.* at 230. The court also noted that it "d[id] not read the cited regulations in as restrictive a way as does [the employer][]" because "[t]he regulations do not appear to foreclose [the employer] from seeking to remove a patient from its facility. If anything, the regulations provide that if 'the safety of individuals in the nursing facility is endangered' or 'the health of the individuals in the nursing facility would be otherwise endangered, some affirmative action, including removal, may be permissible.'" *Id.* at 231 (internal citations omitted) (quoting 130 C.M.R. 610.220(A)).

Elderwood similarly relies on 42 U.S.C. § 1395i-3(c)(2)(A) and Vermont's Licensing and Operating Rules for Nursing Homes § 3.14(b), which prohibit involuntary discharge of a resident except in the following six circumstances:

> (i) the transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;
>
> (ii) the transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;
>
> (iii) the safety of individuals in the facility is endangered;
>
> (iv) the health of individuals in the facility would otherwise be endangered;
>
> (v) the resident has failed, after reasonable and appropriate notice, to pay (or to have paid under this subchapter or subchapter XIX on the resident's behalf) for a stay at the facility; or
>
> (vi) the facility ceases to operate.

42 U.S.C. § 1395i-3(c)(2)(A)(i)-(vi); *see also* Vermont's Licensing and Operating Rules for Nursing Homes § 3.14(b)(1)-(6) (permitting transfer or discharge of a resident in the same circumstances or when "ordered by a court[]").

The statute and Vermont's Licensing and Operating Rules for Nursing Homes "do not appear to foreclose [the employer] from seeking to remove a patient from its facility[,]" *Ligenza*, 995 F. Supp. at 231, nor do they forbid discharge of a resident when

the "safety of individuals in the facility is endangered[.]" 42 U.S.C. § 1395i-3(c)(2)(A)(iii); Vermont's Licensing and Operating Rules for Nursing Homes § 3.14(b)(3).[32] A reasonable jury could find that Elderwood had remedial options available to it which it did not pursue in light of "Elderwood's leadership [] decid[ing]" to discharge AC to his son's care on March 12, 2021, apparently due to AC's "physical aggression[.]" (Doc. 128-35 at 2.)

Elderwood's contention that it "may not chemically or physically restrain a resident pursuant to 42 U.S.C. § 1395i[-3](c)(1)(A)(ii), 42 C.F.R. § 483.45, the State Operations Manual ('SOM'), CMS [Survey and Certification] and [Quality, Safety, and Oversight] Memos, CMS Initiatives, OIG & Chemical Restraints, and various case law[,]" is also not dispositive. (Doc. 115-1 at 27-28.) While 42 U.S.C. § 1395i-3 provides that SNF residents have "[t]he right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms[,]" restraints may nonetheless be imposed "(I) to ensure the physical safety of the resident or other residents, and (II) only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used[.]" 42 U.S.C. § 1395i-3(c)(1)(A)(ii)(I)-(II). Similarly, Vermont regulations allow an SNF to chemically or physically restrain a resident "as authorized in writing by a physician for a specified and limited period of time, or when necessary to protect the resident from injury to himself or herself or to others, or when exercising a right to refuse treatment under section 3.6." Vermont's Licensing and Operating Rules for Nursing Homes § 3.17(a). Even Dr. Menzies suggested "start[ing] something more sedating for [AC] at Elderwood[.]" (Doc. 128-49 at 2.)

The EEOC argues that Elderwood knew or should have known of the Residents'

---

[32] Elderwood's reliance on Mr. Horowitz's opinion that it could not voluntarily discharge AC pursuant to 42 U.S.C. § 1395i-3(c)(2)(A) or Vermont's Licensing and Operating Rules for Nursing Homes § 3.14(b) is unavailing because the court has precluded him from testifying in this case.

harassment in April 2020, but Elderwood counters that it only knew of the harassment as of June 15, 2020. Even assuming Elderwood only had knowledge of the Residents' harassment as of June 15, 2020, a reasonable jury could find Elderwood failed to take sufficient remedial measures as AC was discharged approximately nine months later. COO Quillard acknowledged that "had [he] known [about AC's behavior] sooner, [he] would have acted sooner[]" in order to "bring support in to assist the facility and the staff in dealing with AC." (Doc. 134-1 at 56, ¶ 138) (alteration adopted) (citations omitted). In September 2020, he recommended implementing certain remedial measures, including roundtable discussions and training specifically tailored to AC and his behavior, but they were never implemented. To the contrary, on December 27, 2020, Dr. Menzies admitted that "we have not taught our LNAs how to d[e]fuse [AC's] behaviors." (Doc. 128-49 at 2.) DSW Starace suggested moving AC to a different room to address his behavior, but the move seemingly never occurred because, according to AA Cote, AC had "the right to be downright cruel and mean to staff." (Doc. 128-48 at 2.)

In October 2020, DMC Laczi noted that Elderwood's care plan for AC had no behavioral management plans, no interventions or approaches for staff, and "no documented life story, [which is] an important component in addressing AC's behaviors, assisting with staff interventions, and properly planning for AC[.]" (Doc. 134-1 at 47, ¶ 112(d)) (citations omitted). Elderwood failed to assign AC a one-on-one caregiver even though residents with "a violent temperament" or "physical[ly] violent temperament[]" would normally be assigned one, and AC had engaged in repeated physically aggressive conduct. *Id.* at 7, ¶ 22 (internal quotation marks and citation omitted). As the EEOC contends, "AC was *exactly* the type of resident [who]should have been assigned a one-on-one caregiver." (Doc. 128 at 26-27) (emphasis in original).

Finally, the EEOC's expert witness, Ms. Carnarius, opines that Elderwood's remedial measures were insufficient because it failed to institute the following measures:

- Maintain a policy or clear practice on how to address caregiver complaints of inappropriate behaviors by residents, such as [AC's] racist behaviors towards Black staff;

106

- [T]imely investigate [AC's] racist behaviors towards Black staff or document the same;

- [E]mploy a team approach to [AC's] care that included collaboration and communication with frontline, impacted caregivers about his racist behaviors and how to track and document the same;

- [P]roactive[ly] inform Black staff in advance of [AC's] racist behaviors;

- [P]rovide advanced, targeted training to caregivers regarding [AC's] atypical behaviors towards Black staff or appropriate responses to it;

- [T]imely attempt to identify an appropriate placement for [AC]; or

- [E]xplore alternative interventions, such as the assignment of a one-on-one caregiver.

(Doc. 113-8 at 88.)

Based on the undisputed and disputed evidence, a reasonable jury could find that Elderwood failed to take reasonable, effective, and prompt remedial measures. *See Soto v. CDL (New York) L.L.C.*, 2020 WL 2133370, at *14 (S.D.N.Y. May 5, 2020) ("It is undeniable that [d]efendant took some action, but a reasonable jury could find that a reasonable response required more."); *see also Duch v. Jakubek*, 588 F.3d 757, 766 (2d Cir. 2009) ("If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate.") (emphasis and citations omitted); *MacMillan v. Millennium Broadway Hotel*, 2011 WL 4357523, at *6 (S.D.N.Y. Sept. 16, 2011) (denying summary judgment on a hostile work environment claim because "there are numerous factual issues about the promptness and adequacy of [d]efendant's remedial response[]").

Viewing the totality of the evidence in a light most favorable to the EEOC, a reasonable jury could find that the Staff's work environment was permeated with severe or pervasive racial discrimination and created an objectively and subjectively hostile work environment for which Elderwood did not take sufficiently prompt and effective remedial measures. The court therefore DENIES Elderwood's motion for summary judgment on the EEOC's hostile work environment claim.

107

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART the EEOC's motion to exclude Elderwood's expert Robert L. Fremed. (Doc. 112.) The court GRANTS the EEOC's motion to exclude Elderwood's expert Alan C. Horowitz. (Doc. 114.) The court GRANTS IN PART and DENIES IN PART Elderwood's motion to exclude the EEOC's expert Megan Carnarius. (Doc. 113.) The court DENIES Elderwood's motion for summary judgment (Doc. 115.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 26th day of March, 2026.

Christina Reiss, Chief Judge
United States District Court